## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                    **Plaintiff,**<br>     v.<br><br>**ROGER KNOX, WINTERCAP SA, MICHAEL T. GASTAUER, WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP., WINTERCAP SA INC. AND B2 CAP INC.**<br>                    **Defendants.**<br><br>**RAIMUND GASTAUER, SIMONE GASTAUER FOEHR, AND B21 LTD.**<br>                    **Relief Defendants.** | **Civil Action No. 18-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Roger Knox, Wintercap SA., Michael T. Gastauer, WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc.:

## SUMMARY

1.      This is a securities fraud enforcement action.  From at least June 2015 to the present (the "Relevant Period"), Roger Knox knowingly enabled public company control persons to fraudulently sell stock to investors.  In particular, Knox operated a business, Wintercap SA (formerly known as Silverton SA), through which Knox engaged in a scheme to fraudulently sell the stock of at least 50 publicly traded companies.  Knox, through Wintercap SA, generated approximately $165 million in fraudulent stock sale proceeds during the Relevant Period.  The scheme is ongoing.

2.      Knox provided a layer of disguise to public company insiders or control persons, who, acting in concert with Knox, intended to defraud investors by secretly dumping large quantities of stock in circumvention of registration and disclosure requirements imposed by the federal securities laws.

3.      Prior to selling stock, control persons are required to (a) register the stock with the Commission pursuant to Section 5 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including limitations on the amount of stock a control person can legally sell.  Also, investors in certain public companies are required to publicly disclose any ownership interest in excess of 5% of the company's publicly traded stock.  Such registration requirements, sale restrictions, and disclosure obligations are critical safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

4.      The control persons with whom Knox schemed sought to evade these registration and disclosure rules by concealing their identities (typically by holding the stock in corporate accounts that served as nominee stock holders) from the public, brokers, and regulators. Concealing the control persons' identities enabled them to secretly dump their stock—often millions of shares at a time—into the securities markets and perpetrate a fraud on investors.  In effect, the stock sales appeared as ordinary sales by ordinary investors, when the reality was that these were sales by control persons, such as corporate insiders who were dumping their holdings into the market in violation of the laws governing such sales.

5.      Knox—using the Wintercap SA platform—provided an essential layer of deception in furtherance of the fraudulent scheme.  Knox took possession of stock that had been

2

stashed in nominee entities by control persons so that brokers (and investors) would be unaware of the true beneficial owners. Wintercap SA deposited that stock into multiple omnibus brokerage accounts in Wintercap SA's name (accounts that do not reveal the identity of the underlying beneficial owners, such as the control persons). In order to complete transactions from the omnibus brokerage accounts, Knox falsely certified that Wintercap SA was not trading the stock on behalf of any control persons. In this manner, Knox, through Wintercap SA, sold the control persons' stock for a handsome profit, without any effective securities registration statement, and without adhering to conditions set forth in SEC Rule 144 concerning the sale of unregistered stock by control persons. Out of the proceeds of these illegal stock sales, Knox earned fees amounting to millions of dollars.

6.      For example, Wintercap SA fraudulently sold the publicly traded stock of Environmental Packaging Technologies Holdings, Inc. ("Environmental Packaging") and CURE Pharmaceutical Holding Corp. ("CURE") in 2017. Environmental Packaging and CURE were both controlled, directly or indirectly, by an individual and his team, referred to herein collectively as Control Group A. Control Group A used nominee corporate entities to secretly hold virtually all of the purportedly unrestricted stock of Environmental Packaging and of CURE. The purportedly unrestricted stock represented shares that were not marked as restricted shares and thus could be passed off as unrestricted shares (i.e., stock that could legally be bought and sold in the securities markets without restriction) by concealing the fact that the stock was actually owned by control persons and were restricted by law. Control Group A subsequently transferred much of this stock to Knox through Wintercap SA.

7.      Knox further disguised Control Group A's control of Environmental Packaging and CURE stock by depositing the stock in these companies into omnibus accounts at different

brokerage firms. By doing so, Knox concealed from each brokerage firm the total amount of stock Wintercap SA would be selling. And Knox knowingly or recklessly falsely represented to brokerage firms that Wintercap SA was selling less than 5% of the company's stock, and that Wintercap SA was not selling stock for control persons.

8.      Wintercap SA subsequently sold Control Group A's stock and generated millions of dollars of illegal proceeds. Wintercap SA, and in turn, Knox, earned a cut of those proceeds.

9.      Control Group A did not register these stock sales with the Commission all in violation of Sections 5(a) and (c) of the Securities Act.

10.     In order to secretly transfer these substantial sums out of brokerage accounts and to Knox or control persons, Knox coordinated with defendant Michael T. Gastauer ("Gastauer"). Gastauer substantially assisted Knox by establishing and using a number of U.S.-based entities and bank accounts to receive, and then further distribute, the proceeds of Wintercap SA's stock sales. When doing so, Gastauer repeatedly lied to banks (which have obligations to detect and report suspicious money movements) to make it seem as if he—not Knox—was the beneficiary of millions of dollars in stock sales, thereby distancing Knox from the money and essentially laundering the proceeds of the scheme.

11.     As a result of the conduct alleged herein, Knox and Wintercap SA violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 340.10b-5], Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], and Section 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)]. Knox and Wintercap SA also aided and abetted control persons' violations of Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) and Rules 10b-

5(a) and (c) thereunder. Also as a result of the conduct alleged herein, Gastauer, WB21 US Inc.,

Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. aided

and abetted violations of Knox and Wintercap SA, and unless retrained and enjoined, will

continue to aid and abet violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Section

10(b) of the Securities Exchange and Rule 10b-5 thereunder.

12.     The Commission seeks emergency preliminary relief, including a temporary

restraining order against further violations of the federal securities laws and an emergency asset

freeze to preserve the assets necessary to satisfy an eventual judgment against certain of the

Defendants, and the Commission seeks an emergency asset freeze to similarly preserve assets

held by the Relief Defendants. The Commission also requests an immediate accounting, a

repatriation order, and an evidence preservation order to facilitate the prompt resolution of this

matter on the merits.

