## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,
               **Plaintiff,**

   v.

ROGER KNOX, WINTERCAP SA,
MICHAEL T. GASTAUER, WB21 US
INC., SILVERTON SA INC., WB21 NA
INC., C CAPITAL CORP., WINTERCAP
SA INC. AND B2 CAP INC.
               **Defendants.**

RAIMUND GASTAUER, SIMONE
GASTAUER FOEHR, AND B21 LTD.
               **Relief Defendants.**

Civil Action No. 18-CV-____ (___)

**JURY TRIAL DEMANDED**

### Plaintiff's Memorandum in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief

Plaintiff Securities and Exchange Commission (the "Commission") submits this memorandum of law, as well as the Declaration of Trevor Donelan (the "*Donelan Decl.*") and related Exhibits, in support of its emergency *ex parte* motion for a temporary restraining order, order freezing assets, and order for other equitable relief as to defendants Roger Knox ("Knox"), Wintercap SA (f/k/a Silverton SA), Michael T. Gastauer ("Gastauer"), WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. (collectively, the "Defendants"), and as to relief defendants Raimund Gastauer, Simone Gastauer Foehr, and B21 Ltd. (the "Relief Defendants").

### PRELIMINARY STATEMENT

This case concerns a multi-year international fraudulent scheme perpetrated by Knox, through his entity Wintercap SA, and Gastauer, through numerous entities under his control.

More specifically, Knox schemed to defraud investors by evading the federal securities laws that govern the sale of stock by individuals who controlled publicly traded companies ("control persons"). Knox's scheme involved him coordinating with control persons from scores of small companies with thinly traded stock to illegally dump that stock into the public securities markets, and profit from the sales.

Stock held by control persons generally must be registered with the Commission before it can be sold. Otherwise, that stock is subject to sale limitations. Stock held by control persons is also frequently subject to public disclosure obligations. These legal requirements are designed to create market transparency by granting investors access to material information, including information reflecting from whom the investors are (or would be) buying stock, the identities of the control persons of the company in which investors are investing, and what those control persons are doing with their own stock.

In an effort to evade these requirements, control persons coordinating with Knox disguised their securities holdings and transactions by using shell, or "nominee," companies and sophisticated trading schemes. Knox was integral to facilitating these efforts. Indeed, starting no later than June 2015, Knox provided a trading platform—Wintercap SA—that was designed to obscure the ownership interests of control persons in more than 50 publicly traded companies. The basic mechanics of the Wintercap SA fraud were as follows.[1]

First, control persons coordinating with Knox (Knox's "Clients") transferred their stock to Wintercap SA. *Donelan Decl.* ¶¶ 10, 12, 13, 24. Second, to obscure stock ownership,

---

[1] For most of June 2015 to the present (the "Relevant Period"), Wintercap SA was known as Silverton SA, but Knox changed the name to Wintercap SA in or about 2018, presumably to avoid the heightened scrutiny that was following him at broker-dealers and banks. For convenience, the entity is referred to in this memorandum as Wintercap SA, whether during the time period that it was known as Silverton SA or after.

Wintercap SA often became the record holder of the stock, which meant that Wintercap SA, on paper, was the purported owner of the relevant shares; not the control persons. Id. ¶ 21. Third, Knox, through Wintercap SA, carefully coordinated the deposit and sale of control persons' stock through numerous omnibus brokerage accounts.[2] Id. ¶¶ 10, 12, 24. And, in an effort to avoid scrutiny from brokers when selling large quantities of stock, Knox lied on critical forms maintained by brokerage firms. Id. ¶¶ 10, 12; Complaint, ¶¶ 38-44, 66-70. Wintercap SA then dumped the stock of control persons for proceeds of approximately $165 million. Id. ¶¶ 18, 19. In return, Wintercap SA earned approximately 6% of sale proceeds. Id. ¶ 26.

In order to funnel the proceeds of the scheme to third parties, Knox relied on Gastauer. Gastauer and his defendant entities substantially assisted Knox by, among other things, providing a sham banking network through which he laundered the proceeds of the scheme. Gastauer repeatedly lied to banks to obscure Knox's identity, and helped to transfer money to, or on behalf of, the ultimate beneficiaries of the scheme. Id. ¶ 19; Complaint ¶¶ 96-98. Gastauer and his family also garnered significant financial benefits from Wintercap SA's illegal stock sales. Indeed, Gastauer transferred millions of dollars in proceeds from the fraud to accounts held for the Relief Defendants or Gastauer's own personal accounts. Id. ¶¶ 15-20.

The conduct described herein has left a wake of harmed investors; people who bought control persons' stock, often in the aftermath of promotional campaigns designed to increase the stocks' price, and who are now left with worthless shares. Id. ¶¶ 27-34.

