UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SECURITIES AND EXCHANGE
COMMISSION,**
           **Plaintiff,**

    **v.**

**ROGER KNOX, WINTERCAP SA,
MICHAEL T. GASTAUER, WB21 US
INC., SILVERTON SA INC., WB21 NA
INC., C CAPITAL CORP., WINTERCAP
SA INC. AND B2 CAP INC.**
             **Defendants.**

**RAIMUND GASTAUER, SIMONE
GASTAUER FOEHR, B21 LTD.,
SHAMAL INTERNATIONAL FZE, AND
WB21 DMCC**
         **Relief Defendants.**

**1:18-CV-12058-RGS**

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### ITS MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS
### WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP.,
### WINTERCAP SA INC., AND B2 CAP INC.

Plaintiff United States Securities and Exchange Commission (the "Commission") submits

this memorandum of law in support of its motion for a default judgment against defendants

WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2

Cap Inc. (collectively, the " Entity Defendants").

### SUMMARY

The Commission charged the Entity Defendants with aiding and abetting securities fraud

committed by their co-defendants Roger Knox ("Knox") and his entity Wintercap SA

("Wintercap" and together with Knox, the "Knox Defendants"). Specifically, the Entity

Defendants were charged with aiding and abetting Knox and Wintercap's violations of Sections

5(a) and (c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

On November 6, 2018, this Court entered defaults against the Entity Defendants.  The Commission now asks the Court to enter default judgments against these six entities that:  1) permanently enjoin the Entity Defendants against directly or indirectly violating Section 5 and Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and 2) order each of the Entity Defendants to pay disgorgement plus prejudgment interest and a civil penalty.

## PROCEDURAL HISTORY

The Commission filed its complaint on October 2, 2018.  The Court issued a Temporary Restraining Order, Asset Freeze and Order for Other Equitable Relief ("TRO") on October 2, 2018.  *See* Dkt. No. 9.  The TRO froze assets in accounts belonging to the Entity Defendants, and required them to provide an accounting of their assets, to repatriate their overseas assets, and to provide a list of their addresses and other contact information.  *See id.* ¶VIII.A., B, IX, X, XIII.  Each of the Entity Defendants was validly served with the Complaint and the TRO and executed summons were filed with the Court.  *See* Dkt. No. 18 (WB21 US Inc.); No. 14 (Silverton SA Inc.); No. 20 (WB21 NA Inc.); No. 21 (C Capital Corp.); No. 22 (Wintercap SA Inc.); No. 19 (B2 Cap Inc.).  No counsel appeared for any of the Entity Defendants.  None of the Entity Defendants complied with the accounting, repatriation, or disclosure provisions of the TRO.  The Court then issued a Preliminary Injunction, Asset Freeze and Order for Other Equitable Relief ("PI") on October 26, 2018, which was amended on November 16, 2018.  *See* Dkt. Nos. 46, 57.  The PI also froze assets belonging to the Entity Defendants and required the Entity Defendants to provide an accounting of their assets, to repatriate their overseas assets, and to provide list of their addresses and other contact information.  *See id.* ¶VIII.A., B, IX, X, XII. The Entity Defendants did not comply with the accounting, repatriation or disclosure

requirements of the PI.

On November 5, 2018, the Commission moved to default the Entity Defendants based on their failure to appear in this litigation or answer the Commission's complaint. *See* Dkt. No. 49. The Court entered the requested defaults on November 6, 2018. *See* Dkt. Nos. 50, 51.

On November 15, 2018, the Commission amended the complaint to add claims against two new relief defendants, Shamal International FZE and WB21 DMCC, and to add a claim against all relief defendants. *See* Dkt. No. 54. Because the amended complaint does not affect the claims against any of the Entity Defendants, there is no reason to delay the entry of default judgments against them. In any event, the Entity Defendants were served with the Amended Complaint by mail on November 15, 2018, and have not filed an answer within 17 days (or 14 days plus three days for service by mail). *See* Fed. R. Civ. P. 15(a)(3), Fed. R. Civ. P. 6(d).

## ARGUMENT

**I.    The Commission's Claims against the Entity Defendants Are Established as a Matter of Law.**

### A.  Legal Standard

The entry of defaults is an admission by the defendants of the well-pleaded allegations in the Complaint, and those allegations of fact are taken as true. *See Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir. 1985), *cert. denied*, 475 U.S. 1018 (1986); *SEC v. Tropikgadget FZE, et al.,* No. 15-10543, 2016 WL 4555595, *2 (D. Mass. Aug. 31, 2016) ("Because the [] Defendants have been defaulted in this case, they are 'taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability.'"). The court may examine whether the Complaint, "taking all well-pleaded factual allegations as true," alleges a cause of action. *Id.* (citing *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002)). As detailed below, taking all the well-pleaded facts

alleged as true, the Commission is entitled to default judgment against the Entity Defendants.

**B.  The Entity Defendants Laundered the Proceeds of Securities Fraud**

The Complaint describes a far-ranging securities fraud scheme committed by Roger

Knox and his entity Wintercap (formerly known as Silverton SA).  Their scheme enabled

persons controlling many United States public companies to sell their stock to investors while

fraudulently concealing that the stock the investors were buying was being sold by the

companies' control people, often during a promotional campaign designed to increase the

volume of stock sales.  *See* Complaint ¶¶1-9.  A necessary part of that scheme was the

participation of Michael Gastauer ("Gastauer") and the Entity Defendants that he controlled, and

through which he operated.  *See id.* ¶¶10, 18-19.  Gastauer and the Entity Defendants

participated in the Knox Defendants' fraud by providing them with bank accounts through which

to move the proceeds of their fraud, that obscured the identities of the people and entities

receiving those proceeds, and ultimately to pay the proceeds both to the Knox Defendants and

their business partners who controlled the companies whose stock was being dumped into the

public markets (the "control persons").  *See id.* ¶¶89-103.

