UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SECURITIES AND EXCHANGE COMMISSION,   )
                                               )
            Plaintiff,                  )
                                               )
      v.                            )   Case No.  1:18-cv-12058-RGS
                                               )
ROGER KNOX, WINTERCAP SA,          )
MICHAEL T. GASTAUER, WB21 US     )
INC., SILVERTON SA INC., WB21 NA   )
INC., C CAPITAL CORP., WINTERCAP )
SA INC. AND B2 CAP INC.            )
                                             )
            Defendants,        )
      and                         )
                                             )
RAIMUND GASTAUER, SIMONE      )
GASTAUER FOEHR, B21 LTD., SHAMAL )
INTERNATIONAL FZE, AND WB21 DMCC )
                                             )
          Relief Defendants.    )
_____)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO
MOTION BY NONPARTY CITY GROUP ALLIANCE INC. TO INTERVENE**

Plaintiff Securities and Exchange Commission (the "Commission") hereby opposes the

motion to intervene pursuant to Fed. R. Civ. P. 24 that was filed by nonparty City Group

Alliance, Inc. ("City Group"). *See* Dkt. Nos. 131-132. City Group contends that it should be

permitted to intervene because it is seeks relief from the Court's preliminary injunctions and

orders freezing assets to recover approximately CAD $5 million in allegedly untainted funds it

deposited with defendant Wintercap SA in 2018. *See* Dkt. Nos. 9, 46, 57 (the "Asset Freeze

Orders"). City Group is not entitled to either form of relief that it seeks. As defendants'

creditor, it should not be permitted to intervene in this securities enforcement action. Further, its

claims against the limited funds frozen in this action should not be prioritized over the SEC's

1

disgorgement and penalty claims at this stage of the case when there are likely vastly insufficient funds to compensate harmed victims fully. Moreover, as detailed below, there is more to the story than City Group presents, even if City Group is ultimately able to persuade this Court that it was simply one of the victims of defendants' misconduct.

## RELEVANT FACTS

**A.    At Best, City Group is One, Among Many, Victims of Defendants' Fraud.**

**1.    The Money Transfers To Defendant WB21 US Inc.**

City Group Alliance Inc. ("City Group MI") was formed in February 2018 in the Marshall Islands (about 3 weeks before the Norland transfer) and lists Ripoll as its ultimate beneficial owner. *See* Dkt. No. 132-3, Exs. A and K. City Group MI claims that two Canadian entities, Norland Estates, Inc. ("Norland") and Highpoint Drive Estates, Inc. ("Highpoint") transferred about CAD $5 million to what they claim is a bank account at WB21 Pte. held in the name of City Group MI. *See* Declaration of Virgilio Santana Ripolll ("Ripoll" and "Ripoll Dec."), Dkt. No. 132-3, at ¶14 and Ex. J. However, WB21 Pte., Ltd., is not an actual bank. *See* Declaration of Trevor Donelan ("Donelan Dec."), filed herewith, ¶6, Ex. A. The WB21 Pte. Ltd. account statement is simply a ledger or journal showing the accounting for money held in actual bank accounts that are in the names of various entities related to WB21 Pte., including the Gastauer Entity Defendants (defendants WB21 US Inc., WB21 NA Inc., Wintercap SA Inc., Silverton SA Inc., B2 Cap Inc., and C Capital Corp.) as well as relief defendant, WB21 DMCC. *See id.* ¶6.

City Group MI has claimed that the two transfers from Norland and Highpoint were made to its WB21 Pte. Ltd. bank account. *See* Ripoll Dec., ¶14. In actuality, those transfers were made by Norland and Highpoint by wire payments of approximately CAD $3 million and CAD

$2 million, respectively, to a Wells Fargo bank account in the name of defendant WB21 US, Inc. *See* Donelan Dec., ¶¶7-8, Exs. B-E. When converted into US dollars, those transfers were in the amounts of $2,288,603.33 and $1,697,717.74 respectively. *See id.* When these two transfers were made, Wintercap SA personnel instructed Gastuaer and employees of the Gastauer Entity Defendants to credit these payments to a recently opened WB21 Pte. Ltd. account in the name of City Group MI. *See* Donelan Dec., ¶9, Exs. B, D.

