UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

**SECURITIES AND EXCHANGE COMMISSION,**
                                    **Plaintiff,**

        **v.**

**ROGER KNOX, WINTERCAP SA, MICHAEL T. GASTAUER, WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP., WINTERCAP SA INC. AND B2 CAP INC.**
                        **Defendants.**

**RAIMUND GASTAUER, SIMONE GASTAUER FOEHR, B21 LTD., SHAMAL INTERNATIONAL FZE, AND WB21 DMCC**
                **Relief Defendants.**

**1:18-CV-12058-RGS**

---

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP., WINTERCAP SA INC., AND B2 CAP INC. AND RELIEF DEFENDANTS RAIMUND GASTAUER, B21 LTD. AND WB21 DMCC

Plaintiff United States Securities and Exchange Commission (the "Commission") submits this Local Rule 56.1 statement of undisputed facts in support of its motion for summary judgment against defendants WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. (collectively, the "Entity Defendants"), and relief defendants Raimund Gastauer, B21 Ltd. and WB21 DMCC (collectively, the "Relief Defendants").

**Background and Cast of Characters**

1.      On October 2, 2018, the Commission filed this case, and obtained a temporary restraining order that, among other things, froze all of the defendants' assets.  SEC Appendix Ex.

1, Ex. 2.[1]  On October 26, 2018, this Court issued a preliminary injunction that froze all of the defendants' assets.  Ex. 3.  The Commission amended its complaint on November 15, 2018.  Ex. 4.  The preliminary injunction order has been amended several times since then.  Dkt. Nos. 57, 183, 185, 189, 197, 200, 202.

2.      Roger Knox ("Knox"), a United Kingdom citizen, owned and operated an entity called Wintercap SA.  Ex. 26 at 2 (Knox is UK citizen).  Wintercap SA was based in Switzerland and purported to manage assets for its clients.  From 2015 to about January 25, 2018, Wintercap SA was known by its prior name, Silverton SA.  Ex. 22 at 17; Ex. 24 at 18.  These papers will refer to both Silverton SA and Wintercap SA as "Wintercap SA" throughout regardless of which name it was using at the relevant time.

3.      Richard Targett-Adams ("Targett-Adams") worked for Knox and Wintercap SA from approximately 2014 to October 2018.  Ex. 24 at 18.  Targett-Adams assisted Knox with the business of Wintercap SA and was paid a salary of about $80,000 per year.  *See id*. at 18-19.

4.      Michael Gastauer ("Gastauer")[2], a German citizen who currently resides in Russia, owned and operated a network of corporate entities, including the Entity Defendants and relief defendant WB21 DMCC, that were part of the WB21 group of companies ("WB21 Group").  Ex. 19  at 2 (Gastauer resides in Russia); Ex. 28 at 2 (Gastauer is a German citizen).  In public marketing materials, Gastauer claimed that WB21 Group is a "digital bank" that offers a solution to streamline customers through its fully online, "less than 5 minute[]" know-your-customer process, stating: "[a]ccount opening for you or your business can be difficult if you are

---

[1] All Exhibits are filed with the accompanying Appendix of Exhibits and pincites are to the pdf page number of the exhibit unless paragraph citations are used.

[2] When used without further names, "Gastauer" refers to Michael Gastauer.  When referring to Raimund or Phillip Gastauer, the Commission will use their full names.

not in the same country as your Bank or if you are in an industry that most Banks would not support." Exs. 29-31.

5.      Raimund Gastauer, a German citizen residing in Germany, is Michael Gastauer's father.  Ex. 14, ¶3 (German citizen in Germany); Ex. 12 (Zug Switzerland Police Department report listing Michael Gastauer's father as Raimund Albrecht Erwin Gastauer); Ex. 18, ¶20.

6.      Phillip Gastauer, a German citizen, is Michael Gastauer's son.  Phillip Gastauer was born in 1994 and was 23 years old at the time he opened bank accounts for Wintercap SA Inc. and B2 Cap Inc.  Ex. 32 at 4; Ex. 94 at 14:23-15:5; Ex. 13, ¶2.

7.      WB21 US Inc. is a Delaware corporation with a primary business address of 2225 E. Bayshore Rd., Ste. 200, E. Palo Alto, CA, that was incorporated on October 13, 2015.  Ex. 33. Michael Gastauer was the Chief Executive Officer and sole shareholder of WB21 US Inc.  Ex. 94 at 8:20-9:4.  WB21 US Inc. had a "virtual office" provided by an office services company that gave WB21 US Inc. a location for its mail to be sent, and may have had a physical office for a brief period of time.  *Id.* at 54:21-55:14.  WB21 US Inc. was dissolved on or about July 3, 2018. Ex. 34 at 3.

8.      WB21 NA Inc. is a Delaware corporation with a primary business address of 299 Park Ave., 6th Floor, New York, NY, that was incorporated in August 23, 2016.  Ex. 35 at 5. Michael Gastauer was the sole director of WB21 NA Inc. and its President  *See id.*; Ex. 36 at 1, 7.  WB21 NA Inc. also had an office in New Hampshire, in the apartment above the garage of the home of one of its employees.  Ex. 95 at 36:17-37:8, 40:1-4.  WB21 NA Inc. was dissolved on or about January 14, 2022.  Ex. 37 at 3.

9.      Silverton SA Inc. is a California corporation with a primary business address of 2225 E. Bayshore Rd., Suite 200, Palo Alto, CA, that was incorporated on August 24, 2016.  Ex. 38.  Michael Gastauer was the CEO and sole director of Silverton SA Inc.  Ex. 39 at 5;  Ex. 40.

Silverton SA Inc. did not have any employees.  Ex. 96 at 35:2-19.  It also did not have a physical office in California; rather, it "was just paying an office services company to give them a mailing address in the United States." *Id.* at 38:21-39:16.  Michael Gastauer dissolved Silverton SA Inc. on or about July 9, 2018.  Exs. 40-41.

10.     Wintercap SA Inc. is a Delaware corporation with business addresses at 299 Park Avenue (physical) and 250 Park Avenue (virtual), New York, New York, that was incorporated on April 19, 2018. Ex. 42; Ex. 32 at 3; Ex. 43 at 1; Ex. 95 at 39:14-22, 90:5-91:1.  Phillip Gastauer was the sole director and shareholder.  Ex. 42; Ex. 95 at 36:14-19, 40:1-10.  Wintercap SA Inc. had no direct employees. Ex. 95 at 53:3-14.   Wintercap SA Inc. was dissolved on or about March 8, 2021.  Ex. 44 at 3.

11.     C Capital Corp. ("C Capital") is a Delaware corporation with business addresses at 299 Park Avenue, New York, New York (physical) and 2225 E. Bayshore Rd., Suite 200, Palo Alto, CA (virtual) that was incorporated on November 17, 2016.  Ex. 45 at 3; Ex. 98 at 25:15-22; Ex. 46 at 2.  C Capital was founded by Michael Gastauer, who was its sole director and sole shareholder.  Ex. 98 at 10:10-12.  Gastauer was responsible for managing its daily operations and had sole authority to act on behalf of C Capital.  *Id.* at 10:10-13, 21:5-20.  C Capital had no employees.  *Id.* at 20:18-20.  Gastauer dissolved C Capital Corp. on or about May 4, 2018.  *Id.* at 19:10-15, 20:8-17; Ex. 45 at 2.

12.     B2 Cap Inc. ("B2 Cap") is a Delaware corporation with a business address at 250 Park Avenue, 7th Floor, New York, New York, that was incorporated on April 18, 2018. Ex. 47 at 3-4;  Ex. 48 at 1; Ex. 99 at 47:7-16.  The office was a "virtual hybrid" shared space rented from an office space provider.  Ex. 99 at 47:17-48:9.  Phillip Gastauer was the sole shareholder and director of B2 Cap.  *Id.* at 13:7-10.  B2 did not have any employees.  *Id.* at 47:7-16; Ex. 48 at 2.  B2 Cap was dissolved on or about December 14, 2021.  Ex. 47 at 3.