13.     The Commission further seeks a permanent injunction against the Defendants,

enjoining them from engaging in the transactions, acts, practices, and courses of business alleged

in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)], an order barring Knox and Wintercap SA from participating in any offering of a

penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of

the Exchange Act [15 U.S.C. § 78u(d)] and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, during the Relevant Period, promotional materials concerning Environmental Packaging were mailed to various individuals' residences in Massachusetts, and certain individuals who reside in Massachusetts purchased stock of Environmental Packaging and CURE.

## DEFENDANTS

16.     Roger J. Knox, ("Knox"), age 47, is a citizen of the United Kingdom and resident of France.  Knox is the founder and chief executive officer of Wintercap SA.

17.     Wintercap SA, formerly known as Silverton SA, is a Swiss entity that purports to be an asset manager.  Wintercap SA trades stock for its clients, such as Control Group A, and sells that stock into the United States' securities market.

18.     Michael T. Gastauer, ("Gastauer"), age 43, is a citizen of Germany and resident of Switzerland.  Gastauer is the founder and chief executive of defendants WB21 US Inc. and Silverton SA Inc., which are Delaware corporations with a principal place of business at the same address in Palo Alto, California.  Gastauer is also the founder and chief executive of defendants WB21 NA Inc. and C Capital Corp., which are Delaware corporations that use a mailing address at the same location in New York, New York.

19.     Wintercap SA Inc. and B2 Cap Inc. are Delaware corporations that use a mailing

address in in New York, New York and are operated, directly or indirectly, by Gastauer.

## RELIEF DEFENDANTS

20.     Raimund Gastauer, and Simone Gastauer Foehr are relatives of Gastauer.

Gastauer, directly or indirectly, transferred at least $4.0 million to R. Gastauer and Foehr, or

accounts under their control or for their benefit, from the proceeds of Knox's illicit stock sales.

21.     B21 Ltd. is a United Kingdom-based entity, formerly controlled by Gastauer.

Gastauer transferred, directly or indirectly, approximately $560,000 to B21 Ltd. derived from

Knox's illicit stock sales.

## BACKGROUND

22.     "Restricted stock" is stock of a publicly traded company (also known as an

"issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not

registered with the Commission.  Stock held by an issuer or affiliate of an issuer is restricted

stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot

legally be offered or sold to the public unless a securities registration statement has been filed

with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains

important information about an issuer's business operations, financial condition, results of

operation, risk factors, and management.  It also includes disclosure of any person or group who

is the beneficial owner of more than 5% of the company's securities.

23.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through

one or more intermediaries, controls, is controlled by, or is under common control with, such

issuer (i.e., a control person).  "Control" means the power to direct management and policies of

the company in question.  Typically, affiliates include officers, directors and controlling

shareholders but any person who is under "common control" with or has common control of an issuer is also an affiliate.

24.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  For example, if a control person buys shares in the company s/he controls, those shares are subject to restrictions and ordinarily require a registration for bulk sales of such shares.

25.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.

26.     An "underwriter" is any person or entity, such as Knox or Wintercap SA, who either has purchased from an issuer with a view to distributing a security, or who offers or sells for an issuer (including an affiliate of an issuer) in connection with, the distribution of any security.

## FACTS

27.     During the Relevant Period, Knox engaged in a fraudulent scheme to sell unregistered shares of multiple companies.  Knox provided a platform through which control persons could conceal their identities while selling large amounts of stock to investors in the open market.  The stock held by control persons should have been registered before Knox,

8

through Wintercap SA, sold it, or restricted from resale.  More specifically, during the Relevant

Period, Knox schemed to conceal the identities of the control persons who were selling stock.

The fraudulent stock sales, and Knox's role in providing the platform for consummating those

sales, followed a general pattern, as follows:

    i. *First*, control persons acquired control of a public company by acquiring most, if not all, of the public company's stock.

    ii. *Second*, control persons transferred the public company's purportedly unrestricted stock to nominee entities.  These transfers were typically made in blocks of less than 5% of the total outstanding shares of the issuer, in order to evade disclosure obligations and deflect scrutiny by brokers.  Knox also offered a service to control persons through which Knox, directly or indirectly, created offshore nominee entities for control persons for a fee.

    iii. *Third*, Knox further concealed the control persons' ownership by typically arranging for the issuer's transfer agent to transfer the shares from the nominee entities into Wintercap SA's name, creating the appearance that Wintercap SA was the owner of the stock at that time.

    iv. *Fourth*, Knox coordinated with the issuer's transfer agent to deposit the stock in a United States electronic trading system, which enabled Knox to designate multiple brokerage accounts to trade the shares electronically on United States securities markets.

    v. *Fifth*, Knox, directly or indirectly, transferred the control persons' stock into omnibus brokerage accounts in Wintercap SA's name.  This step helped to further obscure the control persons' ownership of the stock—because brokers

generally do not require omnibus account holders to reveal the identity of the underlying beneficial owners (i.e., the control persons).

vi. *Sixth*, Knox, directly or indirectly, distributed the shares to the various omnibus brokerage accounts in blocks of less than 5% of the total outstanding shares of the issuer. By staying below 5%, Knox evaded disclosure obligations and sought to avoid triggering direct inquiries by compliance personnel in the brokerage firms, who may inquire concerning their customers, like Wintercap SA, before allowing the deposit and sale of securities.

vii. *Seventh*, Knox, through brokerage accounts held by Wintercap SA, dumped the control persons' stock into the securities markets. The "dump" phase of the scheme typically included a promotional campaign funded by the control persons to generate public interest in the stock, which often artificially inflated the market price of the stock.

### Example One: Environmental Packaging

28.     Environmental Packaging is a publicly traded company that was incorporated in Nevada in 2011.

29.     In or about August 2013, a member of Control Group A acquired, directly or indirectly, substantially all of the stock of Environmental Packaging. Control Group A also made management and other corporate decisions concerning Environmental Packaging after taking possession of the company's stock. Control Group A, therefore, was an affiliate of Environmental Packaging and continued to be an affiliate of Environmental Packaging through at least June 2017.