In light of the foregoing conduct, and as set forth further below, the Commission has charged Knox and Wintercap SA with engaging in a scheme to defraud pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a) and (c)

---

[2] An omnibus brokerage account generally does not reveal the identity of the underlying beneficial owner of the stock.

thereunder, and Sections 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act");

making material misstatements in violation of Section 10(b) of the Exchange Act and Rule 10b-

5(b) thereunder, and Section 17(a)(2) of the Securities Act; aiding and abetting the primary

violations of Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c) thereunder, and Sections

17(a)(1) and (3) of the Securities Act, committed by certain control persons; and, selling

unregistered stock, or aiding and abetting the sale of unregistered stock, in violation of Sections

5(a) and (c) of the Securities Act.[3]  The Commission has also charged Gastauer and six of his

entities with aiding and abetting Knox's and Wintercap SA's unregistered stock sales and

fraudulent conduct, and three Relief Defendants who were beneficiaries of the scheme.

The Commission seeks a temporary restraining order to be followed by an order

preliminarily enjoining the Defendants from future violations of the aforementioned federal

securities laws.  As set forth further below, the evidence establishes that the Commission is

likely to succeed on the merits of its claims, warranting the issuance of the requested orders.

The Commission also seeks an asset freeze.  Knox has already orchestrated the sales of at least

50 publicly traded companies' stock, and has generated approximately $165 million in proceeds

from investors who purchased the stock, most of which Knox funneled through Gastauer's bank

accounts. *Donelan Decl.* ¶ 18.  The evidence detailed below demonstrates a substantial risk of

irreparable harm—that is, the dissipation and further concealment of assets that could be used to

compensate investor-victims—that warrants the requested emergency relief.

---

[3] The Commission has also charged the Defendants with acting as unregistered brokers or dealers in violation of Section 15(a) of the Exchange Act.

## STATEMENT OF FACTS

I.   **BACKGROUND**

A.   **Statutory Framework Concerning the Sale of Securities: Control Persons and Underwriters**

Before stock can be sold to the public, the person issuing or selling the stock must either (a) register that stock with the Commission pursuant to Section 5 of the Securities Act; (b) rely on an exemption from registration; or (c) comply with the sale conditions outlined in Commission Rule 144, which provides a safe harbor for selling unregistered stock. See 15 U.S.C. §§ 77d & 77e; 17 C.F.R. § 230.144.  Importantly, even if a public company registers its stock at the time the company issues the stock to investors, those investors must comply with the aforementioned registration, exemption, or safe harbor rules before distributing (selling) that stock to other investors. See, e.g., § 230.144 (preamble).

Absent registration, an exemption or safe harbor must apply to the sale of unregistered stock before that stock can be sold.  One such exemption is Section 4(a)(1) of the Securities Act, which exempts from registration the ordinary sale of stock, but explicitly **does not exempt** sales by "an issuer, **underwriter**, or dealer." 15 U.S.C. § 77d(a)(1) (emphasis added).  An "'underwriter' means any person who has purchased from an **issuer** with a view to, or offers or sells for an **issuer** in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11) (emphasis added). The definition of an "'issuer' [includes] any person directly or indirectly controlling or controlled by the issuer." Id.  Simply put, an underwriter basically includes anyone who sells stock for a control person (i.e., an "issuer").  And an underwriter—and control

persons selling stock through the underwriter—cannot rely on the Section 4(a)(1) exemption from securities registration.[4]

Commission Rule 144, however, provides a safe harbor to investors seeking to sell unregistered stock in the absence of an exemption. But Commission Rule 144 applies only if certain conditions are met. The conditions that trigger the applicability of Commission Rule 144 depend, in large part, on whether the stock in question would be sold for the account of an "affiliate." An "affiliate" is a person in a relationship of control with an issuer and, for purposes of this memorandum, is synonymous with a "control person." See 17 C.F.R. § 230.144(a)(1). When selling stock for the account of a control person—which was the essence of Knox's business model—such sales are subject to strict limitations on the amount of stock that can be sold and have specific disclosure obligations. See generally C.F.R. § 230.144. In short, control persons cannot secretly dump unlimited quantities of stock into the securities markets.[5] Id.

**B.      Statutory Framework Concerning the Sale of Securities by Brokers**

In some instances, brokers rely on Section 4(a)(4) of the Securities Act to sell stock without a registration statement, which section exempts "brokers' transactions." 15 U.S.C. § 77d(a)(4). "The term *brokers' transactions* in Section 4(a)(4) includes transactions in which a broker '[a]fter reasonable inquiry is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is part of a distribution of securities of the issuer.'" 17 C.F.R. § 230.144(g)(4)

---

[4] There are other exemptions to securities registration, but none apply to the fact pattern set forth herein. The Commission highlights the Section 4(a)(1) exemption because it generally governs, and exempts from registration, the resale of stock in securities markets by typical investors.

[5] Specifically, if you are a control person, the number of securities you may sell during any three-month period cannot exceed 1% of the outstanding shares of the same class being sold. But, Knox generally sold more than 1% of each company's issued and outstanding stock for his clients. *Donelan Decl.* ¶ 25.

(emphasis in original).  As set forth below, Knox made false or misleading statements to brokers in an effort to avoid being detected as an underwriter.