**1.     The Knox Defendants' Fraudulent Scheme**

Stock held by control persons generally must be registered with the Commission before it

can be sold.  Otherwise, that stock is subject to sale limitations.  *See* Complaint ¶¶22, 24; 15

U.S.C. §§77d, 77e; 17 C.F.R. §230.144.  Stock held by control persons is also frequently subject

to public disclosure obligations.  *See* Complaint ¶3; 15 U.S.C. §78m.  These legal requirements

are designed to create market transparency by granting investors access to material information,

including information reflecting from whom the investors are buying stock, the identities of the

control persons of the company in which investors are investing, and what those control persons

are doing with the stock they own.  *See* Complaint ¶¶2, 3.

In an effort to evade these requirements, control persons coordinating with Knox disguised their securities holdings and transactions by using shell, or "nominee," companies and sophisticated trading schemes. *See id.* ¶¶31, 42, 55-58, 60-61, 63, 73-75, 77-80. Knox was integral to facilitating these efforts. Starting no later than June 2015, Knox provided a trading platform—Wintercap[1]—that was designed to obscure the ownership interests of control persons in more than 50 publicly traded companies. *See id.* ¶¶1-2. The basic mechanics of the Wintercap fraud were as follows.

First, control persons coordinating with Knox (such as Control Group A identified in the Complaint) transferred the stock they controlled to Wintercap. *See id.* ¶¶27.iii, 29, 32, 60, 64, 80, 83. Control Group A, and other control persons working with Knox, often used nominee corporate entities to conceal that they held virtually all of the companies' purportedly unrestricted stock (i.e., stock that can be bought and sold in the markets without restriction). *See id.* ¶¶29, 31, 60, 61. Knox knew that the nominee corporate entities were designed to distance Control Group A from the stock. *See id.* ¶¶27.ii, 36, 55-58, 62, 63, 73-75.

Then Knox, through Wintercap, carefully coordinated the deposit and sale of control persons' stock through numerous omnibus brokerage accounts in tranches of less than 5% (thus avoiding disclosure obligations that attach when persons own 5% or more of a company's stock). *See id.* ¶¶27.iv, v, 33, 65, 81. An omnibus brokerage account generally does not reveal the identity of the underlying beneficial owner of the stock. *See id.* ¶27.v. In an effort to avoid scrutiny from brokers when selling large quantities of stock, Knox lied on critical forms maintained by brokerage firms. *See id.* ¶¶38-44, 66-70. Specifically, Knox falsely represented

---

[1] For most of June 2015 to the present (the "Relevant Period"), Wintercap SA was known as Silverton SA, but Knox changed its name to Wintercap SA in 2018, presumably to avoid the heightened scrutiny that was following him at broker-dealers and banks. For convenience, the entity is referred to in this memorandum as Wintercap, whether during the time period that it was known as Silverton SA or after.

to the brokerage firms that Wintercap was selling less than 5% of the companies' stock, and that Wintercap was not selling stock for control persons. *See id.* ¶¶37-44, 66-70.

Wintercap then dumped the stock of control persons into the market. *See id.* ¶¶1, 27.vii, 50-52, 71, 83, 85. In return, Wintercap would earn about 6% of those sale proceeds. *See id.* ¶¶32, 64, 89.

In order to funnel the proceeds of the scheme to third parties, including the control groups, and avoid scrutiny on who was receiving trading proceeds, Knox relied on Gastauer. Gastauer and the Entity Defendants substantially assisted Knox by providing a sham banking network through which to launder the proceeds of the scheme. *See id.* ¶¶10, 92-93, 95, 98. Gastauer repeatedly lied to banks to obscure Knox's identity, and helped to transfer money to, or on behalf of, the ultimate participants in the scheme. *See id.* ¶¶96-101. Gastauer also garnered significant financial benefits from Wintercap's illegal stock sales by transferring millions of dollars in proceeds from the fraud to accounts held for the Relief Defendants or to his own personal accounts. *See id.* ¶¶104-07.

The conduct described herein has left a wake of harmed investors: people who bought control persons' stock, often in the aftermath of promotional campaigns designed to increase the stocks' price, and who are now left with far less valuable shares. Donelan Dec. ¶¶31-50; Exs. C-F (showing price information over time); *see also* Complaint ¶87 (table listing some examples of Wintercap SA's illegal stock sales totaling about $64.8 million).

> **2. Gastauer and the Entity Defendants Obtained and Transferred the Proceeds of the Knox Defendants' Illegal Stock Sales.**

Wintercap's illegal sale of unregistered stock generated millions of dollars in stock sale proceeds between approximately October 2015 and April 2018. *See* Complaint ¶89. Knox turned to Gastauer for assistance in moving the proceeds of those stock sales in a manner that

obscured Knox's association with the money.  *See id.* ¶¶90, 92, 93.