### 2.    The Money Was Dissipated from the WB21 US Inc. Bank Account

After the funds from Norland and Highpoint were deposited into WB21 US Inc.'s bank account at Wells Fargo, they were dissipated almost immediately to satisfy outgoing wire transfers for other Wintercap SA clients, or transfers to defendant Michael Gastauer personally or through a Gastauer-controlled relief defendant. *See* Donelan Dec., ¶¶13-18, Exs. C, E. For example, $770,000 was wired to a Philippines-based company, $750,000 was used to purchase stock for Wintercap SA clients other than City Group MI, $218,000 was wired to defendant Michael Gastauer, and $250,000 was wired to Relief Defendant B21 Ltd. in London (an entity controlled by Gastauer). *See id.*, ¶16. Only about $50,000 of these funds were wired to Ripoll himself, but interestingly, were accounted for as payments on behalf of Wintercap SA clients other than City Group MI. *See id.* ¶¶16, 18.

None of these withdrawals, although they were directly funded with the cash received from Norland and Highpoint that had been credited to City Group MI's WB21 Pte. Ltd. account, were reflected on City Group MI's WB21 Pte., Ltd. account ledger. *See* Dkt. No. 132-3, Ex. J, L. Thus, despite City Group MI's belief that its funds were frozen, and are currently available to be returned to them, those funds had been dissipated long before the asset freeze was entered. At

best, City Group MI is either a creditor of defendant Wintercap S.A. and the Gastauer Entity Defendants, or a victim of their fraud.

   **3.     There Are Significant Questions About the Ownership Structure Alleged by City Group MI.**

   While City Group MI has proffered documents showing that it is the ultimate owner of both Norland and Highpoint, there is some contradictory evidence. *See* Dkt. No. 132-3.

   Norland and Highpoint are now both owned by Lakehouse Capital, Inc. ("Lakehouse"), a British Columbia corporation. *See* Dkt. No. 132-3, Exs. B, C. Before Norland was owned by Lakehouse, and at the time it purchased the real property that was sold to generate the money at issue in this case (July 23, 2014), it was owned by Yvonne Gasarch. *See id.*, Ex. B (showing Gasarch owned Norland from June 23, 2014 to November 25, 2014), Ex. F. City Group MI also claims that Norland got the money to purchase the real property from a shareholder loan. *See* Ripoll Dec., ¶8. That means that the shareholder loan to purchase the property must have been made by its sole shareholder at the time, Yvonne Gasarch. Yet, when the property was sold in 2018, the shareholder loan was not repaid to Gasarch, but rather, was repaid to an entity purportedly controlled by Ripoll. City Group MI offers no explanation for this discrepancy. Further, while City Group MI contends that it received the transfers from Norland and Highpoint as repayments of shareholder loans, it has provided no documentation that it was the entity making those loans, or that the loans existed.

   City Group MI claims that Lakehouse is, and has been continually, owned by another separate British Columbia corporation named City Group Alliance, Inc. ("City Group BC") since November 2014. *See* Ripoll Dec., Ex. D. However, bank records for Lakehouse contradict this claimed ownership structure. These records, from December 2014, demonstrate that British Columbian resident Yvonne Gasarch was the 100% owner of Lakehouse Capital, Inc., as well as

its President and sole Director.  *See* Donelan Dec., ¶10, Ex. F.   Frederick Sharp was

Lakehouse's Secretary, and the entity's mailing address was 320-1100 Melville St. in

Vancouver, British Columbia.  *See id*.  City Group MI also claims that City Group BC has been

100% owned by City Group MI since February 21, 2108.  *See* Ripoll Dec., ¶4, Ex. E.  This

claimed ownership structure is questionable based on records obtained by the Commission.   In

particular, the incorporation documents for City Group BC show that it was incorporated by

Thomas Sharp, and it has a mailing address (like Lakehouse) of 320-1100 Melville St. in

Vancouver, British Columbia.  *See* Donelan Dec., ¶11, Ex. G.  Over time, City Group BC has

only had two directors:  Thomas Sharp and Yvonne Gasarch. *See id*.  City Group MI's motion to

intervene fails to explain why the Norland and Highpoint funds were transferred out of Canada,

from British Columbia corporations to a Marshall Islands corporation.   There are published news

reports that City Group BC has sued Canadian tax authorities concerning its audits of the

company.  *See* Donelan Dec., ¶12, Ex. H.