13.     B21 Ltd. is a United Kingdom-based entity that was originally known as AS Therapist Ltd.  The original director of AS Therapist was Adriana Smeu, Gastauer's girlfriend.  Exs. 15-16, 88; Declaration of Trevor Donelan in Support of Summary Judgment, filed herewith ("Donelan SJ Dec."), ¶32.  On or about February 20, 2018, Michael Gastauer became the director of AS Therapist, and then changed the name of the company to B21 Ltd.  Ex. 16.

14.     WB21 DMCC is an entity organized under the laws of the United Arab Emirates, with its business location in Dubai, United Arab Emirates.  Ex. 17, ¶3.  Phillip Gastauer is the CEO and a director of WB21 DMCC.  *See id.*, at ¶1; Ex. 89 at 7.  WB21 DMCC is the owner of WB21 Pte. by virtue of owning all of WB21 Pte.'s shares.  Ex. 94 at 14:18-25.

**Knox and Wintercap's Securities Fraud Scheme**

15.     On October 3, 2018, criminal charges against Knox were unsealed, Knox was arrested and Knox was arraigned on charges that he committed securities fraud and conspired to commit securities fraud.  *See United States v. Knox*, 18-cr-10385-NMG (D. Mass.); Ex. 20.

16.     On October 23, 2018, Knox was indicted by a grand jury on one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. §371, and one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, and 17 C.F.R. §240.10b-5.  Ex. 21.  The indictment also contained forfeiture allegations relating to proceeds of Knox's fraud.  *See id*.

17.     On January 13, 2020, Knox entered a guilty plea as to both counts of the Indictment.  Ex. 22.

18.     When he pled guilty, Knox admitted that, from at least 2015 to his arrest in October 2018, he operated Wintercap SA and through Wintercap SA, "engaged in a scheme to fraudulently sell stock" of numerous publicly traded companies.  Ex. 22 at 17, 27-28.  In particular, Knox agreed with the following factual statements describing his crime:

a.      "Knox's company existed, at least in part, to flout the securities laws and provide a layer of disguise to public company control persons who, acting in concert with Knox, intended to defraud investors by secretly dumping large quantities of stock in circumvention of the registration and disclosure requirements imposed by the Federal securities laws." *Id.* at 18.

b.      "Knox provided a platform through which control persons could conceal their identities while selling large amounts of stock to investors." *Id.*

c.      Knox's control group clients acquired "most, if not all" of the stock of the public companies whose stock they manipulated. *Id.* at 19.

d.      Knox's clients then transferred their stock to nominee companies, typically "in blocks of less than five percent of the total outstanding shares of the issuer in order to evade disclosure obligations and deflect scrutiny by brokers."  Knox also created offshore nominee entities for some clients for a fee. *Id.*

*e.*      Knox helped his clients further conceal their ownership by arranging to transfer the stock from the nominee entities' names to Wintercap SA's name, as its custodian. *Id.* at 19, 24-25.

f.      Knox coordinated the deposit of the shares into the U.S. electronic trading system, and then transferred the shares into omnibus brokerage accounts in Wintercap SA's name in blocks of less than 5 percent of the total outstanding shares for that company.  "[b]rokers generally do not require omnibus account-holders to reveal the identity of the underlying" owners.  Further, "[b]y staying below five percent, Knox evaded disclosure obligations and sought to avoid triggering direct inquiries by compliance personnel in the brokerage firms" that Wintercap SA used. *Id.* at 19-20.

g.      Through Wintercap SA's brokerage accounts, Knox dumped his clients' stock into the securities market.  "The dump phase of the scheme typically included a

promotional campaign funded by the control persons to generate public interest in the stock, which often artificially inflated the market price of the stock." *Id.* at 20.

       h.    Knox's scheme allowed his clients to control their identities, and dump their stock, "often millions of shares at a time" into the market in a way that made their sales appear as ordinary trading when they were really sales by control persons. *Id.* at 20-21.

19.    While Knox disagreed about the number of companies involved in his scheme, he agreed with the prosecutor's recitation of the other aspects of his scheme as described above. *See id.* at 24-26.

20.    On May 30, 2019, criminal charges against Targett-Adams were unsealed, and Targett-Adams appeared on charges that he committed securities fraud and conspired to commit securities fraud. *See United States v. Targett-Adams*, 19-cr-10046-IT (D. Mass.); Ex. 23.

21.    On June 21, 2019, Targett-Adams waived indictment and entered a guilty plea as to both counts of the information: one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. §371, and one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, and 17 C.F.R. §240.10b-5. Ex. 24 at 26.

22.    When he pled guilty, Targett-Adams admitted to a description of Wintercap SA's fraudulent scheme that was very similar to the scheme admitted by Knox. *Id.* at 18-26. In addition, Targett-Adams admitted that while Knox interacted with Wintercap SA's control group clients, he transferred stock into Wintercap SA accounts, helped create nominee shareholder companies, and "transferred the securities fraud proceeds to the control groups from [Wintercap] upon the direction of clients and Knox." *Id.* at 19.

23.    Targett-Adams also agreed that the "securities fraud proceeds were then remitted back to the control groups through the use of a money transfer service called WB21 that made wire transfers into and out of the United States." *Id.* at 20.

24.     Targett-Adams also admitted the WB21 Group's role by using, as an example, the fraud involving a company called Environmental Packaging Technologies Inc., which was sold through Wintercap SA for its control group clients and generated about $1.3 million in fraudulent securities trading proceeds.  Targett-Adams agreed that "[t]o promote the securities fraud, [Wintercap] used the WB21 account to wire securities fraud proceeds first into the United States from foreign brokerages and then on to accounts located in other countries.  The purpose of these wire transfers was to promote the securities fraud scheme by returning securities fraud proceeds to the owners of the stock."  *Id.* at 22-23.

25.     Targett-Adams also agreed that in March 2017, Knox made multiple wire transfers of securities fraud proceeds from Malta to U.S. bank accounts, and a "co-conspirator, acting at the direction of both Knox and Targett-Adams, then transferred money from the bank accounts in the United States to bank accounts located in Canada that were controlled by the [Knox client] control group" in June and July 2017.  *Id.* at 23.  The "co-conspirator" to whom Targett-Adams is referring is Gastauer, who used the Citibank account of WB21 US Inc. to send two payments, one in the amount of $175,026.43 on June 30, 2017 and a second in the amount of $319,317.62 on July 5, 2017, to an entity controlled by Knox's control group clients.  Ex. 49; Ex. 50 at 3; Ex. 51 at 1.

26.     Wintercap SA's illegal stock sales generated millions of dollars in stock sale proceeds between approximately October 2015 and October 2018, and involved the stock of at least 50 different issuers.  Ex. 5, ¶¶18, 22-24; Ex. 6, ¶¶10-11.  Wintercap SA's fraud has left a wake of harmed investors: people who bought control persons' stock, often in the aftermath of promotional campaigns designed to increase the stocks' price, and who are now left with far less valuable shares.  *Id.* ¶¶31-50; Exs. 8-11.

27.     Wintercap SA maintained omnibus brokerage accounts in its own name around the world (the "Wintercap SA Brokerage Accounts"), including accounts at the following institutions:  Wedbush Securities (United States), Forte Securities, LLC (United States), Lombard Forte Securties, Ltd. (United Arab Emirates), Prometheus Capital Finance, Ltd. (United Arab Emirates), Tendall Capital Markets, Ltd. (Malta), Forte Securities, Ltd. (United Kingdom), Valbury Capital, Ltd. (United Kingdom), Linear Investments, Ltd. (United Kingdom), ADM Investor Services, Ltd. (United Kingdom), Interactive Brokers UK, Ltd. (United Kingdom), Peter Pesic & Co. Securities, Inc. (Mauritius), and Haywood Securities, Inc. (Canada).  Ex. 6, ¶¶7.c, 8.