30.     On or about June 21, 2017, Environmental Packaging filed a Form 8-K with the Commission announcing a merger, and disclosed "securities ownership of certain beneficial owners and management," including "5% Shareholders" based on approximately 61 million outstanding shares of Environmental Packaging stock as of June 9, 2017. Environmental Packaging did not disclose, however, Control Group A's ownership of significantly more than 5% of Environmental Packaging's stock.

31.     Control Group A used a series of offshore corporations (the "Environmental Packaging Nominees") to conceal its stock ownership. Prior to the June 21, 2017 Form 8-K filing with the Commission, Control Group A distributed its stock into four Environmental Packaging Nominees, each of which were intended to hold less than 5% of the total number of issued and outstanding shares as reported by Environmental Packaging on June 21, 2017.

32.     By April 2017, Control Group A engaged Knox to sell its stock. At or about that time, Control Group A transferred most of the purportedly unrestricted stock to Wintercap SA. Knox agreed to a profit sharing arrangement with Control Group A pursuant to which Wintercap SA would receive 6% of the stock sale proceeds.

33.     Knox, in furtherance of the scheme, orchestrated the deposit of Control Group A's stock into omnibus accounts held by Wintercap SA in multiple unrelated brokerage firms:

      i.   On or about April 12, 2017, Wintercap SA deposited approximately 2.7 million shares of Control Group A's purportedly unrestricted Environmental Packaging stock with Broker A; and

     ii.   On or about April 27, 2017, Wintercap SA deposited another approximately 2.6 million shares of Control Group A's purportedly unrestricted Environmental Packaging stock with Broker B.

34.     In or about April 2017, Control Group A transferred another approximately 2.6 million shares of purportedly unrestricted Environmental Packaging stock to Wintercap SA. Wintercap SA subsequently sought to deposit that stock in a United States-based brokerage account.  But prior to accepting that stock, a third broker (Broker C) required Knox to complete a "Deposit Securities Request" form.

35.     A basic principle that governs Section 5 of the Securities Act is that all transactions, such as Knox's (or Wintercap SA's) prospective sale of Control Group A's stock, must be registered unless an exemption provided by the Securities Act applies to the transaction. An exemption may apply to certain "brokers' transactions," if "after reasonable inquiry [the broker] is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities, or that the transaction is part of a distribution of securities of an issuer."  Here, Broker C required a representative of Wintercap SA (here, Knox) to complete a "Deposit Securities Request" form.

36.     Knox knew, or was reckless in not knowing, that he, through Wintercap SA, would be selling unregistered stock without an exemption from registration.  Indeed,  Knox's role was to distribute the stock of Environmental Packaging for the company's affiliates, Control Group A.

37.     In an effort to avoid detection, Knox made false or misleading statements to Broker C on its Deposit Securities Request form.  Specifically, when completing the Deposit Securities Request form, Knox falsely answered a series of questions regarding the quantity of the stock Wintercap SA controlled, held, or in which it transacted.  These false answers were designed to fraudulently conceal the fact that Knox and Wintercap SA, and the control persons for whom they would be selling stock, were involved in transactions that required registration.

38.     For example, Broker C asked on the Deposit Securities Request: "Have you or any affiliated accounts deposited shares of [Environmental Packaging] within the last 90 days." Knox responded "no." That answer was false. Wintercap SA had, within just the prior 30 days, deposited a significant percentage of Environmental Packaging stock through Wintercap SA at Brokers A and B.

39.     Broker C asked on the Deposit Securities Request: "Are you currently selling shares thru [sic] any other broker dealer." Knox said "no." Although Knox, through Wintercap SA, had not yet begun to sell Environmental Packaging stock through Brokers A and B, which they had deposited in April 2017, Knox intended to, and did, sell that stock promptly thereafter. Knox's response to this request was misleading and designed to represent that it had only intended to sell Environmental Packaging stock through Broker C.

40.     Broker C asked on the Deposit Securities Request: "How many shares have been purchased by, issued to, or transferred to [Wintercap] within the last year?" Knox falsely represented that approximately 2.6 million shares, which represented only the amount Wintercap SA sought to deposit with Broker C, had been transferred to Knox in the last year when, in reality, approximately 8 million shares had been previously transferred to, and deposited by, Knox through Wintercap SA in or about April 2017.

41.     Broker C asked on the Deposit Securities Request form: "How many shares of [Environmental Packaging] are owned or controlled by, directly or indirectly, you?" Knox falsely represented "0" in response to this question. In reality, approximately 5.2 million shares had been previously transferred to, and deposited by Wintercap SA in April 2017, separate from and in addition to the 2.6 million shares Wintercap SA sought to deposit with Broker C.

42.     Broker C asked on the Deposit Securities Request: "Was the prior owner an officer, director, affiliate, or control [sic] or 10% holder of the securities at the time or within 90 days of [Silverton's] receipt of the security." Knox falsely responded: "No." Knox knew, or was reckless in not knowing, that Control Group A was an affiliate of Environmental Packaging. Indeed, the same individual representing Control Group A transferred Environmental Packaging's stock from each of the Environmental Packaging Nominees to Knox through Wintercap SA, and Wintercap SA's aggregate receipt of Control Group A's stock in or about April 2017 comprised approximately 13% of Environmental Packaging's outstanding stock by May 2017.

43.     Broker C asked on the Deposit Securities Request: "Are you, or have you been, an officer, director, affiliate, control person, or 5% owner of the issuer." Knox falsely responded: "No." In fact, (a) Wintercap SA had become the official record owner of Environmental Packaging stock when Control Group A transferred it to Knox in or about April 2017; (b) Wintercap SA's aggregate receipt of Control Group A's stock in or about April 2017 comprised approximately 13% of Environmental Packaging's outstanding stock by May 2017; and (c) Knox identified Wintercap SA on the Deposit Securities Request as the "shareholder."

44.     Knox signed Broker C's Deposit Securities Request on or about May 2, 2017.

45.     On or about May 3, 2017, Broker C allowed Knox, through Wintercap SA, to deposit approximately 2.6 million shares of Environmental Packaging stock.