### C.    Statutory Framework Concerning Issuer Disclosure Obligations

In addition to the foregoing, certain investors must disclose their control of more than 5% of an issuer's outstanding shares.  See 15 U.S.C. § 78m.  Public companies who are required to file periodic reports with the Commission, including on Commission Form 10-K, must also accurately disclose shareholders who own more than 5% of the company's outstanding shares.[6] As set forth further below, Knox and Wintercap SA schemed with control persons from scores of companies to avoid detection as 5% stock owners by divvying up the control persons' stock in less than 5% tranches across a number of nominee accounts.

## II.    KNOX AND WINTERCAP SA ILLEGALLY SOLD STOCK

### A.    Overview

The general purpose of Knox's scheme was to work with control persons to secretly, and illegally, sell their stock to investors in contravention of the federal securities laws.  In furtherance of the scheme, Knox, through Wintercap SA, (a) took possession of the stock that had been stashed in nominee accounts by control persons so that brokers (and investors) would be unaware of the true beneficial owners; (b) deposited that stock into multiple omnibus brokerage accounts so that brokers (and investors) would be unaware of the total volume of the issuer's stock Wintercap SA controlled; (c) falsely represented that Wintercap SA was not trading the stock on behalf of control persons; and (d) sold the stock for a handsome fee without

---

[6] Although some publicly traded companies are not subject to these disclosure obligations because of their financial condition or number of shareholders, they can choose to voluntarily file Commission reports, which, in turn, must be accurate.  See Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) ("even a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate'") (citation omitted).

an effective registration statement, and without adhering to the limitations and obligations imposed by Rule 144 concerning the sale of unregistered stock by control persons. *Donelan Decl.* ¶¶ 10, 12, 14, 24. Indeed, Knox's business model was designed for this purpose from at least June 2015 to the present. Id. ¶ 24 (providing at least one example of a deposit in June 2015).

**B.      Knox Used Wintercap SA To Illegally Sell Environmental Packaging and CURE Securities**

In 2017, Knox used Wintercap SA to sell the publicly traded stock of Environmental Packaging Technologies Holdings, Inc. ("Environmental Packaging") and CURE Pharmaceutical Holding Corp. ("CURE") without an effective registration statement. Environmental Packaging and CURE were both controlled, directly or indirectly, by the same persons referred to herein collectively as Control Group A. *Donelan Decl.* ¶¶ 9-12. A representative of Control Group A controlled virtually all of both company's stock. Id. He, with another member of Control Group A's assistance, then used nominee corporate entities to secretly hold virtually all of Environmental Packaging's and CURE's purportedly unrestricted stock (i.e., stock that can be bought and sold in the markets without restriction).[7] Id. Although these nominee entities held Control Group A's stock, the corporate records of these nominee entities did not identify the foregoing Control Group A representative as the actual beneficial owner. Id. ¶¶ 10, 12. Representatives of Control Group A subsequently orchestrated the transfer of some of the purportedly unrestricted stock held in those nominee accounts to Wintercap SA. Id. ¶¶ 10, 12.

---

[7] Environmental Packaging and CURE also both omitted the fact that Control Group A owned more than 5% of each company's stock in public Commission filings.

Knox knew that the above-referenced nominees were designed to distance Control Group A from the stock. For example, on or about February 7, 2017, a representative of Control Group A sent the following email to Knox:

> "[a]s discussed, please find attached our confirmation of the [beneficial owners] for the three [CURE nominees]. I believe this satisfies are [sic] requirements. I need to instruct the [transfer agent] to transfer the respective shares to Silverton."

Id. ¶ 12. The representative of Control Group A did just that, transferring more than 10% of CURE's total issued and outstanding shares to Wintercap SA (known as Silverton SA at the time) in or about February and March 2017.  Id. ¶ 12.  Similarly, the same Control Group A representative transferred more than 10% of Environmental Packaging's total issued and outstanding shares to Wintercap SA in or about March and April 2017.  Id. ¶ 10.

From there, Knox further disguised Control Group A's control by depositing its Environmental Packaging and CURE stock in omnibus accounts across different brokerage firms and in less than 5% tranches.  Id. ¶¶ 10, 12.   At least two brokerage firms required Wintercap SA to complete a form before the firms would agree to sell the stock.  Id.  Each time, Knox falsely represented to the brokerage firms that Wintercap SA was selling less than 5% of Environmental Packaging's or CURE's stock, and that Wintercap SA was not selling stock for control persons.  Id.

With regard to Environmental Packaging, Knox even helped Control Group A secretly pay to tout the company, which Control Group A timed with Wintercap SA's anticipated stock sales.  Id. ¶ 10.  Knox created an offshore entity through which Control Group A and Knox, directly or indirectly, routed $1 million to pay stock promoters to tout Environmental Packaging at or about the time Wintercap SA illegally sold that stock to investors.  Id.  And, that is exactly

what happened. Id. Wintercap SA subsequently sold Control Group A's stock and generated more than one million dollars of illegal proceeds.[8] Id.