Gastauer owns and operates a network of corporate entities that he claims are virtual banks (the WB21 Group entities), as well as related corporations, including the Entity Defendants.  *See id.* ¶¶90-91.  In practice, the Entity Defendants functioned as fronts for the Knox Defendants by supplying bank accounts that allowed Knox to move money from Wintercap brokerage accounts into the Entity Defendants' bank accounts, and from there into the accounts of Knox, control persons and their designees, and Gastauer and his relatives.  *See id.* ¶¶92-102.  The Entity Defendants' bank accounts were primarily funded with money from the Knox Defendants' fraudulent trading activities.  *See id.* ¶¶93, 98, 102; Donelan Dec. ¶¶10-12.

In October 2015, Gastauer created WB21 US Inc. and opened, as sole signatory, several bank accounts in that company's name.  *See* Complaint ¶92.  Between December 2015 and August 2016, Gastauer primarily used the WB21 US Inc. accounts to receive and disburse stock sale proceeds from Wintercap's foreign bank accounts.  *See id.* ¶93.

However, in June 2016, when Knox tried to send money directly from a Wintercap (operating at the time as Silverton) brokerage account to WB21 US Inc., his request was rejected.  *See id.* ¶94.  Brokers often scrutinize transfers that are not "first-party."  First-party transfers are those between bank and brokerage accounts held in the same name.  *See id.*  In response, Gastauer formed a new U.S. company called Silverton SA Inc. and opened several bank accounts in that name.  *See id.* ¶95.  Gastauer falsely represented the nature of Silverton SA Inc., and the source of the money it was sending and receiving, to at least one bank in the process.  *See id.* ¶¶96-97.

At later points, when asked by at least one bank about suspicious transfers, Gastauer repeatedly lied to various bank employees in order to substantially assist Knox.  *See id.* ¶¶100-101.  Gastauer also opened bank accounts in the names of WB21 NA Inc., C Capital Corp., B2

Cap Inc. and Wintercap SA Inc. and used these bank accounts to transfer money for the Knox Defendants. *See id.* ¶¶98, 102. Gastauer opened, and began to use, the Wintercap SA Inc. bank account after Knox changed Silverton SA's name to Wintercap SA (so that the transfers would be interpreted by the brokerage firms as "first-party"). *See id.* ¶102.

When he lied to banks, and opened accounts for the Entity Defendants, Gastauer and the Entity Defendants knew, or were reckless in not knowing, that they were substantially assisting the Knox Defendants' scheme by helping them disguise their transfer of the proceeds of that scheme. *See id.* ¶¶96, 99, 101.

## II.    The Entity Defendants Aided And Abetted Violations of the Securities Laws.

### A. Aiding and Abetting Liability

In order to demonstrate that the Entity Defendants aided and abetted the Knox Defendants' violations, the Commission must allege that a primary violation existed and that the Entity Defendants were "generally aware that [their] role or conduct was part of an overall activity that was improper and . . . [that they] knowingly and substantially assisted in the primary violation." *Tambone,* 550 F.3d at 144. Aiding and abetting liability requires knowing or reckless conduct by the Entity Defendants. *See* 15 U.S.C. §77o(b) ("any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this Act, or of any rule or regulation issued under this Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided"); §78t(e) (same, substituting "title" for "Act"); *SEC v. Wey,* 246 F. Supp. 3d, 894, 930 (S.D.N.Y. 2017) (discussing aiding and abetting elements post Dodd-Frank).

In order to prove that the Entity Defendants provided "substantial assistance," to the fraudulent scheme, the Commission must demonstrate that they "in some sort associate[d] [them]self with the venture, that [they] participate[d] in it as something that [they] wishe[d] to

bring about, [and] that [they sought] by [their] action to make it succeed." *SEC v. Apuzzo*, 689

F.3d 204, 206 (2d Cir. 2012) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

The defendants' general awareness that their actions were part of improper activity may be

proven by showing that the defendants knew or should have known that documents they had a

duty to review actually contained misleading or false statements. *See Tambone*, 550 F.3d at 145.

### B. The Entity Defendants Aided and Abetted Violations of the Antifraud Provisions of the Securities Laws.

#### 1. The Knox Defendants Are Primary Violators of the Antifraud Provisions.

The Knox Defendants engaged in a scheme to defraud investors, which included

deceptive devices and acts, and intentional misrepresentations of material fact by each of them,

in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and

Rule 10b-5. Exchange Act Section 10(b) and Rule 10b-5 prohibit any person, in connection with

the purchase or sale of any security, from, directly or indirectly: (1) employing any device,

scheme or artifice to defraud; (2) making an untrue statement of material fact or omitting to state

a material fact necessary to make the statements made not misleading; or (3) engaging in any act,

practice, or course of business that operates as a fraud or deceit upon any person, in connection

with the purchase or sale of a security. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5; *Aldridge v.

A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir. 2002) (*scienter* may be established by recklessness).

Scheme liability under Rule 10b-5(a) and (c) arises where defendants "employ a deceptive

device for the purpose of defrauding investors." *SEC v. Esposito*, 260 F. Supp. 3d 79, 91 (D.

Mass. 2017). Securities Act Section 17(a) contains similar prohibitions to Exchange Act Section

10(b), though the conduct must be in the offer or sale of any security. *See* 15 U.S.C. §77q(a).

To be actionable, a fraudulent misstatement must concern a material fact. *Basic Inc. v.