**B.      There Are Significant Questions About The Scope of Ripoll's Interactions with the Defendants.**

City Group MI offers Ripoll's declaration to support its claims.  *See* Dkt. No. 132-3.  In

that declaration, Ripoll claims to be the sole director and shareholder of City Group MI, as well

as its beneficial owner. *See* Ripoll Dec. ¶1, Ex. K.

However, Ripoll's declaration does not address that he is also the beneficial owner of

record of Quezon Group LLC, a Nevis-based corporation that is also a "client" of Wintercap SA.

*See* Donelan Dec. ¶19; Ex. I.  Quezon Group is one of the largest Wintercap SA "clients."  Since

Wintercap SA initiated its relationship with Gastauer and the Gastauer Entity Defendants in

2016, Wintercap SA has accounted for over $14 million of trading proceeds by transferring them

into the Quezon Group account ledger at WB21 Pte. Ltd. *See id*. ¶20.  The Commission believes

that substantially all of this $14 million in trading proceeds was generated by the fraudulent

Wintercap SA trading proceeds that are described in the Complaint. *See id.* ¶21. Only a small

fraction of this $14 million in trading proceeds (less than $200,000) was subsequently transferred

to bank accounts in Ripoll's name. *See id.* ¶22. The vast majority of the remaining proceeds

were wired all over the world to beneficiaries with no discernible connection to Ripoll. *See id.*

¶23. These transfers create doubt as to whether Ripoll is really acting on his own behalf, or is

instead acting at the direction of someone else, and is directing substantial sums of money to

entities that have been involved in the misconduct described in the Complaint.

## ARGUMENT

### A. City Group Is Not Entitled To Intervene As of Right.

City Group bears the burden of proving four factors in order to establish its right to

intervene under Fed. R. Civ. P. 24(a)(2):

> (i) its motion is timely; (ii) it has an interest relating to the property or transaction that
> forms the foundation of the ongoing action; (iii) the disposition of the action threatens to
> impair or impede its ability to protect this interest; and (iv) no existing party adequately
> represents its interest.

*Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011) (affirming denial of intervention); *In re Efron*,

746 F.3d 30, 35 (1st Cir. 2014) (same). Failure to establish any one of these requirements means

that City Group's motion must be denied. *See Ungar*, 634 F.3d at 51.

Moreover, Rule 24(a)(2)'s requirements must be read "in the context of the particular

statutory scheme that is the basis for the litigation and with an eye to the posture of the litigation

at the time the motion is decided." *United States v. Hooker Chem. & Plastics Corp.*, 749 F.2d

968, 983 (2d Cir. 1984). This is particularly so in Commission enforcement actions. *See*

*generally SEC v. Everest Management Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972). Intervention

is therefore strongly disfavored in Commission enforcement actions that seek to vindicate the

federal securities laws and to protect investors by, among other things, stopping violations, bringing perpetrators to justice, and maximizing recoveries for victims. *See, e.g., SEC v. Callahan*, 2 F. Supp. 3d 427, 438 (E.D.N.Y. 2014) (denying intervention where intervenor "wishes to intervene to pursue its rights in and to its collateral, but that issue is wholly separate from this civil securities fraud suit that has been brought by the SEC").