28.     Between at least late 2015 and when Wintercap SA ceased operations in 2018 (after Knox's arrest), Wintercap SA frequently deposited large blocks of microcap securities into the Wintercap SA Brokerage Accounts, and subsequently sold those securities principally into the U.S. markets.  Wintercap SA then transferred the cash generated from those sales either to foreign bank accounts in its own name or to accounts held by the Entity Defendants.  Ex. 6, ¶9.

29.     Of the $158.8 million of cash that was generated by trading in the Wintercap SA Brokerage Accounts between about October 2015 and October 2018, approximately $46.5 million was deposited directly into various Wintercap SA foreign bank accounts and the remaining $112.3 million was deposited directly into bank accounts in the names of the Entity Defendants for the benefit of Wintercap SA.  Ex. 6, ¶10; Ex. 7 at 4.

30.     For at least 18 of the issuers whose stock Wintercap SA sold on behalf of its control group clients, no registration statements were filed with the Commission that disclosed the entities through which Wintercap SA was selling.  Ex. 5, ¶25.c.

**Each of the Entity Defendants Substantially Assisted Knox and Wintercap SA's Scheme**

31.     Michael Gastauer was the head of the WB21 Group of companies that operated world-wide.  The "main company" was WB21 Pte., and it used "a number of agents or

supporting companies' back offices . . . to provide payment services for its clients." Ex. 94 at 26:11-27:8. Gastauer was the CEO at the WB21 Group level, and he was "responsible for running all of the WB21 family of companies within that group." *Id.* at 28:12-29:2. Wintercap SA Inc. and B2 Cap Inc. were part of the WB21 Group of companies. Ex. 96 at 13:9-22; Ex. 99:7-18.

32.     WB21 Pte. kept account ledgers for accounts it held in the names of Wintercap SA and for sub-accounts it held in the names of Wintercap SA's "clients." *E.g.,* Ex. 86 (Wintercap SA account ledger); Ex. 93 (Wintercap SA client sub-account ledger). Each of these ledgers recorded transactions in actual bank accounts owned by other companies within the WB21 Group, including the Entity Defendants' bank accounts. For example, the Redfern account ledger shows wires that were debited on the WB21 Pte. account ledger when they were sent from WB21 US Inc.'s Citibank account (ending 2788) for Redfern's benefit on various dates including June 28 and 30, 2016, July 14, 2016, and August 11 and 31, 2016. Ex. 93 at 2; Ex. 28 at 7-11.

### WB21 US Inc.

33.     WB21 US Inc. functioned as a payment agent for WB21 Pte. Ltd., a "money processor" licensed for some period of time in Singapore. Ex. 84 at 15:7-20, 16:3-11. In other words, WB21 US Inc. was part of the "global network that was one company" under the umbrella of WB21 Pte. where WB21 Pte. was the "mother company" and WB21 US Inc. was its "agent." *Id.* at 17:6-16.

34.     WB21 US Inc. did not have direct employees. The persons authorized to act for WB21 US Inc. were Michael Gastauer, who was its owner and director, and Abygail De Sousa, who was the chief operations officer for WB21 Pte. *Id.* at 17:20-18:1, 26:11-21, 27:24-28:16.

35.     Michael Gastauer opened bank accounts for WB21 US Inc. with Wells Fargo on or about December 9, 2015, Citibank on April 18, 2016, and two accounts at JP Morgan Chase on April 19, 2016.  *See* Ex. 6, ¶20; Ex. 7 at 4-5.  Michael Gastauer signed the account opening documents for, and was the sole signatory on, each of these accounts.  Ex. 28 at 3, 6; Ex. 52 at 4, 5; Ex. 53.

36.     Between December 2015 and August 2018, Gastauer primarily used the WB21 US Inc. accounts to receive and disburse stock sale proceeds from Wintercap SA.  More than 87 percent of the funds that came into all four of the WB21 US Inc. accounts were transfers of funds either directly from Wintercap SA brokerage or bank accounts or from the other Entity Defendants' accounts, which themselves were primarily funded directly or indirectly through Wintercap SA's trading.  Donelan SJ. Dec., ¶9.  About another 6% of the funds that came into all four of the WB21 US Inc. accounts came from accounts administered by Frederick Sharp's business, a client of Wintercap SA.  *Id.* ¶10; *see also SEC v. Sharp*., No. 21-cv-11276, (D. Mass. filed Aug. 5, 2021); Ex. 25, ¶¶44-50, 53-56.

37.     On account opening documents for WB21 US Inc.'s Citibank account, Michael Gastauer described the "major suppliers" to WB21 US Inc.'s business as Google and Apple.  Ex. 28 at 4.  Gastauer also described WB21 US Inc. as a "software" business on the Wells Fargo account opening documents.  Ex. 52 at 2.  Gastauer did not use WB21 US Inc. as a software company; instead it functioned only to transfer money to and from Knox and Wintercap SA and their clients.  Ex. 94 at 99:5-9; Donelan SJ Dec., ¶¶9-10.

38.     WB21 US Inc.'s Wells Fargo account received a total of $2,243,850 from Wintercap SA Brokerage Accounts between July 31, 2017 and December 21, 2017.  This Wells Fargo account also received a total of $9,827,519 in funds that were transferred from other bank

accounts owned by Wintercap SA in Latvia and Mauritius ($1,240,000), and bank accounts owned by Silverton SA Inc. and WB21 NA Inc. ($8,587,519).  Ex. 6, ¶20; Ex. 7 at 4.

39.     WB21 US Inc.'s Citibank account did not receive proceeds directly from Wintercap SA Brokerage Accounts, but did receive a total of $105,561,135 in transfers from other bank accounts owned by Wintercap SA in Latvia and Mauritius ($7,044,832), and bank accounts owned by Silverton SA Inc. in the United States ($98,516,303).  Ex. 6, ¶21; Ex. 7 at 5.

40.     WB21 US Inc.'s two JP Morgan Chase accounts received $8,041,000 in transfers from bank accounts owned by Silverton SA, Inc.  Ex. 6, ¶22; Ex. 7 at 5.

41.     In June 2016, when Knox asked one of Wintercap SA's brokerage firms to link Wintercap SA's brokerage account to a WB21 US Inc. bank account for purposes of facilitating wire transfers, his request was rejected.  Knox asked the brokerage firm to stop sending money from one of its existing foreign banks and send to WB21 US Inc. instead.  The brokerage firm refused to send trading proceeds to WB21 US Inc. because WB21 US Inc. was not, in the brokerage firm's opinion, a "recognized bank."  Knox responded that he would leave in place his current instructions to send Wintercap SA funds to its existing bank.  Ex. 54.

42.     Brokers often scrutinize transfers that are not "first-party."   First-party transfers are those between accounts held in the same name.  Third party transfers are those between accounts held in different names.  Ex. 87 at 2-3.

43.     Several weeks after Knox's attempt to send money to WB21 US Inc. was rejected, Gastauer created Silverton SA Inc. and opened its first bank accounts.  *Supra* ¶9; *infra* ¶59.  Gastauer named his company Silverton SA Inc. because Knox's company at the time was named Silverton SA.  *See supra*, ¶2.

**WB21 NA Inc.**

44.     WB21 NA Inc. was originally founded to provide services to executives of the worldwide WB21 group of companies and to establish a United States presence of the WB21 Group, but transitioned to functioning as a  payment agent for WB21 Pte., the licensed money processing firm.  Ex. 100 at 28:4-29:20.

45.     WB21 NA Inc. was the employer for several people who performed services for the worldwide group of WB21 companies.  Peter Arnold, whose title was Chief Administrative Officer of WB21 NA Inc., (and who was a high school dropout with experience in sales, credit card processing and flipping cars) stated that Michael Gastauer was the "boss" of all the WB21 companies.  Ex. 95 at 9:13-10:15, 12:16-13:12.  Arnold provided customer service for clients of WB21's money transmitting business.  *Id.* at 18:13-19:14, 20:8-21:8.  Arnold understood that all of WB21's clients were overseas and that the WB21 companies were not doing money transmitting business in the United States because they did not have the required licenses.  *Id.* at 33:20-35:18.  Arnold stopped working for WB21 in about December 2017.  *Id*. at 64:1-17.