46.     With close to 8 million shares of stock now deposited by Knox into multiple brokerage accounts and available for trading, Control Group A sought to promote Environmental Packaging's stock with Knox's substantial assistance. To this end, Control Group A prepared to fund a promotional campaign in order to create public interest in the stock among investors and

14

thereby attempt to drive up the company's stock price. Control Group A, however, wanted to fraudulently conceal its connection to the promotional campaign. To that end, Control Group A asked Knox to create an offshore nominee account to secretly pay for the promotional campaign.

47.     On or about May 19, 2017, a representative of Control Group A wrote an email to Knox which states, in pertinent part: "[w]e need to form an entity with the name Svarna LLC . . . ." The representative of Control Group A also told Knox that Control Group A would provide the name of an individual that could be used as the "beneficial owner" of Svarna LLC—that is, someone not directly connected to the scheme, but who would be listed as the owner of Svarna on its incorporation paperwork. The representative of Control Group A also stated in this email to Knox, in sum and substance, that the Svarna entity would be used as a conduit to pay a stock promoter.

48.     On or about May 22, 2017, Knox emailed the following to the representative of Control Group A: "[a]s discussed, the amended Marshall Island company name Svarna Ltd is available and incorporation has been requested today." As promised, Control Group A provided the "beneficial ownership" information, including the curriculum vitae, for Svarna's newly minted owner. The individual identified as the owner of Svarna was the girlfriend of one of Control Group A's members, and had limited business experience.

49.     Shortly thereafter, Control Group A arranged for Environmental Packaging to transfer approximately $1 million to Wintercap SA in the name of Svarna. Knox subsequently caused Wintercap SA to transfer approximately $1 million, on behalf of Svarna, to a stock promoter through a Gastauer-controlled account. The stock promoter then orchestrated a promotional campaign for the stock of Environmental Packaging at the direction of Control Group A and instructed the publishers of the promotional material to list Svarna as the paying

party for the promotions. The promotional campaign effectively increased the market activity in Environmental Packaging's stock.

50. The average daily trading volume of Environmental Packaging's stock during May 1, 2017, through June 9, 2017 (a Friday), was less than 23,000 shares per day, and on most days during that period of time, Environmental Packaging's stock did not trade at all in the public securities markets. But, on or about June 12, 2017, the first day of Control Group A's paid promotional campaign, approximately 424,956 shares of Environmental Packaging traded in the public securities markets, of which approximately 114,000 shares were Control Group A's stock, sold by Wintercap SA.

51. On or about June 13, 2017, approximately 226,263 shares of Environmental Packaging traded in the public securities markets, of which approximately 66,000 shares were Control Group A's stock, sold by Wintercap SA.

52. Thereafter, Wintercap SA continued to sell Control Group A's stock. Between approximately June 14 and 27, 2017, Knox caused Wintercap SA to dump approximately 567,000 additional shares of Environmental Packaging stock into the public securities markets to investors. Knox's sale of Control Group A's Environmental Packaging stock in June 2017 generated approximately $1.3 million in trading proceeds.

53. Control Group A, Knox, and Wintercap SA failed to register these stock sales pursuant to Section 5 of the Securities Act. Therefore, Control Group A's Environmental Packaging stock should have been restricted from resale because Control Group A was affiliated with Environmental Packaging. Control Group A, Knox, and Wintercap SA also failed to meet the conditions of SEC Rule 144.

54.     On June 27, 2017, the Commission suspended trading in the securities of Environmental Packaging pursuant to Section 12(k) of the Exchange Act due to, among other things, trading activity that reflected manipulative trading and deceptive devices.

55.     After the Commission suspended trading on June 27, 2017, members of Control Group A became concerned that regulators or law enforcement would figure out that Control Group A had sold Environmental Packaging stock.  Control Group A and Knox schemed to cover up their fraudulent conduct.  To avoid direct association with the stock sales in the first place, Control Group A had installed individuals as the supposed beneficial owners of the Environmental Packaging Nominees.  Knox kept track of these "beneficial owners" on a Swiss-regulatory form called a "Form A," which is a form that asset managers like Wintercap SA maintain to track beneficial ownership information of assets.

56.     On paper (the Form As) prior to the Commission's trading suspension, the people listed as beneficial owners were individuals who had been selected based on familial or personal connections to the members of Control Group A.  After the Commission suspended trading in the stock of Environmental Packaging, members of Control Group A became concerned that the supposed beneficial owners of the Environmental Packaging Nominees could easily be traced back to the members of Control Group A.

57.     In or about September 2017, two representatives of Control Group A met with Knox and his business partner in Switzerland to discuss Control Group A's concern.  To allay those concerns, Knox advised them that Control Group A should change the names of the purported beneficial owners on the Form As and should use the names of people who were not so obviously connected to Control Group A.  Knox further advised them that the Form As should

be changed before December 2017 because a Swiss regulator was scheduled to audit Wintercap SA's records.

58.     Prior to December 2017, representatives of Control Group A filled out replacement forms that purported to reflect the beneficial ownership of Environmental Packaging stock.  To complete the concealment, the Control Group A representatives fraudulently backdated the forms to create the false appearance that the beneficiaries had been in place prior to the initial deposit of shares with Wintercap SA.  Knox then caused Wintercap SA to delete all references to the prior Form As in the company's files and replaced the old Form As with the new ones.

### Example Two: CURE

59.     CURE is a publicly traded company that was incorporated in Nevada in 2014.

60.     In or about June 2016, a member of Control Group A acquired, directly or indirectly, substantially all of the stock of CURE.  Control Group A also made management and other corporate decisions concerning CURE after taking possession of the company's stock.  Control Group A, therefore, was an affiliate of CURE and continued to be an affiliate of CURE through at least March 2017.

61.     Control Group A used a series of offshore corporations (the "CURE Nominees") to conceal its stock ownership by distributing its stock to the CURE Nominees in less than 5% tranches.  Therefore, on paper, no CURE Nominee held more than 5% of CURE's outstanding stock.  Then, in early 2017, CURE publicly filed with the Commission an annual report on Form 10-K and represented that it disclosed "any holder of more than five (5%) of CURE's" including "5% Shareholders" based on approximately 23.3 million outstanding shares of CURE stock as of

December 31, 2016. CURE, however, did not disclose Control Group A's ownership over more than 5% of the company's stock.