### C. Knox and Wintercap SA Sold Numerous Other Companies' Stock Without an Effective Registration Statement.

Knox's, through Wintercap SA, sale of Environmental Packaging and CURE stock for Control Group A is merely illustrative of Knox's business model during the Relevant Period. The table set forth below identifies other examples, without limitation, of stock sold by Wintercap SA during the Relevant Period without an effective registration statement.

| Issuer | Date of First Transfer to Wintercap SA | Nominees Used To Aggregate Shares | Cumulative Wintercap SA Shares Available for Trading | Total Shares Available for Trading As of Last Wintercap SA Deposit | Wintercap SA Percentage of Shares Available for Trading | Minimum Gross Proceeds to Wintercap SA |
|---|---|---|---|---|---|---|
| ARSN | 8 4 2016 | 3 | 11,025,000 | 21,150,000 | 52.1% | $ 938,224 |
| CURR | 3 3 2017 | 3 | 2,083,802 | 4,721,812 | 44.1% | $ 1,031,048 |
| DIGAF | 9 7 2016 | 14 | 15,910,000 | 18,581,781 | 85.6% | $ 4,001,095 |
| DVGG_RETC | 6 13 2017 | 3 | 18,366,018 | 18,416,592 | 99.7% | $ 8,371,665 |
| ENVV | 6 16 2015 | 5 | 18,250,000 | 29,986,500 | 60.9% | $ 4,155,097 |
| GLBB | 4 25 2017 | 2 | 900,000 | 1,365,000 | 65.9% | $ 752,230 |
| GRMX | 3 13 2017 | 5 | 7,263,337 | 13,888,337 | 52.3% | $ 5,016,997 |
| ORRP | 4 29 2016 | 5 | 11,050,000 | 14,999,500 | 73.7% | $ 7,853,086 |
| EPTI | 4 12 2017 | 3 | 7,833,344 | 8,050,423 | 97.3% | $ 1,310,751 |
| GLLK | 10 28 2015 | 4 | 9,900,000 | 26,400,351 | 37.5% | $ 1,601,076 |
| NEWG | 8 10 2016 | 3 | 3,600,000 | 6,800,000 | 52.9% | $ 1,929,147 |
| PSCR | 6 27 2016 | 7 | 15,359,998 | 17,909,998 | 85.8% | $ 3,781,011 |
| PSNP | 10 5 2015 | 2 | 6,676,450 | 27,855,450 | 24.0% | $ 1,960,469 |
| SPRN | 2 28 2017 | 4 | 11,450,000 | 21,691,615 | 52.8% | $ 1,326,243 |
| SRUP | 11 16 2016 | 6 | 10,446,672 | 10,763,339 | 97.1% | $ 2,727,225 |
| UMFG | 3 31 2017 | 4 | 19,250,000 | 22,291,754 | 86.4% | $ 1,918,749 |
| VBIO | 6 3 2015 | 20 | 8,837,065 | 19,622,915 | 45.0% | $ 11,773,801 |
| ZENO | 9 27 2016 | 3 | 4,432,050 | 10,924,836 | 40.6% | $ 4,362,333 |
| **TOTAL** | | | | | | $ 64,810,246 |

Each example in that table illustrates a pattern of unregistered sales on behalf of various control groups. *First*, in close temporal proximity, one or more control persons exercising control over a significant percentage of a publicly traded company's stock transferred that company's stock to several nominee accounts. *Donelan Decl.* ¶ 24. *Second*, the control persons

---

[8] For the sake of brevity, the Commission has not summarized herein another example that is outlined in the complaint concerning trading in the securities of Garmatex Holdings, Ltd. See Complaint ¶¶ 76-85; *Donelan Decl.* ¶¶ 13-14.

further aggregated and transferred the company's stock to Wintercap SA for the purpose of distributing it to the public. Id. *Third*, Knox, through Wintercap SA, distributed (i.e., sold) the control persons' stock to the market and, therefore, acted as an underwriter. Id. *Fourth,* on each occasion, no effective registration statement was filed concerning Wintercap SA's sale. Complaint, ¶ 87; *Donelan Decl.* ¶ 25. *Fifth*, on each occasion, no exemption applied, and the control persons did not comply with the conditions set forth in Rule 144. *Donelan Decl.* ¶ 25.

## IV.    THE DEFENDANTS' MOVEMENT OF MONEY OFFSHORE

Wintercap SA generated approximately $165 million in stock sale proceeds between approximately October 2015 and April 2018, including through the sale of stock referenced in the table above. *Donelan Decl.* ¶¶ 18, 24.  Knox turned to Gastauer for assistance in moving the proceeds of those stock sales in a manner that obscured Knox's association with the money.

Gastauer was (and still is) the owner and operator of WebBank 21 Group or WB21 Group through WB21 Limited, which purports to be a virtual bank that offers a solution to "streamline" customers through the banking "know-your-customer" requirements.[9] Id. ¶ 7.  In reality, Gastauer operates a front for his customers, pretending that the accounts he opens at banks are his own when, in reality, he opens and maintains accounts (for a fee) on behalf of customers, such as Knox.  Indeed, after Gastauer began working with Knox, Gastauer created a series of U.S. entities (and corresponding bank accounts), which were merely shell companies designed to receive and distribute the proceeds of Wintercap SA's stock sales. Id.