Levinson*, 485 U.S. 224, 231-32 (1988). A fact is material if there is a substantial likelihood that

a reasonable investor would consider it important in the total mix of information available.  *Id.*

Section 10(b) of the Exchange Act requires a showing that the defendants acted with scienter.  *Aaron v. SEC*, 446 U.S. 680, 687, n.5 (1980).  Section 17(a)(1) of the Securities Act requires scienter, but negligence is sufficient to establish liability under Sections 17(a)(2) and (3).  *See id.* at 695-97.

Here, Knox made and submitted materially false statements on broker forms so that he could get those brokers to sell securities Wintercap then owned.  *See* Complaint ¶¶38-44, 67-70.  Knox's misstatements were not due to a mistake or accident.  He knew that one representative of Control Group A coordinated the deposit of a significant percentage of two companies' stock with Wintercap.  *See id*. ¶¶32, 36, 57-58, 62-64, 74-75.  Knox, as Wintercap's owner and principal officer, also knew that Wintercap divided and deposited that stock across multiple brokerage accounts.  *See id*. ¶¶33-34, 65.  Knox knew this information at the time that Knox signed and submitted brokers' forms when seeking to deposit these two companies' stock into Wintercap's brokerage accounts.  *See id.*  Accordingly, Knox acted with scienter.

These facts establish that Knox made material misstatements to brokers in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, and Section 17(a)(2) of the Securities Act.  Knox also satisfies Section 17(a)(2)'s requirement that he obtain money "by means of any untrue statement of a material fact" because he obtained money from selling the shares that he was allowed to deposit into Wintercap's brokerage account by virtue of making the false statements on the brokers' forms.  *SEC v. Tambone*, 550 F.3d 106, 127-128 (1st Cir. 2008), *aff'd in rel. part*, 597 F.3d 436 (1st Cir. 2010) (en banc) (Section 17(a)(2) violated by defendant's use of a statement it knows or should have known was materially false).  Knox's misstatements were also part of a larger scheme to collect, distribute, and secretly sell the stock of control persons in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)

thereunder, and Sections 17(a)(1) and (3) of the Securities Act.  He engaged in numerous

misrepresentations to brokerage firms and other deceptive acts to evade the restrictions on the

disposition of control persons' stock.  *See In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d

319, 329 (S.D.N.Y. 2004) (liability under Rule 10b-5(a), (c) for participation in a fraudulent

scheme); *SEC v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008).

**2.      The Entity Defendants Were Aware of the Knox Defendants' Improper Actions and Substantially Assisted Their Scheme.**

The Entity Defendants knowingly or recklessly provided substantial assistance to Knox

and Wintercap by creating and maintaining a U.S.-based corporate and banking network for the

purpose of allowing Knox and Wintercap to transfer the proceeds of illegal stock sales out of

brokerage accounts, and distribute those proceeds to the Knox Defendants, control parties, and

their third party designees.  *See* Complaint ¶¶89-103.  As the founder and chief executive officer

of WB21 US Inc., Silverton SA Inc., WB21 NA Inc., and C Capital Corp.—each of which

Gastauer used to substantially assist Knox—Gastauer's conduct is imputed to each company.

*See* Complaint ¶¶18, 102; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir.

1972); *Tropikgadget FZE*, 146 F. Supp. 3d at 280.  Similarly, Gastauer caused one of his

relatives to form Wintercap SA Inc., and B2 Cap Inc, but Gastauer was actually the controller

and operator of these companies and their related bank accounts so his scienter is imputed to

those companies as well.  *See* Complaint ¶¶19, 102; *Manor Nursing*, 458 F.2d at1096 n.16.

Gastauer repeatedly lied to banks holding the Entity Defendants' accounts about the true

nature of Silverton SA Inc.'s business.  *See* Complaint ¶¶96-97, 100-101.  Over the course of

several years, he continued to conceal Knox's identity and the actual source of the money

flowing through the Entity Defendants' bank accounts.  *See id*. ¶¶90, 92, 93, 96, 101.  These

actions to conceal the Knox Defendants' wide-ranging fraudulent scheme and to distribute its

proceeds to its perpetrators (the very reason for the scheme's existence), clearly constitutes the

Entity Defendants' substantial assistance and awareness that they were part of improper conduct.

*See Apuzzo*, 689 F.3d at 214 (aiding and abetting liability established by allegations that

transactions in which the defendant participated were designed to conceal revenue and disguise

payments); *SEC v. Durgarian*, 477 F. Supp. 2d 342, 353-54, 357(D. Mass. 2007) (defendants

who acted to conceal trading errors and were aware that their actions would further the scheme to

conceal were liable for aiding and abetting).

### C. The Entity Defendants Aided and Abetted Violations of the Securities Registration Provisions of the Securities Laws.

### 1.    Knox Defendants' Primary Violation - Sale of Unregistered Stock

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through

the mail or interstate commerce unless a registration statement has been filed and is in effect.

Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or

interstate commerce unless a registration statement has been filed.   There are three elements to

these offenses: (1) no registration statement was filed or is in effect; (2) the defendant directly or

indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the

use of interstate communications.  *See SEC v. Esposito*, 260 F. Supp. 3d 79, 88 (D. Mass. 2017);

*Tropikgadget*, 146 F. Supp. 3d at 280.   Scienter is not an element of the offense.  *See Esposito*,

260 F. Supp. 3d at 88-89; *SEC v. Gibraltar Global Securities, Inc., et al.*, 13-cv-02575, 2016 WL

153090, *3 (S.D.N.Y. Jan. 12, 2016) ("Section 5 liability does not require scienter.").