While City Group likely satisfies the first factor (timeliness), it meets none of the three other requirements. The second factor requires City Group to demonstrate that it has an interest in the "property or transaction that forms the foundation of the ongoing action." *Ungar*, 634 F.3d at 50. At best, City Group has a claim for recovery against some or all of the defendants in this case. Though City Group argues that it has a claim to identifiable, untainted assets that are preserved in a bank account and available for return to it, the evidence is clear that the defendants have spent those funds. *See* Donelan Dec., ¶¶13-18. Therefore, City Group cannot demonstrate an interest in property that currently exists, much less property that is the "foundation" of the ongoing action. *See SEC v. Novus Techs., LLC*, No. 07 cv 235, 2008 WL 115114, *4 (D. Utah Jan. 10, 2008) (rejecting creditor-investor's motion to intervene seeking to impose a constructive trust on assets in defendants' possession that it contended belonged to it).

The type of interest required by Rule 24(a)(2) is the same type of interest that necessitates the joinder of a party under Fed. R. Civ. P. 19. *See Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389-90 (2d Cir. 2006); *see also B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 545 n.2 (1st Cir. 2006) (party to contract whose specific performance is sought is likely indispensable and also satisfies Rule 24(a)(2) interest requirement). As in *Mastercard*, City Group's motion must be denied because City Group's "absence from this litigation is not the cause of any harm to its interests. Nor will [City Group]'s presence allow it to

protect those interests." *Id*. at 390.  City Group's interest is similar to that of all other defrauded investors in, or creditors of, the defendants in this case.  The cause of any harm to City Group's interests is the fraud that the Commission alleges was perpetrated by the defendants.  It is a bitter possibility that, given the comingling of assets, and the comparatively limited funds that were frozen, the funds remaining after that fraud may be insufficient to make all such investors and creditors whole.  *See id*. at 390 ("Visa's ability to protect its interest will not be impaired or impeded *because* it is denied intervention in this case. As we have discussed, any harm to Visa's interests would result from FIFA's alleged conduct in breaching its contract with MasterCard and granting the sponsorship rights to Visa.").  City Group's participation as a party in the substantive determination of the SEC's claims against the defendants and any defenses that the defendants may raise will not allow City Group to protect its interest in recovering any funds and it therefore should not be permitted to intervene as a party.

Similarly, City Group cannot show that it meets the third factor -- that its purported interests would be impaired if it were not permitted to intervene.  The gravamen of City Group's claim is that of a creditor.  It, like many other entities and individuals, may have been victimized by and lost money as a result of, the fraudulent scheme alleged in the Complaint.  The existing impairment of its interests has not been caused by the Court's Asset Freeze orders that it seeks to challenge, but rather by the fraud that the defendants conducted, including their co-mingling and dissipation of those assets. City Group seeks, via the vehicle of intervention, to obtain a preferential position vis-à-vis all those other potential victims of the fraudulent scheme.  While the Commission does seek disgorgement of all sums in the defendants' possession, and will ultimately consider a plan to return sums to harmed investors and creditors, City Group's claim to jump over that process should not be countenanced. *See U.S. v. Alisal Water Corp.*, 370 F.3d

915, 920 (9th Cir. 2004) (denying intervention in government enforcement action where intervenor sought to collect a debt).

Last, City Group cannot demonstrate that its interests are not adequately represented. Even giving City Group and its principal the benefit of the doubt that they are innocent investors who relied on Wintercap SA for asset management services (*but see* Donelan Dec., ¶¶20-24), its interest in recovering the funds it sent to defendants Wintercap SA and WB21 US Inc. is similar to the Commission's goal in maximizing the recovery from all of the defendants to return those funds to legitimately harmed investors and creditors. When the Commission acts under its statutory authority to benefit defrauded investors and remedy alleged securities fraud, it is presumed, like other governmental agencies acting in similar *parens patriae* enforcement actions, sufficiently to represent the interests of the public for purposes of Rule 24(a). *See Hooker Chems.*, 749 F.2d at 984, 987; *SEC v. Bear Stearns & Co., Inc.*, No. 03 Civ. 2937, 2003 WL 22000340, *3 (S.D.N.Y. Aug. 25, 2003) ("the SEC, in its role as *parens patriae*, is presumed to represent the interests of the investing public aggressively and adequately. Reflexive intervention by the public in SEC actions would undermine both the SEC's ability to resolve cases by consent decree and the efficient management of those cases by courts."). In such cases, an intervenor must make far more than a "minimal showing" that its interest is in fact different from the governmental entity's interest, and may be required to show that the governmental entity is "ill-equipped or unwilling" to protect their interests. *Hooker,* 749 F.2d at 985; *Commonwealth v. U.S. Dep't of Health & Human Servs.*, 289 F. Supp. 3d 259, 264 (D. Mass 2018) (ratcheting upward the showing required by putative intervenor seeking to show representation of government entity is inadequate and noting exception to *B. Fernandez* standard cited by City Group).