46.     WB21 NA Inc. rented office space for 2 people in a larger office in New York, but did not actually have any New York operations.  Ex. 95 at 32:20-33:12, 44:22-24; Ex. 35 at 7-10.

47.     Arnold was involved in opening three bank accounts for WB21 NA Inc.:  1) Arnold opened a WB21 NA Inc. account at the Savings Bank of Walpole on September 1, 2016.  Ex. 55 at 1.  Arnold submitted corporate authorizations to open this account that were signed by Michael Gastauer.  *See id*. at 3, 5-6; 2) Arnold and another WB21 employee opened an account (acct. number ending 3021) for WB21 NA Inc. at Bank of America on October 10, 2017.  Ex. 56 at 3, 4, 8.  Arnold's name was taken off of this account and replaced with Michael Gastauer on January 10, 2018.  *See id.* at 2; 3) Arnold opened a WB21 NA Inc. bank account at TD Bank on August 16, 2017 (acct number ending 8020).  Ex. 35 at 1, 3; Ex. 57 at 1-2.  Arnold submitted

corporate authorizations to open this account that were signed by Michael Gastauer. Ex. 35 at 6.

Arnold's name was taken off of this TD Bank account and replaced with Michael Gastauer on

January 10, 2018. Ex. 57 at 3.

48.     Arnold explained that the Savings Bank of Walpole account which was opened in

New Hampshire near his home was used to pay his salary and the salary of his administrative

assistant. Arnold also explained that he discussed with Michael Gastauer that the accounts at TD

Bank and Bank of America that he opened were to be used to pay for setting up the company's

operations in New York, but were "absolutely, positively not to be used for transfers" of money

for clients. Ex. 95 at 66:17-69:21. Arnold also knew that WB21 NA Inc. had an account at

Wells Fargo, which sent funds to the Savings Bank of Walpole account that was used for payroll.

*Id.* at 70:11-71:2.

49.     WB21 NA Inc. began to use its bank accounts to act as a payment agent for

WB21 Pte. and to transfer money for Wintercap SA clients after several banks closed WB21 US

Inc.'s bank accounts in early 2018. The loss of WB21 US Inc.'s bank accounts was "clearly [] a

problem" for the WB21 group of companies, and in order to continue its payment processing

function for Wintercap SA, Gastauer began using WB21 NA Inc.'s accounts to process those

payments. Ex. 100 at 34:7-24, 40:7-41:18.

50.     Despite Arnold's conversation with Michael Gastauer about the TD Bank account

not being used to transfer money for clients, Gastauer used the account to transfer money to or

for the benefit of Wintercap SA clients after Arnold's name was removed from the account. For

example, on April 13, 2018, WB21 NA Inc. sent 6 payments totaling $289,500 to or for the

benefit of Wintercap SA clients, and on April 24, 2018 it sent 3 payments totaling $490,000 to or

for the benefit of Wintercap SA clients. Ex. 58 at 4-5.

51.     On or about November 16, 2016, another WB21 employee emailed Arnold and forwarded a message from Targett-Adams at Silverton SA about opening a new sub-account with WB21 for one of Silverton SA's clients.  Ex. 59 at 1.  The other WB21 employee asked Arnold to "[p]lease ensure [] they have smooth ride.  This is our best customer."  *Id.*  Arnold replied, "Done."  *Id.*

52.     Shania Lazzaro worked for WB21 NA Inc. from September 2016 to about March 3, 2017.  Declaration of Shania Lazzaro, filed herewith ("Lazzaro Dec."), ¶4.  During the time Lazzaro worked for WB21 NA Inc. in 2016 and 2017, she was asked to register several companies in the United States and to obtain employer identification numbers ("EINs") for those companies.  *Id.* at ¶7. Michael Gastauer was involved in asking Lazzaro to register those companies and obtain EINs for them.  *Id.*  One of those companies was C Capital Corp.  *Id.*; Exhibit 2 to Lazzaro Dec.

53.     In February 2017, Lazzaro signed a blank form with the heading "List of Authorised Signatures" and returned it to several WB21 Group employees, including Gastauer. Lazzaro Dec., ¶10; Exhibit 3 to Lazzaro Dec. at 2.  She signed the form because her employer asked her to sign it in connection with providing authorized signatures to SWIFT.  Lazzaro Dec., ¶10.  Lazzaro does not recall what SWIFT was, or why WB21 was giving SWIFT authorized signatures.  *Id.*  The form states that Lazzaro was the Chief Compliance Officer but she was not the Chief Compliance Officer of any entity at the time, and has never been the Chief Compliance Officer of any entity.  *Id.*; Exhibit 3 to Lazzaro Dec.

54.     Michael Gastauer opened five additional bank accounts for WB21 NA Inc.:

- Bank of America (acct number ending 1703), opened on January 11, 2018

- JP Morgan Chase (2 accts ending 7773 and 9118), opened on March 2, 2017

- TD Bank (acct number ending 8381), opened on January 10, 2018

- Wells Fargo (acct number ending 5546), opened on January 10, 2018.

*See* Ex. 6, ¶24.  Michael Gastauer signed the account opening documents for, and was the sole or joint signatory on, each of these accounts.  Ex. 60 at 4-5; Ex. 36 at 1, 7-8; Ex. 61 at 1, 7-8; Ex. 62; Ex. 63 at 4-5.

55.     None of the 8 WB21 NA Inc. accounts received transfers directly from the Wintercap SA Brokerage Accounts.  However, several of these accounts received transfers from bank accounts owned by Silverton SA Inc., WB21 US Inc., or C Capital Corp that had received direct or indirect proceeds from Wintercap SA's trading.  Together, WB21 NA Inc.'s eight United States accounts received a total of $12,344,945 in transfers from Silverton SA Inc., WB21 US Inc., or C Capital Corp.  Ex. 6, ¶24; Ex. 7 at 5-6.

56.     Gastauer represented to Wells Fargo that WB21 NA Inc. was a "business management company" and did not disclose that it was a money transmitting business or was acting as the agent for a money transmitting business.  Ex. 63 at 2.  However, Gastauer used the WB21 NA Inc. Wells Fargo account both to receive money from accounts that were primarily funded by Wintercap SA trading proceeds, and to distribute money to or for Wintercap SA clients.  *See* Ex. 64 at 3 ($275,000 of payments on April 25 for three Wintercap SA clients and $477,750 of payments on April 30, 2018 for three Wintercap SA clients); 6 ($748,270 of payments for five Wintercap SA clients on May 3, 2018).

57.     Between September 2016 and August 2018, Gastauer primarily used the WB21 NA Inc. accounts to receive and disburse stock sale proceeds from Wintercap SA.  More than 96 percent of the funds that came into all eight of the WB21 NA Inc. accounts were transfers of funds from the other Entity Defendants' accounts, which themselves were primarily funded directly or indirectly through Wintercap SA's trading.  *See* Donelan SJ Dec., ¶9.  Less than 3%

of the funds that came into all eight WB21 NA Inc. accounts came from WB21 Pte. and another WB21 company in Lithuania.  *See id.* ¶11.

### Silverton SA Inc.

58.     Gastauer founded Silverton SA Inc. to be a payment agent for WB21 Pte., the Singapore-based payment processor.  Ex. 96 at 17:10-16.  It was named similarly to Knox's company (which at the time was Silverton SA) because it was a dedicated payment agent, for the use only of Knox's company, and Knox wanted "whoever is wiring these funds" for the benefit of Knox's company, Silverton SA, not to "have to enter the payment processor's name, namely WB21 Pte."  *Id.* at 29:8-30:7, 31:10-15.

59.     As Silverton SA Inc.'s corporate designee explained, "Silverton SA and Roger Knox wanted that whenever he makes a transfer from his other bank accounts or brokerage accounts, that it would be the same as if it was being made to his bank account."  Ex. 96 at 55:7-24.