62.     Control Group A then engaged Knox to sell the stock held by the CURE Nominees through Wintercap SA. Knox knew, or was reckless in not knowing, that Control Group A controlled each of the CURE Nominees. Indeed, the same representative of Control Group A made each transfer of CURE stock to Wintercap SA.

63.     On or about February 7, 2017, a representative of Control Group A emailed the following to Knox: "As discussed, please find attached our confirmation of the [beneficial owner] for the three [CURE Nominees]. I believe this satisfies are [sic] requirements. I need to instruct the [transfer agent] to transfer the respective shares to Silverton."

64.     Shortly thereafter, Control Group A, through the CURE Nominees, transferred more than 3 million shares of CURE stock—or more than 13% of CURE's outstanding shares of stock and 54% of CURE's purportedly unrestricted stock—to Wintercap SA so Knox could sell the stock. Knox, in turn, agreed to a profit sharing arrangement with Control Group A pursuant to which Wintercap SA would receive 6% of the stock sale proceeds.

65.     In furtherance of the scheme, Knox, through Wintercap SA, subsequently deposited Control Group A's stock into two unrelated brokerage firms in omnibus accounts as follows:

> i. On or about March 3, 2017, Knox deposited approximately 1.1 million shares of Control Group A's purportedly unrestricted CURE stock into accounts at Broker A;

    ii.  On or about March 3, 2017, Knox deposited approximately 982,202 shares of Control Group A's purportedly unrestricted CURE stock into accounts at Broker C;

    iii.  On or about March 16, 2017, Knox deposited another approximately 1 million shares of Control Group A's purportedly unrestricted CURE stock into accounts at Broker A.

66.    Prior to depositing stock with Broker A on or about March 16, 2017, Broker A required a Wintercap SA representative to fill out an "Equity Authentication Form" pursuant to its reasonable inquiry process to determine whether the stock could be sold without registration.

67.    Knox knew, or was reckless in not knowing, that he and Wintercap SA were acting as underwriters because they intended to distribute the stock of CURE for the company's affiliates, Control Group A. In an effort to avoid detection, Knox made false or misleading statements to Broker A on its Equity Authentication Form.

68.    Broker A asked on the "Equity Authentication Form": "How many shares have been issued to, or transferred to, [Silverton] within the last year." Knox falsely responded: "1,101,600." This number of shares reflected the amount of shares initially transferred to Broker A on or about March 3, 2017. Knox failed to inform Broker A that Knox, through Wintercap SA, had also received, and deposited shortly thereafter, approximately 982,202 shares to Broker C by March 3, 2017.

69.    Broker A asked on the "Equity Authentication Form": "Was the Prior Owner an officer, director, affiliate, control or 10% holder of the securities at the time, or within 90 days, of [Silverton's] receipt of the security." Knox falsely responded: "No." Knox knew, or was reckless in not knowing, that Control Group A was an affiliate of CURE. As described in

Paragraphs 62 through 64, the same individual representing Control Group A transferred CURE's stock from each of the CURE Nominees to Wintercap SA. Knox thus knew, or recklessly disregarded, that the number of shares transferred to Wintercap SA by Control Group A—which Knox subsequently divided between accounts with Brokers A and C—comprised more than 10% of CURE's outstanding shares.

70.     On or about March 15, 2017, Knox signed Broker A's Equity Authentication Form.

71.     Between approximately March 10 and 21, 2017, Knox, through Wintercap SA, dumped approximately 147,647 shares of CURE stock. At or about the same time, CURE issued approximately eight press releases and Control Group A paid to market the company, and there was a price and daily trading volume spike of CURE's stock. Knox, through Wintercap SA, sold Control Group A's stock for proceeds of approximately $1 million.

72.     Control Group A, which also sold additional shares of CURE stock through another intermediary, failed to register its stock sales with the Commission pursuant to Section 5 of the Securities Act. Consequently, Control Group A's sale of unregistered CURE stock should have been restricted from resale because Control Group A was an affiliate of CURE. Control Group A also failed to meet the conditions of SEC Rule 144.

73.     As they did with regard to Environmental Packaging, members of Control Group A became concerned that regulators or law enforcement would figure out that Control Group A had sold CURE stock after the Commission suspended trading in the securities of Environmental Packaging.

74.     At the same meeting described in Paragraph 57, two representatives of Control Group A also discussed Control Group A's concern about the CURE Nominees. As he did with

Environmental Packaging, Knox advised Control Group A's representatives that Control Group A should change the names of the purported beneficial owners on the Form As and should use the names of people who were not so obviously connected to Control Group A. Knox further advised them that the Form As should be changed before December 2017 because a Swiss regulator was scheduled to audit Silverton's records.

75. Prior to December 2017, representatives of Control Group A filled out replacement forms that purported to reflect the beneficial ownership of CURE stock. To complete the concealment, the Control Group A representatives fraudulently backdated the forms, to create the false appearance that the beneficiaries had been in place prior to the initial deposit of shares with Wintercap SA. Knox then caused Wintercap SA to delete all references to the prior Form As in Wintercap SA's files and replaced the old Form As with the new ones.

### Example Three: Garmatex

76. Garmatex Holdings, Ltd., formerly known as Oaxaca Resources Corp., ("Garmatex") operated as a publicly traded company at times during the Relevant Period, and was incorporated in Nevada in 2014.

77. Between approximately August 26 and September 2, 2014, approximately 32 Mexican nationals purportedly purchased 1,200,000 shares of Garmatex for a total of just $9,000 in a registered securities offering (the "S-1 Shareholders").

78. On or about September 11, 2014, Garmatex's board of directors directed Garmatex's transfer agent to send all of the share certificates purportedly owned by the S-1 Shareholders to a law firm based in Nevada. The certificates purportedly issued to the S-1 Shareholders were, in reality, controlled by one or more parties acting in concert and in control of Garmatex (the "Garmatex Affiliate(s)").