Initially, in October 2015, Gastauer created WB21 US Inc. and then opened, as sole signatory, several bank accounts in that company's name. Id. Between approximately

---

[9] For example, banks routinely require customers to fill out account opening forms reflecting the nature and purpose of an account, and to subsequently answer questions about certain banking activity.

December 2015 and August 2016, Gastauer primarily used the WB21 US Inc. accounts to receive and disburse stock sale proceeds from Wintercap SA foreign bank accounts. Id. ¶¶ 15-20.

However, in June 2016, when Knox tried to send money directly from a Wintercap SA (operating at the time as Silverton SA) brokerage account to WB21 US Inc., his request was rejected. Id. ¶ 17. Brokers often scrutinize transfers that are not "first-party." First-party transfers are those between bank and brokerage accounts held in the same name. In response, Gastauer formed a new U.S. entity called Silverton SA Inc. and opened several bank accounts in that name.[10] Gastauer falsely represented the status of Silverton SA Inc. to at least one bank in the process. Id. ¶ 7, 19. At later points, when asked by at least one bank about suspicious transfers, Gastauer repeatedly lied to various bank employees in order to substantially assist Knox. Id. ¶ 19; Complaint ¶¶ 96-98. In reality, Gastauer established Silverton SA Inc. in the United States so that Knox had a mechanism to transfer the proceeds of (what at the time was) Silverton SA's illegal stock sales from brokerage firms to third party beneficiaries, often in foreign jurisdictions. *Donelan Decl.* ¶ 20.

Gastauer also took money for himself and his family. Id. ¶¶ 35-38. Indeed, Gastauer transferred millions of dollars from accounts he created for Knox to accounts under his personal control, and approximately $4 million to his father and a second relative for no legitimate purpose or consideration. Id. ¶¶ 35-37. The source of these funds, however, was Wintercap

---

[10] At the time, Knox's Wintercap SA was operating as, and had brokerage accounts in the name of, Silverton SA. *Donelan Decl.* at ¶ 5. Knox was careful to not include "Inc." when causing brokerage firms to transfer money from his Silverton SA brokerage accounts to Gastauer's Silverton SA Inc. bank accounts. Id. ¶ 17.

SA's illegal stock sales to investors. Gastauer also caused his entities to transfer money to another entity—B21 Ltd.—which was previously controlled by Gastauer. Id. ¶ 38.

## V.   KNOX'S AND WINTERCAP SA'S CONDUCT IS ONGOING

Wintercap SA is continuing to sell stock in the same manner as described above, with Knox at the helm. For example, as recently as June 2018, Wintercap SA generated approximately $5 million in proceeds by liquidating the stock of two publicly traded companies. *Donelan Decl.* ¶ 39.

### ARGUMENT

## I.   THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS

Section 27 of the Exchange Act provides for personal jurisdiction and has been construed to include foreign persons, bounded only by the due process clause of the Fifth Amendment. Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir. 1972); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir. 1975), cert. denied, 423 U.S. 1018; SEC v. Carillo, et al., 115 F.3d 1540, 1543 (11th Cir. 1997); see also Nowak v. Tak How Invs, Ltd., 94 F.3d 708, 713, 717 (1st Cir. 1996) (finding personal jurisdiction over foreign defendants); Bluetarp Fin., Inc. v. Matrix Construction Co., 709 F.3d 72, 82 (1st Cir. 2013) (same). The standard applied is the traditional minimum contacts analysis. Id. Under this analysis, to determine if jurisdiction will lie, Courts look to whether a defendant has purposefully availed himself of the United States by conducting activities here. Id. This standard is clearly met in this case. The Defendants availed themselves of the United States financial markets through the use of United States-based brokerage and bank accounts, and by virtue of Wintercap SA's sale of

the stock of companies regulated by the Commission.[11]   In fact, the use of U.S. financial

markets, U.S. brokerage and bank accounts, and the securities of U.S. companies regulated by

the Commission, all were necessary components of the Defendants' conduct.

### III.   A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PROTECT INVESTORS AND IN THE PUBLIC INTEREST

#### A.   Legal Framework

In the First Circuit, a temporary restraining order and a preliminary injunction "may be

granted if the movant shows a likelihood of success on the merits, a risk of irreparable harm, a

favorable balance of equities, and that the injunction would be in the public interest." SEC v.

Fife, 311 F.3d 1, 8 (1st Cir 2002). "The 'sine qua non' of a preliminary injunction analysis is

whether the plaintiff is likely to succeed on the merits of its claim." Id.