A showing that a defendant was a "necessary participant" or a "substantial factor" in the

unregistered sale or offer of sale is sufficient for Section 5 liability.  *See Zacharias v. SEC,* 569

F.3d 458, 464-66 (D.D.C. 2009)  (applying substantial factor test and noting that liability extends

beyond those who actually distribute shares to the public);  *SEC v. Murphy,* 626 F.2d 633, 649-

52 (9th Cir. 1980); *cf SEC v. Saxena,* 26 Fed. Appx. 22, 23 (1st Cir. 2001) (per curiam) (defendant violated Sections 5(a) and 5(c) by "participating in the offer or sale of unregistered securities in interstate commerce or through the mails"). "Once participation in an unregistered sale has been shown, the petitioners have the burden of proving an exemption to the registration requirements." *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004).

Knox, through Wintercap, actually offered to sell—and did sell—securities in unregistered transactions on behalf of a number of clients, including Control Group A. *See* Complaint ¶¶50-52, 71, 83, 87. The requirement for a registration statement applies to each separate offer and sale of a security, not to the security itself; thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). Wintercap routinely sold a significant percentage of more than 50 companies' publicly traded stock for control persons without an effective registration statement. *See* Complaint ¶¶53, 72, 84, 87; *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) (shareholder was a control person because of his "influence on and domination of the mark for the company's shares"). Also, Wintercap's stock sales involved the use of interstate communications, including using foreign and domestic bank and brokerage accounts. *See* Donelan Decl. ¶¶7.c, 8, 10.

### 2. The Entity Defendants Were Aware That Their Conduct Was Part of an Improper Scheme and They Substantially Assisted that Scheme.

As discussed above with respect to the antifraud violations, the Entity Defendants knowingly or recklessly provided substantial assistance to Knox and Wintercap by creating and maintaining a U.S.-based corporate and banking network that allowed them to disguise the beneficial ownership of persons directing the illegal distribution of securities in violation of Section 5, and to funnel the trading proceeds back to the scheme participants. *See* Complaint

¶¶89-103.  This was a necessary step in the distribution of these securities.  The Entity

Defendants knowingly or recklessly routinely accepted payments from the Knox Defendants'

brokerage accounts and named themselves so that the brokerage firms would believe those

payments were first party transfers, subject to less scrutiny.  *See id.* ¶¶94-95, 102.  Because he

was their founder, chief executive officer, or the person who operated and controlled them,

Gastauer's state of mind is imputed to the Entity Defendants and his knowingly or recklessly

false statements concerning their operations, nature, and the source of funds in their bank

accounts, are attributable to them.  *See* Complaint ¶¶18, 19, 96-97, 100-102; *Manor Nursing*, 458

F.2d at 1096 n.16.  The Entity Defendants' actions to conceal the Knox Defendants' wide-

ranging fraudulent scheme demonstrate that they knew they were part of improper conduct and

that they were lending their substantial assistance to help it succeed.  *See Apuzzo*, 689 F.3d at

214; *Durgarian*, 477 F. Supp. 2d at 353-54, 357.

## III.   The Court Should Enter the Proposed Final Judgments Against Each Entity Defendant.

### A.  Permanent Injunctions

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act provide that

the Commission may seek a permanent injunction against further violations of the federal

securities laws.  *See* 15 U.S.C. §77t(b), 78u(d)(2).  A court will issue a permanent injunction if

the defendant's conduct demonstrates a reasonable likelihood of further violations.  *SEC v.

Sargent*, 329 F.3d 34, 39 (1st Cir. 2003).  When assessing the likelihood of recurrence, courts

consider the egregious or isolated nature of the violation, the degree of scienter, and the extent to

which the defendant recognizes the wrongfulness of his conduct.  *Id*.

Here, the need for a permanent injunction against the Entity Defendants is compelling

given the nature, magnitude, and duration of the fraudulent scheme they supported.  Each of the

Entity Defendants was an integral part of the overall schemes described in the complaint. Over several years, the Entity Defendants received the illicit trading proceeds of the Knox Defendants' schemes, concealed their source and the identity of their owners, and routed those funds ultimately to Knox and the control persons as the fruits of their violations. *See* Complaint ¶¶10, 92, 93, 97, 98-99; Donelan Dec. ¶¶9-11. The Entity Defendants, via Gastauer, also made multiple misrepresentations to banks to conceal that the funds they were receiving were proceeds of securities fraud and thus to allow the scheme to function without detection. *See id.* ¶¶92, 96, 100-101. The Entity Defendants together laundered millions of dollars in proceeds of fraudulent stock sales. *See* Donelan Dec. ¶¶9-11. A permanent injunction is necessary to provide some assurance that the Entity Defendants will not be used to defraud investors through another fraudulent scheme. The Entity Defendants have expressed no recognition of the wrongfulness of their conduct, and have not complied with the Court's TRO or PI that were designed to protect assets that could ultimately be used to repay victimized investors. Even though the Entity Defendants do not appear to be operating currently, that is likely because their bank accounts were frozen by this Court, and their business operations could be resumed following the resolution of this court matter. The current pause in their operations caused by the litigation of this case does not negate the need for permanent injunctive relief.