In this case, the Commission has devoted substantial resources to pursuing claims on behalf of parties injured by the defendants' fraudulent scheme, and has acted vigorously to protect those interests, including by pressing claims to assets held overseas. Courts have frequently found that the Commission adequately protects the interests of all investors for purposes of Rule 24(a) even when it does not prefer the claims of one defrauded investor over another. *See SEC v. Credit Bancorp*, 194 F.R.D. 457, 468 (S.D.N.Y. 2000) (citing cases); *SEC v. Byers*, No. 08 Civ. 7104, 2008 WL 5102017, *1 (S.D.N.Y. Nov. 25, 2008) ("This is an enforcement action brought by the SEC to . . . address the alleged fraud perpetrated by defendants and to recover defendants' assets and the proceeds of their purported scheme for the benefit of defrauded investors and creditors. Although not all investors share the same interests, it is in all their interests to maximize the value of the assets under the receivership."). Thus, City Group cannot make the required showing that its interests are inadequately represented.

In sum, City Group has failed to show that it is entitled to intervene in this matter as of right because it has failed to establish that it has a legally protectable interest that will be practically impaired without its participation as a party, and it has failed to establish that any interest it has is inadequately represented by the existing parties.

**B.    The Court Should Deny City Group's Motion for Relief from the Asset Freeze Order.**

Should the Court decide to entertain the substance of City Group's motion for relief from the asset freeze even if it is not permitted to intervene in this case (*see SEC v. Pinez*, 989 F. Supp. 325, 337 (D. Mass. 1997)), that motion should also be denied, at least on the current record.

> To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established

at trial. *See SEC v. Roor*, No. 99 Civ. 3372, 1999 U.S. Dist. LEXIS 11527, 1999
WL 553823 at *3 (S.D.N.Y. July 29, 1999). The touchstone of the inquiry is
equity. "[T]he disadvantages and possible deleterious effect of a freeze must be
weighed against the considerations indicating the need for such relief.

*SEC v. Stein*, No. 07 Civ. 3125 (GEL), 2008 U.S. Dist. LEXIS 108604, at *2-3 (S.D.N.Y. Apr.

30, 2008) (quoting *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972));

*see also* Dkt. No. 40 (denying defendant Knox's motion for relief from the asset freeze unless he

produces evidence showing that funds were untainted). Even when a defendant's assets are

untainted, those assets should not be released from an asset freeze unless it is known that the

available funds are greater than the amount of the defendant's potential liability. *See, e.g., SEC v*

*Sekhri*, No. 98 CIV. 2320 RPP, 2000 WL 1036295, at *1 (S.D.N.Y. July 26, 2000) ("a freeze

order need not be limited only to funds that can be directly traced to defendant's illegal

activity"); *SEC v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (refusing to release

personal funds not traceable to the fraud because defendant's liability exceeded the total funds

frozen); *Stein*, 2008 U.S. Dist. LEXIS 108604, at *3-4 (denying motion for $60,000 in legal fees

when it appeared likely that defendant would soon have liabilities to government and fraud

victims); *SEC v. Roor*, No. 99-3372 (JSM), 1999 U.S. Dist. LEXIS 11527, at *7-8 (S.D.N.Y.