60.     Michael Gastauer opened bank accounts for Silverton SA Inc. with Citibank on September 14, 2016, Wells Fargo on September 14, 2016, and JP Morgan Chase on September 19, 2016.  Gastauer signed the account opening documents for, and was the sole signatory on, each of these accounts.  Ex. 39 at 1, 5-6; Ex. 65 at 4-5; Ex. 66 at 1-2.

61.     Silverton SA Inc.'s Citibank account received at least $90,026,365 from Wintercap SA brokerage accounts between September 30, 2016 and December 20, 2017.  That Citibank account also received a total of $5,300,480 in transfers from other bank accounts owned by Wintercap SA, located in Latvia and Mauritius.  Ex. 6, ¶14, Ex. 7 at 4.

62.     On account opening documents for Silverton SA Inc.'s Citibank account, Michael Gastauer described Silverton SA Inc. as "a venture capitalist business that invests in the financial technology industry," stated "this business invests in financial technology and does not require

suppliers" and said that he expects to receive wires from Germany and the United Kingdom that were "money from his own co." Ex. 39 at 3, 11. These statements were false because Silverton SA Inc. did not invest Michael Gastauer's own money; rather it was established only as a payment agent for WB21 Pte. Ex. 96 at 13:8-15. Further, Silverton SA Inc. never actually operated or functioned as a venture capitalist business that invested in the financial technology industry. *Id.* at 63:20-64:5.

63.     On account opening documents for Silverton SA Inc.'s Wells Fargo account, Michael Gastauer described Silverton SA Inc. as a "consulting" business in the "professional, scientific and technical services" industry. Ex. 65 at 2. This statement was not accurate. Rather, as Silverton SA Inc's designated 30(b)(6) representative testified, Silverton SA Inc. was "a dedicated payment agent for Knox's companies to transfer money from their brokerage and bank accounts into the WB21 Pte. payment network." Ex. 96 at 76:3-12.

64.     Silverton SA Inc.'s Wells Fargo account received at least $17,225,739 from Wintercap SA brokerage accounts between September 27, 2016 and May 21, 2018. That Wells Fargo account also received a total of $2,571,045 in transfers from other bank accounts owned by Wintercap SA, located in Latvia and Mauritius. Ex. 6, ¶15; Ex. 7 at 4.

65.     Between September 2016 and August 2017, Silverton SA Inc.'s JP Morgan Chase account received at least $1,465,290 in transfers from other bank accounts in the names of C Capital Corp., WB21 US Inc., and WB21 NA Inc. and another $2,420,000 in transfers from the other two Silverton SA Inc. accounts. Ex. 6, ¶16; Ex. 7 at 4.

66.     Between September 2016 and May 2018, Gastauer primarily used the Silverton SA Inc. accounts to receive and disburse stock sale proceeds from Wintercap SA. About 99 percent of the funds that came into all three of Silverton SA Inc.'s bank accounts were transfers of funds directly from Wintercap SA bank or brokerage accounts. *See* Donelan SJ Dec., ¶9. The

only other funds that went into the Silverton SA Inc. accounts came from an entity doing business with a Silverton SA client. *See id.* ¶12.

### Wintercap SA Inc.

67.     On February 1, 2018, Knox emailed Michael Gastauer and De Sousa saying that as of January 25, 2018, Silverton SA had a new name – Wintercap SA. Ex. 27. Wintercap SA Inc. was incorporated less than three months later. Ex. 42.

68.     Wintercap SA Inc. operated exclusively as an agent providing money transfer services to WB21 Pte., for the benefit of WB21 Pte. clients. Ex. 97 at 47:21-48:1, 76:3-8, 85:16-24. Wintercap SA Inc.'s primary role was to act as payment agent for Wintercap SA. *Id.* at 46:16-47:7.

69.     Phillip Gastauer opened bank accounts for Wintercap SA Inc. with TD Bank on May 10, 2018, and Citibank on May 11, 2018. *Id.* at 66:13-67:1, 80:25-83:2; Ex. 32, Ex. 43. Phillip Gastauer signed the account opening documents and was a signatory on each of these accounts. Ex. 32 at 1-2, 5, 8; Ex. 43 at 1, 4, 6.

70.     In April 2018, De Sousa (whom Lazarro knew from her previous work at WB21) reached out to Lazzaro through Facebook with an offer to pay Lazzaro if Lazzaro would allow WB21 to use her Social Security number to open several companies as WB21 had in the past. Lazzaro Dec., ¶12; Exhibit 4 to Lazzaro Dec. at 1. De Sousa told Lazzaro that WB21 would pay her $3,000 ($1,500 for each of two companies) that were opened using Lazzaro's Social Security number and birth date. *Id.* at 1-2. The two Entity Defendants that were opened that same day, or the next day, were Wintercap SA Inc. and B2 Cap Inc. Ex. 42, Ex. 47 at 1. The email chain shows Lazzaro's impatience to be paid the $3,000 she was promised, and her repeated requests to De Sousa as to ask Michael Gastauer to pay her the money promptly. Ex. 4 to Lazzaro Dec. at 4-5. Gastauer paid Lazzaro that money several days later. Lazzaro Dec., ¶13. Lazzaro also

asked De Sousa if WB21 had a job for her and De Sousa responded that she would ask Gastauer.
*Id.* ¶14; Ex. 4 to Lazzaro Dec. at 6-7.  De Sousa responded that Gastauer did not have a "day to
day job" for her but reach out when they needed more companies.  *Id.* at 7; Lazzaro Dec., ¶15.
In or around May 2018, the colleague and/or Michael Gastauer reached out to Lazzaro and told
her that WB21 would pay Lazzaro to open bank accounts for their companies.  *Id.* at ¶16.

71.     Gastauer and/or De Sousa asked Lazzaro to travel to New York City to help them
with additional matters.  *Id.* at ¶17.  Lazzaro met Gastauer and De Sousa in New York, along
with Gastauer's son, Phillip Gastauer, on May 10, 2018.  *Id.*  While they were in New York,
Phillip Gastauer and Lazzaro went to a bank to open a bank account for one of the WB21
companies for which Lazzaro had allowed them to use her Social Security number.  *Id.*  Despite
assisting with the opening of the bank account, Lazzaro did not make transactions in that bank
account or control deposits to, or withdrawals from, it.  *Id.* at ¶18.  Between May and October
2018, Lazzaro did not do any work for the WB21 Group other than helping them set up accounts.
Lazzaro was paid $2,800 per month for being available to open accounts for WB21 and Michael
Gastauer.  *Id.* at ¶19.  She understood that Gastauer could not use his own name to open
accounts.  *Id.*

72.     Citibank account opening records identify Shania Lazzaro as an authorized
signatory on the account, and as a control person and the Treasurer of Wintercap SA Inc.
Exhibit 6 to Lazzaro Dec. at 1-2 (same as Ex. 32).  Lazzaro never functioned as the Treasurer or
a control person of Wintercap SA Inc., and she never made any transactions in the Wintercap SA
Inc. Citibank account.  Lazzaro Dec., ¶21.

73.     Lazzaro did not recognize the signature that purported to be hers on account
opening records for a Citibank account in the name of Wintercap SA Inc.  Lazzaro does not

recall going to Citibank to open this account, but she did go to at least one bank in New York with Phillip Gastauer to open an account.  *Id.* at 20; Exhibit 6 to Lazzaro Dec., at 1-2.

74.     In Citibank account opening records, Wintercap SA Inc.'s annual gross revenue and annual net profit are listed as $500,000 and $175,000, respectively.  Ex. 32 at 3.  In these records, Wintercap SA Inc. identified itself as a "Digital marketing company[.]"  *Id.*  Wintercap SA Inc. neither generated revenue nor operated as a digital marketing company.  Ex. 97 at 74:5-21.