22

79.     On or about February 28 and March 16, 2017, the Garmatex Affiliate(s) transferred a total of 5,250,000 shares of Garmatex stock to offshore nominee entities.  The Garmatex Affiliate(s) divided the transfers into three equal parts, transferring 1,750,000 to each of the three separate entities.

80.     In or about March 2017, Garmatex filed with the Commission a Form 8-K in which it disclosed, among other things, its 5% stockholders.  As of March 8, 2017, Garmatex disclosed approximately 35.4 million outstanding shares in a Form 8-K.  Each of the nominee entities referenced in Paragraph 79 held just under 5% of Garmatex's stock pursuant to its Form 8-K but, in reality, the Garmatex Affiliate(s) controlled each of these nominee entities. Garmatex did not disclose the stock held by the Garmatex Affiliate(s) referenced in Paragraph 79, which collectively comprised close to 15% of Garmatex's outstanding stock.  On or about March 13, 15, and 16, 2017, the Garmatex Affiliate(s) orchestrated the transfer of 5,250,000 shares of Garmatex stock to Wintercap SA in three equal parts.

81.     On or about the same days, Wintercap SA deposited these stock in accounts they controlled at Brokers A and C and began selling it in furtherance of the scheme.

82.     Knox knew, or was reckless in not knowing, that an individual or group of individuals working in concert—here, the Garmatex Affiliate(s)—coordinated and directed the transfer and ultimate disposition of close to 15% of Garmatex's stock by mid-March 2017 and, therefore, were control persons of Garmatex.

83.     In or about April 2017, the Garmatex Affiliate(s) deposited two additional tranches of Garmatex stock with Wintercap SA, most of which Wintercap SA subsequently deposited and sold without an effective registration statement in effect.  Overall, the Garmatex Affiliates transferred approximately 20% of Garmatex's outstanding stock to Wintercap SA

within just two months. Knox, through Wintercap SA, sold all of that stock. Knox coordinated those stock sales at or about the same time the Garmatex Affiliate(s) orchestrated a promotional campaign that increased the price and volume of Garmatex's stock.

84.     The Garmatex Affiliate(s), Knox, and Wintercap SA did not register the Garmatex stock with the Commission pursuant to Section 5 of the Securities Act, or comply with the conditions of SEC Rule 144.

85.     Wintercap SA's sale of Garmatex stock in or about March and April 2017 generated over $5 million in illicit proceeds.

*  *  *

86.     In addition to the stock of Environmental Packaging, CURE, and Garmatex, Knox, through Wintercap SA, also sold the stock of numerous other publicly traded companies without an exemption from registration or effective registration in effect with the Commission pursuant to Section 5 of the Securities Act during the Relevant Period.

87.     The table set forth below in this Paragraph identifies examples, without limitation, of sales for which no effective registration statement was filed. Each example in that table illustrates how control persons transferred, directly or indirectly, purportedly unregistered that to Wintercap SA, which Wintercap SA subsequently sold after the purportedly unregistered stock was deposited with brokers (i.e., "Shares Available for Trading"). By doing so, Knox and Wintercap SA acted as underwriters because they distributed stock for control persons. And, on each occasion, no registration exemption applied, and the control persons, Knox, and Wintercap SA failed to comply with the conditions of SEC Rule 144.

| Issuer | Date of First Transfer to Wintercap SA | Nominees Used To Aggregate Shares | Cumulative Wintercap SA Shares Available for Trading | Total Shares Available for Trading As of Last Wintercap SA Deposit | Wintercap SA Percentage of Shares Available for Trading | Minimum Gross Proceeds to Wintercap SA |
|---|---|---|---|---|---|---|
| ARSN | 8/4/2016 | 3 | 11,025,000 | 21,150,000 | 52.1% | $ 938,224 |
| CURR | 3/3/2017 | 3 | 3,091,802 | 5,729,810 | 54.0% | $ 1,031,048 |
| DIGAF | 9/7/2016 | 14 | 15,910,000 | 18,581,781 | 85.6% | $ 4,001,095 |
| DVGG / RETC | 6/13/2017 | 3 | 18,366,018 | 18,416,592 | 99.7% | $ 8,371,665 |
| ENVV | 6/16/2015 | 5 | 18,250,000 | 29,986,500 | 60.9% | $ 4,155,097 |
| GLBB | 4/25/2017 | 2 | 900,000 | 1,365,000 | 65.9% | $ 752,230 |
| GRMX | 3/13/2017 | 5 | 7,233,337 | 13,858,337 | 52.2% | $ 5,016,997 |
| ORRP | 4/29/2016 | 5 | 11,050,000 | 14,999,500 | 73.7% | $ 7,853,086 |
| EPTI | 4/12/2017 | 3 | 7,833,344 | 8,050,423 | 97.3% | $ 1,310,751 |
| GLLK | 10/28/2015 | 4 | 9,900,000 | 26,400,351 | 37.5% | $ 1,601,076 |
| NEWG | 8/10/2016 | 3 | 3,600,000 | 6,800,000 | 52.9% | $ 1,929,147 |
| PSCR | 6/27/2016 | 7 | 15,359,998 | 17,909,998 | 85.8% | $ 3,781,011 |
| PSNP | 10/5/2015 | 2 | 6,676,450 | 27,855,450 | 24.0% | $ 1,960,469 |
| SPRN | 2/28/2017 | 4 | 11,450,000 | 21,691,615 | 52.8% | $ 1,326,243 |
| SRUP | 11/16/2016 | 6 | 10,446,672 | 10,763,339 | 97.1% | $ 2,727,225 |
| UMFG | 3/31/2017 | 4 | 19,250,000 | 22,291,754 | 86.4% | $ 1,918,749 |
| VBIO | 6/3/2015 | 20 | 8,837,065 | 19,622,915 | 45.0% | $ 11,773,801 |
| ZENO | 9/27/2016 | 3 | 4,432,050 | 10,924,836 | 40.6% | $ 4,362,333 |
| **TOTAL** | | | | | | $ 64,810,246 |

88.     Knox's fraudulent enterprise is ongoing.  As recently as June 2018, a witness cooperating with the Federal Bureau of Investigation recorded a conversation with Knox.  Knox described his business model, including, among other things: (a) his use of nominee accounts to segregate stock into tranches of less than 5%; (b) his use of multiple brokers to sell stock to avoid scrutiny; (c) his understanding that he is ultimately selling stock for control persons; and (d) his plans to continue conducting business in that manner.