#### B.   The Commission is Likely to Succeed on the Merits

The evidence detailed above demonstrates that the Commission is likely to succeed on

the merits of both its Section 5 claims, which do not include the element of *scienter,* as well as

its anti-fraud claims, which do include it.  In that regard, the sale of unregistered stock by Knox

and Wintercap SA in violation of Section 5—for which *scienter* is not an element—is a

sufficient basis for freezing their assets. See SEC v. Longfin Corp., 316 F. Supp. 3d 743, 748,

756 (S.D.N.Y. May 1, 2018) (granting preliminary injunction freezing assets for alleged

violations of Section 5 of the Securities Act).

---

[11] Similarly, venues lies in this district.  The "proper question [in these types of cases] is not just where the defendants acted, but whether the defendants knew or had reason to know that the misleading manipulation would be communicated to and relied upon by market participants within the forum." SEC v. AutoChina Int'l. Ltd., 2013 WL 265974, at *1-2 (D. Mass. Jan. 24, 2013) (finding that venue was proper in the District of Massachusetts because Massachusetts-based investors purchased the illegally sold stock).  Here, Massachusetts investors purchased stock sold illegally by Wintercap SA. *Donelan Decl.* ¶ 31.

### 1.    Sale of Unregistered Stock

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. A *prima facie* showing of a Section 5(a) or 5(c) violation requires that: (1) no registration statement was filed or is in effect; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the use of interstate communications. See SEC v. Esposito, 260 F. Supp. 3d 79, 88 (D. Mass. 2017); SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (citing SEC v. Spence & Green Chemical Co., 612 F. 2d 896, 901-02 (5th Cir. 1980).

Courts interpreting the "sale" element have concluded that it may be satisfied by a showing that a defendant was a "necessary participant" or a "substantial factor" in the unregistered sale or offer of sale. See Zacharias v. SEC, 569 F.3d 458, 464-66 (D.D.C. 2009) (applying "substantial factor" test); see also Friendly Power Co. LLC, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999); SEC v. Murphy, 626 F.2d 633, 649-52 (9th Cir. 1980); SEC v. Holschuh, 694 F.2d 130, 139-40 (7th Cir. 1982) ("[T]he relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions."); cf SEC v. Saxena, 26 Fed. Appx. 22, 23 (1st Cir. 2001) (per curiam) (noting that defendant had violated Sections 5(a) and 5(c) by "participating in the offer or sale of unregistered securities in interstate commerce or through the mails.").

As set forth above, Knox and Wintercap SA  were "necessary participants" and a "substantial factor" in the sale of the relevant securities.  Knox, through Wintercap SA, offered to sell—and did sell—unregistered stock on behalf of a number of clients, including Control

Group A.[12] The evidence shows that members of Control Group A were, in fact, controlling

Environmental Packaging and CURE. And, as the table above demonstrates, for a host of other

publicly traded companies, Wintercap SA routinely sold a significant percentage of each

company's publicly traded stock for control persons without an effective registration statement.

See SEC v. Longfin Corp., et al., 18-cv-02977-DLC, Dkt. No. 52, at 30 (concluding that a jury

would likely conclude a shareholder was a control person because of his "influence on and

domination of the mark for the company's shares").

        Accordingly, the Commission has established a likelihood of proving that Knox and

Wintercap SA violated Sections 5(a) and (c) of the Securities Act.[13] Indeed, the Commission

need not prove that Knox knew or recklessly disregarded that he sold for control persons to

violate Sections 5(a) and (c) of the Securities Act; *scienter* is not an element of the offense. See

Esposito, 260 F. Supp. 3d at 88-89; SEC v. Gibraltar Global Securities, Inc., et al., 13-cv-02575-

GBD-JCF, Dkt. No. 84 at 5 ("Section 5 liability does not require scienter.") (citing SEC v.

Czarnik, 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010)).

        In addition, the Commission, can also establish that it is likely to succeed on the merits of

its antifraud allegations against Knox and Wintercap SA for the reasons set forth below.

        **2.       Antifraud Violations: Knox and Wintercap SA**

        To succeed in a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b)

thereunder, a plaintiff must prove that the defendant made a material misrepresentation or

---

[12] The requirement for a registration statement applies to each separate offer and sale of a
security, not to the security itself; thus, "proper registration of a security at one stage does not
necessarily suffice to register subsequent offers or sales of that security." SEC v. Universal
Exp., Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).

[13] Wintercap SA's stock sales were in connection with the use of interstate communications,
including using foreign and domestic bank and brokerage accounts. *Donelan Decl.* ¶ 7.

omission with *scienter*.  See Aaron v. SEC, 446 U.S. 680, 695 (1980); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) (*scienter* may be established by a showing of recklessness).  Rule 10b-5(a) and (c)—also known as scheme liability—state, in relevant part, that it "shall be unlawful for any person [. . .] [t]o employ any device, scheme, or artifice to defraud, [. . .] or [. . .] [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976) (quoting 17 C.F.R. § 240.10b-5).  Scheme liability under Rule 10b-5(a) and (c) arises where the defendants "employ a deceptive device for the purpose of defrauding investors." Esposito, 260 F. Supp. 3d at 91.[14] Direct evidence of *scienter* is unnecessary; rather, "proof of *scienter* required in fraud cases is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983).  The Commission need not prove *scienter* under Sections 17(a)(2) and (3) of the Securities Act. See Aaron v. SEC, 446 U.S. at 698-702.  Proof of negligence alone suffices.  See id.