### B.  Disgorgement and Prejudgment Interest

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Williams*, 884 F. Supp. 28, 30 (D. Mass. 1995) (disgorgement is intended to deprive defendants of their "ill-gotten gains"). It has long been recognized that the "deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *Manor Nursing Ctrs*, 458

F.2d at 1104; *see also SEC v. Druffner*, 517 F. Supp. 2d 502, 511 (D. Mass. 2007).  The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation"; a district court has wide latitude to order (and calculate) disgorgement.  *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *Tropikgadget*, 2016 WL 4555595, *8.  It is also "irrelevant for disgorgement purposes, how the defendant chose to dispose of the ill-gotten gains."  *SEC v. Rosenfeld*, 2001 WL 118612, *2 (S.D.N.Y. Jan. 9, 2001); *accord SEC v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987).

Defendants can be jointly and severally liable for disgorgement in the amount of the proceeds of the fraud that they each controlled.  *See SEC v. Wyly,* 56 F. Supp. 3d 394, 406 (S.D.N.Y. 2014) (joint and several disgorgement is appropriate when entities have collaborated or worked closely together); *SEC v. Verdiramo*, 907 F. Supp. 2d 367, 376 (S.D.N.Y. 2011) (finding defendant jointly and severally liable for disgorgement for violation of Section 5 even if he did not personally profit); *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (joint and several liability is proper when multiple entities have close relationship in engaging in Section 5 violations).  Courts have also found that disgorgement on a joint and several basis is warranted when there is "successive ownership of profits already realized" as there was here.  *SEC v. Absolutefuture.com*, 393 F.3d 94, 96 (2d Cir. 2004).  Disgorgement is a "sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset;" it "establishes a personal liability, which the defendant must satisfy regardless [of] whether he retains the selfsame proceeds of his wrongdoing."  *SEC v. Whittemore*, 659 F.3d 1, 10 (D.C. Cir. 2011).

The unregistered sales in violation of Section 5 and the antifraud provisions of the securities laws generated at least $158 million in trading proceeds.  See Donelan Dec., ¶10. Purchasers who bought in these transactions were deprived of the information that a registration

statement would have afforded, including the critical information that the sellers were control persons of the issuers. Those gains must be disgorged.  Of the $158.8 million of cash generated by trading in the Knox Defendants' brokerage accounts, approximately $46.5 million was deposited directly into their foreign bank accounts (some of which then was transferred to the Entity Defendants' bank accounts), and the remaining $112.3 million was deposited directly into bank accounts owned by Silverton SA Inc., Wintercap SA Inc., and WB21 US Inc.  See Donelan Dec. ¶11, Ex. A.  The money in those brokerage accounts was the result of the fraudulent trading described in the Complaint.  See Complaint ¶¶33, 45, 52, 65, 71, 81, 85, 87; Donelan Dec. ¶¶9, 11.  In addition, Silverton SA Inc. and WB21 US Inc. bank accounts received an additional $16,156,357 that was transferred from Wintercap's bank accounts at Baltikums Bank in Latvia and AfrAsia Bank in Mauritius.  See Donelan Dec. ¶14, 15, 20-21.

All of the Entity Defendants received money from, and transferred money to, each others' bank accounts, essentially circulating the proceeds of the Knox Defendants' wide-ranging fraud among themselves, before sending some of it back to the Knox Defendants, to Gastauer and his family members, to the Relief Defendants and to third parties including Knox's control group clients and their designees.  See Complaint ¶¶92, 98-99, 104-07; Donelan Dec. ¶¶14-28.  An appropriate way to calculate disgorgement for each of the Entity Defendants is the amount of the proceeds of the fraud that they each controlled, as detailed in the Donelan Declaration (¶¶13-29), in the following amounts:

| Entity Defendant | Disgorgement Amount |
| --- | --- |
| Silverton SA Inc. | $116,588,918 |
| Wintercap SA Inc. | $2,808,900 |
| WB21 US Inc. | $125,673,503 |
| WB21 NA Inc. | $12,344,945 |
| C Capital Corp. | $15,332,672 |
| B2 Cap Inc. | $1,496,728 |

Each of the Entity Defendants should be held jointly and severally liable up to their disgorgement amounts.  At the direction, and under the control, of Gastauer, these entities

worked together closely to circulate the proceeds of the fraud among the bank accounts they each owned and to facilitate the distribution of the proceeds of the fraud to its perpetrators. *See Wyly,* 56 F. Supp. 3d at 406, *Verdiramo*, 907 F. Supp. 2d at 376.

The Commission also seeks prejudgment interest. "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (internal citations omitted); *Druffner*, 517 F. Supp. 2d at 512 (noting that the "First Circuit endorses the award of prejudgment interest in securities violations" and awarding it "to prevent the defendant from receiving the benefit of what would otherwise be an interest-free loan"). The Court has broad discretion whether to grant prejudgment interest and what rate to use for calculation. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476-77 (2d Cir. 1996) (using IRS underpayment rate); *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 369 (D.R.I. 2011); 17 C.F.R. §201.600(b) (Commission Rules of Practice state that prejudgment interest is computed at IRS underpayment rate, compounded quarterly). Prejudgment interest is calculated for the entire period from the time of the defendants' unlawful gains to the entry of judgment. *See First Jersey,* 101 F.3d at 1477.