July 28, 1999) (denying motion to release funds for personal expenses from mortgage of

property that pre-existed alleged fraud, citing the "likelihood that [the defendant] would soon

have significant personal liabilities to the government and to the victims of the fraud he is

alleged to have perpetrated"); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("It is

irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal

activity. . . .").

While City Group argues that these cases should not control because it is a "non-party

against whom no wrongdoing is alleged," the case it cites as the basis for that proposition does

not provide the support it claims. *See* Dkt. No. 132-2 at 2. In *SEC v. Cherif*, 933 F.2d 403, 414-15 (7th Cir. 1990), the court found that while the district court erred in the jurisdictional analysis relating to its ability to issue a preliminary injunction freezing a non-party's brokerage account, it decided to continue that freeze order for 14 days to allow the parties and the district court to sort out whether the freeze would be proper because the account owner should be named as a nominal, or relief, defendant, or whether the account owner should be sued as a defendant. *See id*. In any event, that case is entirely inapposite. As relevant here, the Asset Freeze Orders issued by this Court covered bank accounts owned by, and in the name of, the Gastauer Entity Defendants – not City Group itself. The fact that City Group may have ownership claims to assets that were contributed to those accounts, and then dissipated as part of the fraudulent scheme alleged in the Complaint, does not give them a basis to challenge, or obtain relief from, the Asset Freeze Orders. *See* Donelan Dec., ¶¶13-18. Recognizing City Group's claim would essentially allow any harmed investor in a securities fraud enforcement action to challenge an asset freeze order and assert that its ownership interest in any remaining funds should give it priority over other harmed investors.

Even if the funds contributed by City Group remained in a frozen WB21 US Inc. account (which they do not), those funds should not be released to City Group and Ripoll on the current record. Consider the defendants' fraudulent scheme as a game of musical chairs. Paying City Group out of any remaining funds would essentially privilege -- over other investors -- an investor whose funds remained untouched at the moment the music stopped playing.

Moreover, If Ripoll is really the ultimate beneficial owner of City Group, as he claims to be, as well as the ultimate beneficial owner of Quezon Group, an entity that was credited with over $14 million in proceeds of the fraud, there is a legitimate question about whether he has

ultimately profited as a result of the fraud alleged in the Complaint. *See* Donelan Dec., ¶¶20-24. In a scenario in which the defendants' collective funds are likely unable to suffice to compensate all harmed investors or creditors in full, it will likely be necessary to net even innocent investors' losses against their gains from the fraudulent schemes. Before granting any relief from the Asset Freeze Orders to City Group, the Commission should be entitled to take Ripoll's deposition to gain a more complete understanding of the full scope of his financial transactions with the defendants, and to understand the full scope of any business dealings he had with them that may be related to any of the Complaint's allegations, and to submit supplemental briefing to the Court after that deposition has been taken. Only with this full picture would the Court be equipped to consider fully and fairly Ripoll's claim that he is entitled to the immediate return of CAD $5 million.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court deny

City Group's motions to intervene, and for relief from this Court's Asset Freeze Orders.

May 6, 2019                                        Respectfully submitted,

                                                   SECURITIES AND EXCHANGE COMMISSION
                                                   By its attorneys,

                                                   /s/ Kathleen Shields
                                                   Eric Forni
                                                   Rebecca Israel
                                                   Kathleen Shields
                                                   David M. Scheffler
                                                   Jonathan Allen
                                                   33 Arch Street, 24th Floor
                                                   Boston, MA 02110
                                                   Telephone: (617) 573-8904 (Shields direct)
                                                   (617) 573-8827 (Forni direct)
                                                   Fax: (617) 573-4590
                                                   Email: shieldska@sec.gov; fornie@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2019, a true and correct copy of the foregoing document
was filed through the Court's CM/ECF system, and accordingly, the document will be sent
electronically to all participants registered to receive electronic notice in this case. A copy will
also be sent via first class mail and/or email to those parties who have not yet registered for
notice via the Court's CM/ECF system.

                                   /s/ Kathleen Shields
                                   Kathleen Shields