75.     In TD Bank account opening records dated May 10, 2018, under "Principle Line of Business" Wintercap SA Inc. wrote, "Public Relations Agencies," adding, "ADVERTISING SERVICES[.]"  Ex. 43 at 1.  Wintercap SA Inc. did not act as a public relations agency, but rather only acted as a payment processing agent for WB21 Pte.  Ex. 97 at 85:5-24.

76.     Once Wintercap SA Inc. had an account at TD Bank, Knox instructed one of Wintercap SA's brokers to begin sending proceeds of its trading in that brokerage account to the Wintercap SA Inc. bank account at TD Bank.  Ex. 92.  Knox's correspondence with the broker makes it clear that that the broker believed that the brokerage account and the TD Bank account were actually owned by the same entity, when they were really owned by two different entities. *Id*. at 1 (brokerage employee stating that she "spoke to Roger Knox who confirmed details of the payment to the same name account at TD Bank"); at 2 ("Silverton SA recently changed its name to Wintercap SA and is now looking to wire out funds to a new bank account in the new name.").

77.     Wintercap SA Inc.'s TD Bank account received at least $2,808,900 from Wintercap SA Brokerage Accounts between May 29, 2018 and July 11, 2018.  Transfers from the Wintercap SA Inc. TD Bank account to Wintercap SA Inc.'s account at Citibank between May 29, 2018 and June 26, 2018 totaled $1,500,00. Ex. 6, ¶18; Ex. 97 at 92:12-94:17, 99:5-23;

Ex. 7 at 4.  This $1,500,000 from Wintercap SA Inc.'s TD Bank account was the only money to

go into Wintercap SA Inc.'s Citibank account.  Ex. 90.

78.     Between May 2018 and September 2018, Gastauer only used the Wintercap SA

Inc. accounts to receive and disburse stock sale proceeds from Wintercap SA; that is, there were

no other sources of income into those accounts.  Donelan SJ Dec., ¶9.

### C Capital Corp.

79.     C Capital served as a "payment agent for WB21 P[te.] Limited to execute their

payment orders on behalf of WB21 P[te.] and its funds."  Ex. 98 at 10:24-11:23.  C Capital's

corporate designee testified that C Capital also served as a vehicle to receive and send out

Michael Gastuaer's personal funds, but that it served no other business purpose beyond these two

functions.  *Id.* at 18:8-16.  C Capital Corp.'s accounts did not function as a vehicle to send and

receive Gastauer's personal funds, as only $300 of the more than $17.5 million that was received

into that account originated from Gastauer's personal accounts.  Donelan SJ Dec., ¶11.

80.     Michael Gastauer opened a bank account for C Capital at Citibank on December

12, 2016.  Ex. 46.  Gastauer signed the account opening documents and was the sole signatory on

the account.  *Id.* at 2, 4-5.  C Capital also had two bank accounts at JP Morgan Chase where

Gastauer was the sole signatory.  Exs. 67-68.  C Capital Corp.'s Citibank account was closed on

April 2, 2018, after Gastauer was informed that Citibank's Financial Intelligence Unit had

concerns about the account.  Ex. 74 at Ex. D; Ex. 46 at 6, 8.

81.     On account opening documents for C Capital's Citibank account, Michael

Gastauer indicated that C Capital would neither provide "money transmission services," nor

"hold or transact any funds in this account that belong to one or more of [C Capital's] customers

and are not part of [C Capital's] operating funds[.]" Ex. 46 at 3.  However, C Capital's corporate

designee admitted that "there were also cases where C Capital Corp. would receive funds from

other payment agents to execute other payments on behalf of WB21… all these companies acted as payment agents for the payment of funds out of Singapore which had about 30,000 clients and was managing money wires worldwide." Ex. 98 at 30:2-32:25.  The designee also admitted that the funds with which C Capital transacted did not belong to C Capital.  *Id.* at 45:20-25.

82.     None of C Capital's bank accounts received transfers directly from Wintercap SA's Brokerage Accounts.  However, several of these accounts received transfers from bank accounts owned by Silverton SA Inc., WB21 US Inc., and WB21 NA Inc. that had received direct or indirect proceeds from Wintercap SA's trading.  Together, C Capital's three United States accounts received a total of $15,332,672 in transfers from Silverton SA Inc., WB21 US Inc., or WB21 NA, Inc.  Ex. 6, ¶26; Ex. 98 at 29:11-30:19; Ex. 7 at 6.

83.     Between December 2016 and March 2018, Gastauer primarily used the C Capital accounts to receive and disburse stock sale proceeds from Wintercap SA.  More than 99 percent of the funds that came into the three C Capital accounts were transfers of funds from the other Entity Defendants' accounts, which themselves were primarily funded directly or indirectly through Wintercap SA's trading.  Donelan SJ. Dec. ¶9.

**B2 Cap Inc.**

84.     B2 Cap's sole purpose was to act as payment agent for WB21 Pte. Limited.  Ex. 99 at 25:9-21, 51:11-19.

85.     Phillip Gastauer opened a bank account for B2 Cap at Citibank on May 22, 2018, and at TD Bank on April 27, 2018.  Exs. 48, 69.  Phillip Gastauer was on the account opening documents for, and was the sole signatory on, each of these accounts.  Ex. 48 at 1-2; Ex. 69 at 2; Ex. 70.

86.     B2 Cap's Citibank account received $1,496,728 in transfers from another Citibank account owned by Wintercap SA Inc., which had received proceeds from Wintercap SA Brokerage accounts via a transfer from Wintercap SA Inc.'s TD Bank account. Ex. 6, ¶28.

87.     According to B2 Cap's designated representative, B2 Cap opened the account at TD Bank as an operational business account for B2 Cap.  Ex. 99 at 48:10-51:19.

88.     In TD Bank account-opening records dated April 25, 2018, under "Principle Line of Business" Phillip Gastauer wrote, "Advertising Agencies," adding, "advertising and consulting on new business advertisemen [sic]"  Ex. 48 at 2.  B2 Cap was not active as an advertising agency in April or May of 2018, or at any other time.  Ex. 99 at 52:19-55:17.

89.     B2 Cap's TD Bank account received $700,000 in transfers from another TD Bank account owned by Wintercap SA Inc., which had received proceeds from Wintercap SA Brokerage accounts.  Ex. 7 at 6; Donelan SJ. Dec. ¶16.  B2 Cap's TD Bank account also received $150,000 from WB21 NA Inc.  *Id.*

90.     Between May and July 2018, B2 Cap accounts were used primarily to receive and disburse stock sale proceeds from Wintercap SA.  More than 98 percent of the funds that came into the two B2 Cap accounts were transfers of funds from the other Entity Defendants' accounts, which themselves were primarily funded directly or indirectly through Wintercap SA's trading.  Donelan SJ. Dec. ¶9.

**Gastauer Lied to Banks to Facilitate Knox and Wintercap SA's Scheme**

91.     In March 2017, Citibank conducted a "Know Your Customer" or "KYC" Investigation into accounts in the names of WB21 US Inc. (ending 788) and Silverton SA Inc. (ending 3963).  Ex. 71.  Citibank's branch manager emailed Michael Gastauer after being unable to reach him in other ways and asked a series of questions about his account activities that she needed answered "to prevent the account from being closed."  *Id.* at 3.  She warned Gastauer that

the accounts could not be reopened if it was closed by the small business regulation department.