### Monetary Transfers

89.     Wintercap SA's sale of unregistered stock generated approximately $165 million in proceeds during the Relevant Period.  Knox traded stock through Wintercap SA's name through United States-based brokerage accounts (such as Broker C) and foreign brokerage accounts (such as Broker A).

90.     In or about 2016, Knox began working with Gastauer, who controlled "WebBank 21 Group" or "WB21 Group," to facilitate Knox's transfer of Wintercap SA's stock sale proceeds.

91.     In public marketing materials, Gastauer claims that WB21 Group is a virtual bank that offers a solution to "streamline" customers through banks' know-your-customer requirements, stating: "[a]ccount opening for you or your business can be difficult if you are not in the same country as your Bank or if you are in an industry that most Banks would not support." In reality, WB21 Group was not a registered bank, and Gastauer's "solution" was actually a circumvention of banking regulations designed to disguise his clients'—here, Knox's and Wintercap SA's—identities.

92.     In or about October 2015, Gastauer founded a WB21 Group U.S. affiliate, WB21 US Inc. Gastauer opened several bank accounts in three large U.S.-based banks in the name of WB21 US Inc. and was the sole signing authority for each. In account opening forms, Gastauer made false statements to banks, describing WB21 US Inc. as a software company that had Apple and Google as "major suppliers." In reality, Gastauer opened WB21 US Inc. to enable Knox to move Wintercap SA's money to, or for the benefit or direction of, Wintercap SA's clients (i.e., control persons) and other destinations.

93.     Between approximately December 2015 and August 2016, the primary source of funds in the WB21 US Inc. bank accounts were deposits from Wintercap SA's bank accounts in Latvia and Mauritius. Indeed, Gastauer enabled Knox to move millions of dollars through Gastauer's U.S. bank accounts under the false pretense that the money was generated through WB21 US Inc.'s purported venture capital business.

94.     In addition to the foregoing, Knox also sought to transfer the money he generated through Wintercap SA's unregistered and fraudulent stock sales out of U.S. brokerage accounts to third parties.   To that end, in or about June 2016, Knox asked one of Wintercap SA's brokers to link Wintercap SA's brokerage account to the WB21 US Inc. bank account for purposes of facilitating wire transfers.  The broker rejected the request because WB21 US Inc. was not, in the broker's opinion, a recognized bank.  Indeed, WB21 US Inc. was not a registered bank.  And, in general, brokers often scrutinize transfers between unaffiliated accounts, such as a transfer from a brokerage account held in Wintercap SA's name to a bank account held in a different name, whereas "first-party transfers" (i.e., transfers between accounts held in the same name) are generally less scrutinized.

95.     In or about August 2016—shortly after Knox's June 2016 request was rejected— Gastauer, directly or indirectly, formed Silverton SA Inc. as a U.S. corporation, listing himself as the principal of the company (at the time, Wintercap SA was operating under, and had brokerage accounts in, the name of Silverton SA).  Gastauer then established bank accounts in the name of Silverton SA Inc.

96.     When communicating with banks, Gastauer falsely represented that Silverton SA Inc. was his venture capital firm.  For example, on or about August 18, 2016, Gastauer said the following in an email to a representative of one of the banks: "Silverton is one of our companies. I am using [Silverton] to fund WB21.  Other than myself funding WB21, we are in the process of raising Venture Capital from investors."  Gastauer knew, or was reckless in not knowing, that these statements were false.  Gastauer knew, or was reckless in not knowing, that he was substantially assisting Knox's and Wintercap SA's unregistered and fraudulent sale of stock by disguising Knox's transfer of the proceeds of the stock sales to third parties.

97.     Indeed, in the same August 18, 2016 email, Gastauer also took steps to cover-up

Knox's conduct after the bank asked for an explanation for certain outgoing wire transactions.

Even though it was actually Knox and/or Knox's clients, through Wintercap SA, who had

directed the transfers to third parties, Gastauer falsely claimed that: "[These entities] are working

with us to find VC investors. They are getting a commission paid for placing investments."

And, in or about May 2017, a bank representative asked Gastauer in a telephone conversation

about certain transfers involving Silverton SA Inc., and he replied: "that's a pure investment

company that is my own personal  vehicle . . . I invest in different types of asset classes, real

estate is one of them, but other types of investment vehicles include companies that are selling

stock, like venture capital/private equity type of investment."

98.     To further conceal the source of money, Gastauer also established two other U.S.

entities, WB21 NA Inc. and C Capital Corp. (and established bank accounts for each) between

approximately August 2016 and December 2016.  During the Relevant Period, Gastauer and

Knox often routed money, directly or indirectly, from the Silverton SA Inc. U.S. bank account to

the WB21 NA Inc., WB21 US Inc., C Capital Corp., and B2 Cap, Inc. U.S. bank accounts before

the money was ultimately disbursed to third parties.

99.     Also during the Relevant Period, Gastauer routinely used the foregoing entities

and related bank accounts to almost exclusively receive and distribute the proceeds of Knox's

and Wintercap SA's unregistered and fraudulent stock sales.  And, Gastauer continued to

substantially assist Knox by misrepresenting material information to banks.

100.    For example, on or about March 21, 2017, Gastauer emailed the following false

statement to a bank representative who had asked a series of questions about Silverton SA Inc.'s,

business activity on behalf of the bank's regulation department: "Silverton is my personal investment vehicle, which I use to fund the operations of WB21 (US) Inc."