Here, Knox made and submitted materially false statements on broker forms.  See Complaint ¶¶ 38-44, 69-74.  Knox's misstatements were not due to a mistake or accident.  He knew that one representative of Control Group A coordinated the deposit of a significant percentage of both Environmental Packing and CURE stock with Wintercap SA.  Knox, as Wintercap SA's owner and principal officer, also knew that Wintercap SA segregated and deposited that stock across multiple brokerage accounts.  And, Knox knew this information at the time that Knox signed and submitted a broker's "Deposit Securities Request" when seeking to

---

[14] "The SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b-5, or Section 17(a) of the Securities Act." SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002).

deposit Environmental Packaging stock, and Broker A's "Equity Authentication Form" when

seeking to deposit CURE stock. Id. Accordingly, Knox acted with *scienter* (or, at a minimum,

was negligent).[15]

In light of the foregoing, Knox made these material misstatements to brokers in violation

of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a)(2) of the

Securities Act. Knox's misstatements, however, were also part of a larger scheme to collect,

distribute, and secretly sell the stock of control persons in violation of Section 10(b) of the

Exchange Act and Rules 10b-5(a) and (c) thereunder, and Sections 17(a)(1) and (3) of the

Securities Act. Indeed, Knox's misstatements are evidence of his intent to disaggregate the

shares Wintercap SA was preparing to sell on behalf of control persons.

### 3.    Aiding and Abetting: Gastauer

The evidence also demonstrates that the Commission is likely to prove that Gastauer (and

the entities through which he operated, including defendants WB21 US Inc., Silverton SA Inc.,

WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc.) aided and abetted Knox's

and Wintercap SA's primary violations of Sections 5(a), 5(c), and 17(a) of the Securities Act,

and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Indeed, Gastauer "knowingly

or recklessly provide[d] substantial assistance" to Knox. See Section 15(b) of the Securities Act;

Section 20(e) of the Exchange Act; SEC v. Wey, 246 F. Supp. 3d, 894, 930 (S.D.N.Y. 2017)

(discussing aiding and abetting elements post Dodd-Frank); SEC v. Smith, 2015 WL 4067095, at

*8 (D.N.H. July 2, 2015) (same). The Commission can prove "substantial assistance" by

showing that Gastauer "associated himself with the venture, that he participated in it as

---

[15] Knox's conduct is imputed to Wintercap SA. See SEC v. Manor Nursing Ctrs. Inc, 458 F.2d 1082, 1096, n.16 (2d Cir. 1972) (scienter of an individual who controls a business may be imputed to that entity); Tropikgadget FZE, 146 F. Supp. 3d at 280 (same).

something that he wished to bring about, and that he sought by his actions to make it succeed."
SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (internal quotations and citations omitted).

Gastauer knowingly, or recklessly, provided substantial assistance to Knox and
Wintercap SA by creating and maintaining a U.S.-based corporate and banking network for the
purpose of allowing Knox and Wintercap SA to transfer the proceeds of illegal stock sales out of
brokerage accounts, funnel those proceeds through Gastauer's corporate entities and bank
accounts with seemingly no tie to Knox, and distribute those proceeds to third parties, including
at least one stock promoter that a control group used to tout the stock sold by Wintercap SA. See
Complaint ¶¶ 89-103. To further this venture, Gastauer repeatedly lied to banks about the true
nature of Silverton SA Inc.'s business. Id. ¶ 96-98. And, Gastauer encountered numerous red
flags along the way, including emails from and telephone conversations with banks in which
Gastauer was repeatedly questioned about the proprietary of suspicious wires in and out of his
accounts. Id. Gastauer, nonetheless, continued to conceal Knox's identity and the actual source
of the money flowing through Gastauer's accounts from banks.[16]

### 4.    Relief Defendants

Gastauer transferred millions of dollars of Wintercap SA's illegal sale proceeds to
Raimund Gastauer, Simone Gastauer Foehr, and B21 Ltd. Raimund Gastauer, Simone Gastauer
Foehr, and B21 Ltd. do not appear to have any legitimate claim to these funds. Indeed, they are
not employees of Wintercap SA or associated on any of the corporate records of the Gastauer-

---

[16] As the founder and chief executive officer of WB21 US Inc., Silverton SA Inc., WB21 NA
Inc., and C Capital Corp.,—each of which Gastauer used to substantially assist Knox—
Gastauer's conduct is imputed to each company. See Manor Nursing Ctrs., 458 F.2d at 1096,
n.16; Tropikgadget FZE, 146 F. Supp. 3d at 280. Similarly, Gastauer caused a relative to open
Wintercap SA Inc., and B2 Cap Inc, but Gastauer was actually the operator of these companies
and related bank accounts. Id.

entities subject to this case. *Donelan Decl.* ¶ 35.  Each are related to Gastauer in some way, which is a strong indication that Gastauer was merely passing on the fruits of the fraud to those close to him.  Id. ¶ 36-37.   Raimund Gastauer, Simone Gastauer Foehr, and B21 Ltd. are not entitled to benefit from illegal stock sales described herein.