By virtue of the time value of money, the Entity Defendants received an additional benefit from controlling the proceeds of the scheme they laundered, and they should be obligated to repay this amount. The Commission proposes the use of the IRS underpayment rate, compounded quarterly and has computed prejudgment interest using this method, by applying the compounded rate for each of the Entity Defendants starting on the date they received the last transfer of the proceeds of the fraud they controlled. *See* Donelan Dec. ¶30, Ex. G. Using this method, the prejudgment interest that should be paid by each Entity Defendant is:

| Entity Defendant | Date of last transfer of proceeds of fraud | Prejudgment Interest | Total Disgorgement Plus Prejudgment Interest |
|---|---|---|---|
| Silverton SA Inc. | $116,588,918 | $1,954,511 | $118,543,429 |
| Wintercap SA Inc. | $2,808,900 | $23,472 | $2,832,372 |
| WB21 US Inc. | $125,673,503 | $1,050,148 | $126,723,651 |
| WB21 NA Inc. | $12,344,945 | $206,952 | $12,551,897 |
| C Capital Corp. | $15,332,672 | $386,776 | $15,719,448 |
| B2 Cap Inc. | $1,496,728 | $12,507 | $1,509,235 |

### C.  Civil Penalties

The Commission respectfully requests that the Court impose a third-tier penalty against each of the Entity Defendants.

### 1.  The Civil Penalty Statutory Scheme

Section 21(d)(3)(A) of the Exchange Act and Section 20(d)(1) of the Securities Act give the Commission authority to seek civil penalties against violators of the securities laws.  *See* 15 U.S.C. §77t(d)(1); §78u(d)(3)(A).  In 1990, Congress determined that disgorgement alone is an insufficient remedy, concluding that "[s]ince disgorgement merely requires the return of wrongfully obtained profits, it does not impose any meaningful economic cost on the law violator. . . . authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise would provide great financial returns to the violator."  S. Rep. 101-337 (1990), *reprinted in* 1990 WL 263550 (Leg. Hist.).

Under both the Securities Act and the Exchange Act, courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of a violation, or (ii) a specified amount per violation, depending on whether the violation falls in the "first-tier," "second-tier" or "third-tier."  *See* 15 U.S.C. §77t(d)((2); 15 U.S.C. §78u(d)(3)(B); *see also Locke Capital*, 794 F. Supp. 2d at 370 (describing three-tier penalty

scheme).  As applied to the Entity Defendants' violations, the maximum first-tier penalty amount

for a corporate entity is $92,383 per violation, the maximum second-tier penalty amount for a

corporate entity that engaged in "fraud, deceit, manipulation or deliberate or reckless disregard

of a regulatory requirement" is $461,916 per violation, and the maximum third-tier penalty

amount for a corporate entity that is engaged in "fraud, deceit, manipulation or deliberate or

reckless disregard of a regulatory requirement", and the violation directly or indirectly results in

substantial losses or creates a significant risk of substantial losses to other persons, is $923,831

per violation.  *See* 15 U.S.C. §77t(d)((2); 15 U.S.C. §78u(d)(3)(B); 17 C.F.R. §201.1001(b).[2]

Unlike disgorgement, civil penalties may not be ordered jointly and severally and should be

ordered separately against each defendant.  *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d

279, 288 (2d Cir. 2013).

Although the statutes provide maximum penalties "for each such violation," neither the

Securities Act nor the Exchange Act prescribe how to calculate the number of violations.

Several courts have determined that a "violation" encompasses each instance that a defendant

has acted to violate the securities laws.  *See, e.g.*, *SEC v. Lazare Indus., Inc.*, 294 Fed. Appx.

711, 715 (3d Cir. 2008) (district court's imposition of $500,000 penalty was reasonable given

that it could have considered each sale of unregistered stock as a separate violation).  For

example, the Court may consider the number of statutes that were violated, or may consider the

number of victims to whom misrepresentations were made.  *See, e.g., SEC v. Kenton Capital

Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (imposing $1.2 million penalty calculated by

"multiplying the maximum third tier penalty" by the "number of investors who actually sent

---

[2] Though the statutes contain lower penalty amounts for each of the tiers, these amounts were
increased for violations occurring after November 2, 2015, to account for inflation.  *See* 17
C.F.R. §201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the
Securities and Exchange Commission (as of January 15, 2018), *available at*
https://www.sec.gov/enforce/civil-penalties-inflation-adjustments-pdf.pdf.

money" to the defendant).  The Court may also simply impose a penalty in the amount of, or based on, the Entity Defendants' gross pecuniary gain.  *See Locke Capital*, 794 F. Supp. 2d at 371; *SEC v. Gibraltar Global Securities, Inc.*, No. 13-civ-2575, 2016 WL 153090, *5-6 (S.D.N.Y. Jan. 12, 2016) (calculating each of two defendants' civil penalties as half of the total ill-gotten gains they received from violations of Securities Act §5 and Exchange Act §15).

### 2.      Third-Tier Penalties Are Appropriate Here.

If the Court imposes a civil monetary penalty against the Entity Defendants in a specified amount pursuant to the three-tier penalty scheme – as opposed to a penalty in the amount of their gross pecuniary gain – the Commission submits that a third-tier penalty would be appropriate because the Entity Defendants aided and abetted fraud  and their violations directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons who decided to buy the microcap securities dumped into the market by the Knox Defendants. *See, e.g.*, *Rizek v. SEC*, 215 F.3d 157, 163-64 (1st Cir. 2000) (upholding Commission's imposition of third-tier penalty against defendant who churned multiple customer accounts); *Tropikgadget*, 2016 WL 4555595, *8 (imposing third tier penalty against defendants who conducted a large-scale pyramid scheme); *SEC v. EagleEye Asset Management*, 975 F. Supp. 2d 151, 162 (D. Mass. 2013) (imposing third tier penalty on a defendant who forged documents to transfer client money into highly speculative markets); *SEC v. Manterfield*, 2009 WL 935953, at *1-2 (D. Mass. Apr. 8, 2009) (imposing third tier penalty on a defendant for making misrepresentations to investors resulting in investor losses over $15 million).  Following the Knox Defendants' dumping of shares into the market for Environmental Packaging during a promotional campaign, the market price of those securities substantially declined and investors suffered substantial losses.  *See* Complaint ¶¶50-52; Donelan Dec. ¶¶32-37, 46-47, Ex. C, D. Similarly, investors who purchased shares  during the time that the Knox Defendants were