*Id.* Michael Gastauer lied to Citibank when answering a number of the questions.  For example:

| Citibank's Question | Gastauer's Response | Gastauer's Statement Is False Because |
|---|---|---|
| Is the activity business related or personal? | Silverton is my personal investment vehicle, which I use to fund the operations of WB21 (US) Inc. | Silverton did not invest Gastauer's own money. Supra ¶61.  At the time of this email, Silverton SA Inc. was "a dedicated payment agent for Knox's companies to transfer money from their brokerage and bank accounts into the WB21 Pte. payment network." Ex. 96 at 76:3-12. |
| What is the business profile of Silverton SA Inc.? | Silverton is an entity to manage my personal funds. It holds accounts with different banks and broker firms and receives payouts from my interest gaining investment accounts. | At the time of this email, Silverton SA Inc. "was not managing Michael Gastauer's personal funds," it did not have any accounts with brokerage firms, and it "had not received any personal funds belonging to Mr. Gastauer." *Id.* at 78:2-22. |
| What is the purpose for investigated transactions? | Funding the business activities of WB21 (US) Inc. | The business purpose of these transactions was to act as a payment processor for Knox's companies.  WB21 US Inc. was an "agent for a money servicing business." Ex. 94 at 99:5-9. |
| What is the relation with: Valbury Capital Ltd., Linear Investments Ltd., Tendall Capital Markets Ltd.? | These companies are broker firms, managing my investments. | These firms were brokerage firms, that held accounts in the name of Knox's company – Silverton SA.  Ex. 6, ¶7.c. Silverton SA Inc. did not have accounts with these firms. Ex. 96 at 83:13-84:2. |
| Why funds from Valbury Capital Ltd., Linear Investments Ltd., Tendall Capital Markets Ltd. are not sent directly to other accounts? | Silverton is the entity that holds accounts with the broker firms.  For accounting purposes, payouts need to be done to Silverton. | Gastauer obscures difference between Silverton SA (Knox's company) which holds these accounts, and Silverton SA Inc., which does not hold these accounts. *Id.* at 84:3-15. |

| What is the relation with:<br>Mobius Biotechnology Inc.,<br><br>Full Service Media LLC,<br>. . .<br>Vektor Vodka LLC,<br><br><br>Stevia First Corp., . . . | Technology Supplier<br><br>PR Advisor<br><br>Company owned by business partner receiving expenses<br><br>Investment | Mobius was not a technology supplier to Silverton SA Inc.; and Full Service Media was not a PR advisor to Silverton SA Inc. *Id.* at 86:8-17. Vektor Vodka was a company in which Knox's control group clients invested and Stevia First was an issuer whose shares were sold by Knox's control group clients. Donelan SJ Dec. ¶18. |
| The activity seems like operating as part of an MSB [money services business] of the same owner.  Account may be prohibited and requires further explanation. | WB21 (US) Inc. is not doing any MSB business. | "WB21 US Inc. was an agent for a money servicing business." Ex. 94 at 99:5-9. "WB21 US Inc. wasn't doing anything other than just transferring the U.S. currency on behalf of PTE." *Id.* at 100:8-12. |

92.     In August 2016, a Citibank branch manager emailed Michael Gastauer because its compliance group had questions about certain listed wire transactions in the WB21 US Inc. account, including 5 credit wires totaling $1,565,000 from Silverton SA.  Ex. 72 at 2.  The Citibank manager asked what the relationship between WB21 US Inc. and several entities was, and what was the purpose of the transactions with those entities.  *Id*.  Michael Gastauer's response to Citibank was false.  For example:

| Entity Involved in Questioned Transaction | Gastauer's Explanation of Entity's Relationship with Silverton SA Inc. and Purpose of Transaction | Gastauer's Response is False Because |
| --- | --- | --- |
| Silverton SA | "Silverton is one of our companies, I am using to fund WB21.  Other than myself funding WB21, we are in the process of raising Venture Capital from investors." | Silverton SA is Knox's company, not Gastauer's company. |
| Redfern Investors Ltd. | "Redfern Investors is an Investor that has bought | Redfern Investors is a nominee company controlled by Frederick |

| | | |
|---|---|---|
| | shares of WB21 and transferred the purchase price." | Sharp.  Donelan SJ Dec. ¶19. The payment from Redfern was not for the purchase of shares.  Ex. 93. |
| Reformation Services LLC | Reformation Services and others are "working with us to find VC investors.  They are getting a commission paid for placing investments." | Reformation Services was an entity used by Wintercap SA's clients to fund promotions to generate demand for the shares they sold. Donelan SJ Dec. ¶20. |

93.     In December 2017, Michael Gastauer emailed a Citibank representative with answers to Citibank's questions about the nature of Silverton SA Inc.'s business, its purpose in maintaining its accounts at Citibank, and "the purpose(s) of the numerous incoming and outgoing wires."  Ex. 73.  Gastauer's responses to Citibank's questions were false.  For example:

| Citibank's Question | Gastauer's Response | Gastauer's Response is False Because |
|---|---|---|
| Nature of Silverton SA Inc.'s business | "Silverton SA Inc. is a business that has been incorporated by myself, to serve as my private investment vehicle.  I am using Silverton to hold my funds in different types of investment accounts with several banks.  The company is managing my liquidity and holds cash to allow me funding my other businesses." | Silverton SA Inc. did not hold any personal funds of Michael Gastauer.  Ex. 96 at 95:4-16. |
| Purpose of Maintaining its Citi accounts | "The accounts at Citi are used to hold some cash position and offer liquidity for funding my other businesses as needed.  I am using the Citi accounts to receive payouts from my other investment accounts held under Silverton.  I am primarily using my Citi accounts for payments and cash management." | The purpose of Silverton SA Inc. maintaining its account at Citibank in December 2017 was to operate as a payment agent for WB21 Pte. *Id.* at 95:17-96:12. |
| Purpose of the Numerous Wires | "The incoming wires are payouts from my other investment accounts held under Silverton at different Banks.  The purpose is to maintain a certain amount of cash to be able to provide liquidity for my other | The purpose of the incoming and outgoing wires in this account was to facilitate payments for WB21 Pte. at the request of Knox's companies and were not to fund |

| | businesses. Outgoing wires are mainly funding of my other business." | Gastauer's businesses. *Id.* at 96:13-98:1. |
|---|---|---|

94.     In or about May 2017, a Citibank representative asked Gastauer in a telephone conversation about why he transferred funds from Silverton SA Inc. to WB21 US Inc. and Gastauer replied that Silverton SA Inc. is " a pure investment company that is my own personal vehicle." Citibank also asked Gastauer whether these were his "own personal funds that you invest?" and Gastauer replied, "Yes, correct. . . .   I invest in different types of asset classes, real estate is one of them, but other types of investment vehicles include companies that are selling stock, like venture capital/private equity type of investment." Ex. 74 at 8.  These statements were not accurate.  Silverton SA Inc. was a dedicated payment agent that provided services for Wintercap SA and thus the funds in that account were not Gastauer's personal funds.  Ex. 96 at 31:10-14.

95.     In March 2017, a Citibank representative called Michael Gastauer regarding outgoing wires from WB21 US Inc. to Gareth Greening. Ex. 74 at 3-4.  Gastauer told Citibank that Greening was a consultant whom WB21 US Inc. was paying for his services to help to find potential investments for WB21 US to make. *Id.* at 3.  Gastauer also told the Citibank representative that WB21 US Inc. was the "ultimate originator of the funds" that it sent to Greening. *Id.* at 4.  These statements were inaccurate.  In actuality, Greening was a friend or relative of Knox.  Knox loaned money to Greening for an investment being made by Knox and Greening, and made the loan through a WB21 account in the name of a nominee, Castle Keep, that Knox used to pay his expenses.  Donelan SJ Dec., ¶21.  Further, WB21 US Inc. was not the "originator" of the funds sent to Greening.  Rather, WB21 US Inc. was transferring direct or indirect proceeds of Wintercap SA's trading. *Id.*, ¶9.

96.     On or about March 1, 2018, Michael Gastauer called Citibank regarding several of C Capital's outgoing wire requests that were pending and not being sent.  Ex. 74 at 5-6. Gastauer told the Citibank representative that all nine of the wires were for "the same type of products or service or purchase," namely "it is an investment services [sic], so we invest in buying shares from different providers."  *Id.* at 6.  The wires that Gastauer was seeking authorization for were not investments in buying shares.  Rather, two of the wires were to Michael Gastauer himself, and the other seven were sent to, or on behalf of, Wintercap SA clients.  *Id.*; Donelan SJ Dec., ¶22.