101.    Also, on or about December 4, 2017, Gastauer emailed the following false statement to a bank representative who had asked for a description of the "nature of business for Silverton SA Inc.": "Silverton SA Inc. is a business that has been incorporated by myself, to serve as my private investment vehicle. I am using Silverton to hold my funds in different type [sic] of investment accounts with several banks. The company is managing my liquidity and holds cash to allow me funding my other businesses." In reality, and as Gastauer knew, Silverton SA Inc. was a company he created to facilitate the transfer of money generated from Knox and Wintercap SA. But, consistent with Gastauer's false statements to banks, Gastauer did not include Knox's name on the U.S. bank account opening forms or U.S. corporation records.

102.    In or about February 2018, Knox changed Silverton SA's name to Wintercap SA. In response, Gastauer, directly or indirectly, created U.S.-based Wintercap SA Inc. and B2 Cap Inc. (and corresponding bank accounts) to continue funneling money for Knox. Overall, Gastauer controlled more than 20 bank accounts in the names of defendants WB21 U.S. Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., or B2 Cap Inc. for the purpose of facilitating Knox's sale of unregistered stock and fraudulent scheme.

103.    During the Relevant Period, Knox repeatedly also made false or misleading statements to brokers by representing, in sum and substance, that he was transferring the proceeds of his stock sales to his own bank accounts pursuant to first-party relationships. Consequently, Knox successfully transferred millions of dollars of sale proceeds from Wintercap SA's brokerage accounts into the bank accounts that had been established, and purportedly held for the benefit of, Gastauer and his entities. From there, Knox, directly or indirectly, transferred

29

the proceeds out of the United States and/or to accounts set up by the control persons, while keeping a cut for himself.

## Relief Defendants

104.    Gastauer also transferred, directly or indirectly, millions of dollars of Wintercap SA's stock sale proceeds to the Relief Defendants for no legitimate purpose or consideration.

105.    Between approximately December 26, 2017 and February 27, 2018, Gastauer caused WB21 US Inc. and C Capital Corp to transfer approximately $3.3 million to Gastauer's father, Raimund Gastauer, or accounts held for Raimund Gastauer's benefit.

106.    Between approximately April 7, 2016 and July 6, 2017, Gastauer used his personal bank accounts in the U.S. to transfer approximately $736,000 to Simone Gastauer Foehr, or accounts held for Simone Gastauer Foehr's benefit.  Gastauer's personal bank accounts in the U.S. were funded with Wintercap SA proceeds paid through WB21 US Inc. and C Capital Corp.  On information and belief, Simone Gastauer Foehr is Gastauer's relative.

107.    Between approximately March 2, 2018 and April 13, 2018, Gastauer caused C Capital Corp and WB21 US Inc. to transfer approximately $560,000 to B21 Ltd., an entity previously controlled by Gastauer.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a) of the Securities Act)

108.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

109.    By reason of the conduct described above, Knox and Wintercap SA, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

110.    By reason of the conduct described above, Knox and Wintercap SA each violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5 thereunder)

111.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

112.    By reason of the conduct described above, Knox and Wintercap SA, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

113.    By reason of the conduct described above, Knox and Wintercap SA each violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
#### (Violations of Sections 5(a) and 5(c) of the Securities Act)

114.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

115.    By reason of the conduct described above, Knox and Wintercap SA, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraph 87, as to which no registration statement has been filed and for which no exemption from registration has been available.

116.    As a result, Knox and Wintercap SA each violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act)**

117.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

118.    By reason of the conduct described above, control persons, including Control Group A, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

119.    By reason of the conduct described above, control persons, including Control Group A, directly or indirectly (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the stock of Environmental Packaging and/or CURE, as to which no registration statement has been filed and for which no exemption from registration has been available.

120.    Knox and Wintercap SA knowingly or recklessly provided substantial assistance to control persons, including Control Group A, in their violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act.

121.    As a result, Knox and Wintercap SA each violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

## FIFTH CLAIM FOR RELIEF
## UNREGISTERED BROKER-DEALER
### (Violations of Section 15(a)(1))

122.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

123.    Knox and Wintercap SA, by engaging in the conduct described above, either directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

124.    As a result, Knox and Wintercap SA violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## SIXTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 20(e) of the Exchange Act)

125.     Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

126.     By reason of the conduct described above, control persons, including Control Group A, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

127.     Knox and Wintercap SA knowingly or recklessly provided substantial assistance to control persons, including Control Group A, in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

128.     As a result, Knox and Wintercap SA each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act)

129.     Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

130.     By reason of the conduct described above, Knox and Wintercap SA, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

131.     By reason of the conduct described above, Knox and Wintercap SA, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraph 87, as to which no registration statement has been filed and for which no exemption from registration has been available.

132.    Gastauer, WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. knowingly or recklessly provided substantial assistance to Knox and Wintercap SA in their violations of Sections 5(a), 5(c), and 17(a) of the Securities Act.

133.    As a result, Gastauer, WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. each violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

### EIGHTH CLAIM FOR RELIEF
### AIDING AND ABETTING
#### (Violations of Section 20(e) of the Exchange Act)

134.    Paragraphs 1 through 107 above are re-alleged and incorporated by reference as if fully set forth herein.

135.    By reason of the conduct described above, Knox and Wintercap SA, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

136.    Gastauer, WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. knowingly or recklessly provided substantial assistance to Knox and Wintercap SA in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

137.    As a result, Gastauer, WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Temporarily, preliminarily, and permanently restrain Knox and Wintercap SA, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q], and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

B.     Temporarily, preliminarily, permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

C.     Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, and order the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

D.     Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.     Enter an order barring the Knox and Wintercap SA from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

F.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

G.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED this 2 day of October 2018.


Respectfully submitted,



Eric A. Forni (Mass Bar No. 669685)
        Senior Trail Counsel
David M. Scheffler (Mass Bar No.670324)
        Enforcement Counsel
J. Lauchlan Wash (Mass Bar No. 629092)
        Enforcement Counsel
Jonathan Allen (Mass Bar No. 680729)
        Enforcement Counsel
Rebecca Israel
        Enforcement Counsel
Martin F. Healey (Mass Bar No. 227550)
        Regional Trial Counsel
Amy Gwiazda (Mass Bar No.663494)
        Assistant Regional Director

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
ForniE@sec.gov (Forni email)