### C.   An Asset Freeze, TRO, and Preliminary Injunction are Necessary, and in the Public Interest

Wintercap SA generated approximately $165 million during the relevant period.  This money is the ill-gotten gains that Wintercap SA, and/or the control persons with whom Knox schemed, made from investors, including investors in Massachusetts.  At least some of this money was held by Gastauer (and the defendant entities he created), and Gastauer transferred, directly or indirectly, at least some of this money to the Relief Defendants. *Donelan Decl.* ¶¶ 35-38.  Wintercap SA raised approximately $9 million from the sale of Environmental Packaging, CURE, and Garmatex alone.  Id. ¶¶ 27-34.

In this case, an asset freeze is particularly warranted because the Defendants frequently funnel money out of the country—leading to the dissipation of funds—and have demonstrated efforts to conceal their conduct.  Id. ¶ 20.  The evidence clearly shows a strong indication that the Defendants will continue to take steps to dissipate their illegally obtained money.  See Micro Signal Research, Inc., v. Otus, 417 F.3d 28, 31 (1st Cir. 2005) (although "[t]he possibility that a defendant may not have assets on the day of judgment may not automatically make out a showing of irreparable injury, . . . the story is quite different where there is a strong indication that the defendant may dissipate or conceal assets") (citations omitted).  And, given Gastauer's connection to the Relief Defendants, there is a substantial likelihood that the Relief Defendants would take steps to dissipate or conceal the funds in their possession as well.

In light of the foregoing, the Defendants should also be temporarily restrained and preliminary enjoined from violations of the federal securities laws. Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] authorize the Commission to seek, and the Court to enter, preliminary injunctions against future securities law violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of recurrence." The Defendants are still in the business of selling stock illegally and/or trying to conceal the fruits of those sales. They should be stopped immediately.

## III.   THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND LITIGATION OF THIS CASE

### A.   The Court Should Enter an Order to Repatriate the Defendants' Assets

Courts may impose an order to repatriate funds transferred to foreign jurisdictions. See SEC v. Thibeault, 80 F. Supp. 3d 288, 293 (D. Mass. 2015) (ordering repatriation and noting that "once equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy"); SEC v. Illarramendi, 2011 WL 2457734, at * 6 (D. Conn. June 16, 2011) (same). Such relief will further protect the funds from dissipation, and is appropriate when, as here, foreign nationals may have transferred funds outside of the jurisdiction of the United States.

### B.   The Court Should Order an Accounting

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and the Defendants' current financial resources. See, e.g., Thibeault, 80 F. Supp. 3d at 293 (ordering an accounting); SEC v. Illarramendi, 2011 WL 2457734, at * 6 (same). An accounting is critical to determine the disposition and the amount of the Defendants' assets as well as the assets available for disgorgement and a civil penalty.

### C.     The Court Should Order the Defendants to Preserve Documents

Similarly, the Court should enter an order prohibiting the Defendants, or any of their

agents, or anyone acting in concert with him, from destroying and altering documents to preserve

as much of the evidence as possible given the Defendants' potentially-continuing misconduct.

See, e.g., SEC v. Lybrand, 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000); FTC v. American

Investors Corp., 1995 WL 768924, at *1 (D. Mass. November 16, 1995).

### D.     An Order Authorizing Alternative Means of Service is Appropriate

In addition to the means of service provided by the Federal Rules of Civil Procedure, the

Commission asks the Court to authorize service of any Order issued by the Court in connection

with this Application, as well as the papers on which the Order was granted, upon the Defendants

and their agents (or banks and brokerage firms holding the Defendants' assets) by email.  This

alternative means is calculated to provide notice of the Court's Order and the underlying

documents and has been approved by courts in similar circumstances in other cases.  See

AngioDynamics, Inc. v. Biolitec, AG, 780 F.3d 420, 429 (1st Cir. 2015) ("[b]y its plain terms,

Rule 4(f)(3) does not require exhaustion of all possible methods of service before a court may

authorize service by 'other means,' such as service through counsel and by email").

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court

enter, *ex parte*, a temporary restraining order in the form attached hereto and set a hearing date

before the temporary restraining order expires to determine whether to enter a preliminary

injunction.

Respectfully submitted,

_____

Eric A. Forni (Mass Bar No. 669685)
    Senior Trail Counsel
David M. Scheffler (Mass Bar No. 670324)
    Enforcement Counsel
J. Lauchlan Wash (Mass Bar No. 629092)
    Enforcement Counsel
Jonathan Allen (Mass Bar No. 680729)
    Enforcement Counsel
Rebecca Israel
    Enforcement Counsel
Martin F. Healey (Mass Bar No. 227550)
    Regional Trial Counsel
Amy Gwiazda (Mass Bar No. 663494)
    Assistant Regional Director

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
ForniE@sec.gov (Forni email)

Dated:  October 2, 2018