dumping control persons' shares of Garmatex into the market, while those control persons were running a promotional campaign, also suffered substantial losses from the steep decline in the price of Garmatex shares. *See* Complaint ¶¶81, 83-85; Donelan Dec. ¶¶38-44, 48-50 Ex. E, F.

A third-tier penalty also comports with the general factors that courts look to in imposing civil penalties: (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition. *See generally SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005); *cf. Sargent*, 329 F.3d at 41-42 (setting forth similar criteria to be applied in insider trading case).

Applying these factors here weighs heavily in favor of a third-tier penalty.  First, the Entity Defendants, under Gastauer's control, aided and abetted egregious securities law violations by lying to banks and brokerage firms to allow the Knox Defendants and their control group business partners to launder the proceeds of securities fraud schemes involving at least 50 U.S. publicly traded companies.  *See* Complaint ¶¶1, 87, 92-93, 96, 97, 100-101.  The Entity Defendants' misconduct was not isolated -- but rather the entire purpose of their existence.  *See* Complaint, ¶99.  Second, the Entity Defendants' actions, through their principal Gastauer, exhibited a high degree of scienter.  Gastauer knew that he were lying to banks and brokerage firms on behalf of the Entity Defendants when he caused those firms to represent that they were venture capital firms or private investment vehicles and failed to disclose that they were really laundering proceeds from the Knox Defendants' schemes.  *See* Complaint ¶¶92, 96, 97, 100-102. Third, the Entity Defendants' misconduct spanned several years and involved the formation of at

least 20 bank accounts to launder the proceeds of fraud.  *See id.* ¶¶92-102.  Their fraud was not

an isolated instance of misconduct, but rather a series of actions taken to facilitate the

concealment of a wide-ranging securities fraud scheme.  *See, e.g., SEC v. Universal Express,*

*Inc.,* 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007), *aff'd sub nom, SEC v. Altomare*, 300 Fed. Appx.

70 (2d Cir. 2008) (third-tier penalties appropriate where "defendants engaged in numerous and

inexcusable instances of securities law violations over the course of at least four years");

*Lybrand*, 281 F. Supp. 2d. at 731 (third-tier penalties awarded) ("Far from being an isolated

event, the actions of these men involved a multitude of improper securities transactions that

occurred over several months – they violated the securities laws repeatedly and with

regularity.").  Unlike defendants who engage in misconduct ancillary to their main business, the

very purpose for the Entity Defendants' existence was to facilitate fraud.  *See* Complaint ¶¶92,

98-99, 102.

The fourth, sixth and seventh factors, the extent to which the Entity Defendants have

accepted responsibility and cooperated with authorities or may not be able to pay a judgment,

also weigh in favor of third tier penalties.  Rather than accept responsibility and cooperate, they

have ignored the Court's requirements in the TRO and PI to produce accountings of their assets,

and have refused to defend or participate in discovery by defaulting.

The fifth factor – whether the Entity Defendants created substantial losses or the risk of

substantial losses to other people – weighs heavily in favor of imposing a third-tier penalty.

Here, as a result of the fraud that the Entity Defendants facilitated, there is a significant risk that

investors have lost substantial sums.  *See* Donelan Dec. ¶¶45-50.  These losses were substantial

to the investors who suffered them.  *See SEC v. Levine*, 517 F. Supp. 2d 121, 141 (D.D.C. 2007)

(third-tier penalties awarded), *aff'd* 279 Fed. Appx. 6 (D.C. Cir. 2008); *Robinson,* 2002 WL

1552049, at *11 (third-tier penalty appropriate where "[g]iven [company's] prospects, it is a

certainty that [defendant's] sales of stock 'directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons'").

**D.      Frozen Assets Not Subject to Criminal Forfeiture Should Be Paid to the Commission In Partial Satisfaction of the Requested Judgment.**

At the beginning of this case, the Court froze the assets of the Entity Defendants to ensure that these assets would be available to satisfy an eventual judgment for disgorgement or penalty. *See* Dkt. Nos. 9, 46, 57.  The Commission requests that the Entity Defendants' assets not subject to criminal forfeiture be paid to the Commission in partial satisfaction of the disgorgement, prejudgment interest and civil penalties requested here.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court enter the proposed default judgments against defendants WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. in the form submitted.

Respectfully submitted,

December 3, 2018                    SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/ Kathleen Shields
Rebecca Israel
Kathleen Shields
David M. Scheffler
Jonathan Allen
Eric Forni
33 Arch Street, 24th Floor
Boston, MA 02110
Telephone: (617) 573-8904 (Shields direct)
Fax: (617) 573-4590
Email: shieldska@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2018, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

    /s/ Kathleen Shields
Kathleen Shields