**The Relief Defendants Received Proceeds of the Fraud**

97.     Michael Gastauer was the Director of B21 Ltd. during the relevant time period. Ex. 91.  Previously, the Director of B21 Ltd. was his girlfriend.  Donelan SJ Dec. ¶32.

98.     "B21 has never conducted business in… the United States."  Ex. 15, ¶4.

99.     C Capital transferred approximately $565,000 to B21 Ltd between March and May 2018.  Ex. 75.  Also, WB21 US Inc. transferred $10,000 to B21 Ltd. in April 2018.  *Id.* Finally, WB21 DMCC transferred approximately $264,689 to B21 Ltd. between August 24 and October 4, 2018.  Exs. 78-79.  These funds were derived directly or indirectly from proceeds of Wintercap SA's trading.  Donelan SJ Dec., ¶31.

100.     Phillip Gastauer is a Director of WB21 DMCC.  Ex. 17, ¶1.

101.     In May 2018, WB21 NA Inc. transferred approximately $1.3 million to WB21 DMCC.  Ex. 76.

102.     On June 13, 2018, B2 Cap wired $500,000 to WB21 DMCC from one of its TD Bank accounts.  Ex. 77 at 2-3.  On August 1, 2018, B2 Cap wired an additional $250,000 to WB21 DMCC from one of its TD Bank accounts.  *Id.* at 4-5.  These two transfers from one entity controlled by Phillip Gastauer to another total $750,000.  These transfers were made from

accounts that were substantially funded, directly or indirectly, with proceeds of Wintercap SA's trading.

103.    Between May and August 2018, WB21 DMCC's Emirates account received at least $2,861,639.21 in net transfers from other bank accounts in the names of B2 Cap, and WB21 NA Inc.  Donelan SJ. Dec. ¶¶33-34; Ex. 78.

104.    WB21 DMCC's Emirates account received and disbursed stock sale proceeds from Wintercap SA.  Approximately 97 percent of the funds that came into WB21 DMCC's Emirates account were transfers of funds either directly from Wintercap SA brokerage or bank accounts or from the other Entity Defendants' accounts, which themselves were primarily funded directly or indirectly through Wintercap SA's trading.  Donelan SJ. Dec. ¶33.

105.    WB21 DMCC wired a total of about $264,689 to B21 Ltd. between August 2018 and October 2018.  Donelan SJ. Dec. ¶34; Ex. 78; Ex. 79.

106.    "WB21 DMCC has never conducted business in… the United States."  Ex. 17, ¶4.

107.    Between December 2017 and February 2019, WB21 US, Inc. and C Capital transferred approximately $3.3 million from the United States to an account held for the benefit of Raimund Gastauer.  Exs. 79-81; Donelan SJ Dec. ¶¶29-30.  These funds were sent from WB21 US Inc. and C Capital accounts that were funded primarily, either directly or indirectly, with proceeds of Wintercap SA's trading.

108.    Raimund Gastauer asserts that he has "never obtained any income…  in the United States" nor has he conducted "any business in… the United States."  Ex. 14, ¶¶6, 9.

**The Entity Defendants' Ill-Gotten Gains From The Scheme**

109.    In the summer of 2018, the relationship between Gastauer and the WB21 Group, on the one hand, and Knox and his companies, on the other hand, deteriorated as the result of WB21 seeking additional information about Knox's clients and not making payments to Knox's

clients when requested.  Ex. 82; Ex. 83.  Knox asked the WB21 companies to withdraw and pay to Wintercap SA all of the funds that were then showing as the balances in all of Wintercap SA's client accounts.  Ex. 84, ¶¶4-7.  The WB21 companies were still holding substantial funds for Wintercap SA at the time Knox was arrested on or about October 2, 2018.  Ex. 85, ¶4; Ex. 20.

110.    The funds held by the WB21 companies in the summer of 2018, and that were recorded in the WB21 Pte. ledgers, were sourced from the funds originally transferred to the Entity Defendants' Accounts from the Wintercap SA Brokerage Accounts and Wintercap SA bank accounts (and thus Wintercap SA's trading for its control group clients) that had not yet been paid out to Wintercap SA and its clients.  Ex. 6, ¶¶10-12, 17, 19, 23, 25, 27, 29.

111.    Based on account ledgers kept by WB21 Pte., the total value of funds that WB21 Pte. was holding on behalf of Wintercap SA and its clients as of dates between July 25, 2018 and August 14, 2018 (the "Remaining Wintercap SA Balance") was approximately $11,264,415.  Ex. 86; Donelan SJ Dec. ¶23.  WB21 Pte. did not honor Wintercap SA requests for withdrawals after these statements were created.  Donelan SJ Dec. ¶24.  The Remaining Wintercap SA Balance of $11,264,415 thus represents the amount of ill-gotten gains collectively received by the Entity Defendants.

112.    The proceeds of Wintercap SA's trading were often transferred between and among the 21 different bank accounts held by the Entity Defendants.  Donelan SJ Dec. ¶¶9, 13, 14-16; Ex. 7 at 4-6.

113.    The total Wintercap SA trading proceeds that flowed through the bank accounts of Silverton SA Inc., WB21 US Inc., WB21 NA Inc., and C Capital Corp. exceed the $11,264,415 Remaining Wintercap SA Balance.  Ex. 7 at 4-6.  The total Wintercap SA trading proceeds that flowed through the bank accounts of Wintercap SA Inc., and B2 Cap Inc. were less than the Remaining Wintercap SA Balance.  *Id.*

114.    For Wintercap SA Inc., the amount of funds flowing through its accounts that was directly or indirectly sourced from Wintercap SA's trading is $3,668,900 (the $2,808,900 in Ex. 7 plus $750,000 from the WB21 NA Inc. account at TD Bank and $110,000 from the Silverton SA Inc. account at Wells Fargo).  Donelan SJ Dec. ¶15.

115.    For B2 Cap Inc. the amount of funds flowing through its accounts that was directly or indirectly sourced from Wintercap SA's trading is $2,346,728 (the $1,496,728 in Ex. 7 plus $700,000 from the Wintercap SA Inc. account ending 9280 at TD Bank and $150,000 from the WB21 NA Inc. account ending in 5546 at Wells Fargo).  Donelan SJ Dec. ¶16.

**The Entity Defendants' Conduct Caused Harm to Investors**

116.    The Entity Defendants' conduct facilitated a securities fraud scheme that created substantial losses or the risk of substantial losses to the investors who purchased the shares that Wintercap SA sold for its control group clients.  Ex. 5, ¶¶27-34; Ex. 6, ¶¶31-50.  U.S. based retail investors spent millions of dollars to purchase shares during the Knox Defendants' dumps of shares for their control group clients, and they were left holding those shares, whose value declined when the promotions and dumps were over.  Ex. 5 ¶¶27-34.

117.    For example, Knox and Wintercap SA dumped the shares of Environmental Packaging Technology Inc. into the market during a promotional campaign.  Ex. 6, ¶¶32-35. Following that dump of shares, the market price of those securities substantially declined and investors suffered substantial losses.  *Id.*, ¶¶36-37, 46-47; Exs. 8-9.

118.    Investors who purchased shares during the time that Knox and Wintercap SA were dumping their control group clients' shares of Garmatex Holdings, Ltd. ("Garmatex") into the market, while those control persons were running a promotional campaign, also suffered substantial losses from the steep decline in the price of Garmatex shares after the promotion was over.  Ex. 6, ¶¶38-44, 48-50; Exs. 10-11.

February 22, 2022                Respectfully submitted,

                                 SECURITIES AND EXCHANGE COMMISSION

                                 By its attorneys,

                                 /s/ Kathleen Shields
                                 Kathleen Shields
                                 Nita Klunder
                                 33 Arch Street, 24th Floor
                                 Boston, MA 02110
                                 Telephone: (617) 573-8904 (Shields direct);
                                 (617) 573-8822 (Klunder direct)
                                 Fax: (617) 573-4590
                                 Email: shieldska@sec.gov; klunderni@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2022, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

                        /s/ Kathleen Shields
                        Kathleen Shields