UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>    Plaintiff,<br>v.<br>**ROGER KNOX, WINTERCAP SA, MICHAEL T. GASTAUER, WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP., WINTERCAP SA INC. AND B2 CAP INC.**<br>    Defendants.<br><br>**RAIMUND GASTAUER, SIMONE GASTAUER FOEHR, B21 LTD., SHAMAL INTERNATIONAL FZE, AND WB21 DMCC**<br>    Relief Defendants. | 1:18-CV-12058-RGS |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS WB21 US INC., SILVERTON SA INC., WB21 NA INC., C CAPITAL CORP., WINTERCAP SA INC., AND B2 CAP INC. AND RELIEF DEFENDANTS RAIMUND GASTAUER, B21 LTD. AND WB21 DMCC**

Plaintiff Securities and Exchange Commission (the "Commission") submits this reply brief in support of its motion for summary judgment on all of its claims against defendants WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc. (collectively, the "Entity Defendants"), and relief defendants Raimund Gastauer, B21 Ltd. and WB21 DMCC (collectively, the "Relief Defendants"). The only one of the Entity Defendants or Relief Defendants to challenge the requested relief is Raimund Gastauer, who elects not to contest the majority of the factual basis for the relief the Commission requests. Raimund Gastauer makes two arguments, neither of which create a material issue of fact that preclude summary judgment as to him.

1

First, Raimund Gastauer claims not to be the recipient of fraudulent proceeds that were used to purchase a London property because he claims that he transferred his interest in the entity that purchased that property before the purchase took place. This argument is misleading at best. Even if the Court were to credit the complex series of corporate maneuvers that Raimund Gastauer describes in his opposition brief by which he legally divested himself of ownership of the entity that purchased the London property, Raimund Gastauer nonetheless signed the lease for the London property on behalf of its corporate purchaser, represented himself to be the sole director of that corporation and thus exercised control over the London property. He was thus unjustly enriched because he used proceeds of fraud – from the bank accounts of defendant C Capital Corp. – to fund the purchase of the London property.

Second, Raimund Gastauer speculates that the C Capital Corp. money he used to purchase the London property may not be proceeds of fraud because it is theoretically possible that the funds belonged to Michael Gastauer, or other WB21 group clients, and not to Knox and his clients. When examined in detail, that argument is both unsupported and logically unsound. The $2.8 million that was used to purchase the London property, and the $500,000 that was sent directly to Raimund Gastauer's bank account from WB21 US Inc., are directly traceable to proceeds of Knox's fraud. The evidence shows that Michael Gastauer diverted that money to his father Raimund, and Raimund should thus be liable for it.

## ARGUMENT

A. **Raimund Gastauer Signed the Lease by Which GFT Investment Holdings SA Purchased the London Property and Represented that He Was its Sole Director and Shareholder.**

Raimund Gastauer's opposition proffers a newly-disclosed and misleading account of his involvement in the purchase of an apartment in London by GFT Investment Holdings SA ("GFT

2

Investment"). *See* Opposition Br. at 8-9; Gastauer's Rule 56.1 Statement of Facts ("Gastauer SOF") at ¶¶119-127; Exs. 104-110, 123. Raimund Gastauer claims that he is absolved of any responsibility for the transaction because, "by February 27, 2018. . . [he] had divested himself of his ownership and control of GFT Investment" by a series of corporate transactions. *See* Opposition Br. at 8-9; Gastauer SOF ¶¶122-126. Raimund Gastauer omits any mention of the facts that – throughout the transaction and its aftermath – he and Michael Gastauer represented that he was the sole owner and director of GFT Investment to both their counsel and the seller in the transaction, and he signed the purchase documents on behalf of GFT Investment as its sole director. *See* Commission's Response to Gastauer 56.1 Statement ("Reply SOF"), ¶¶133-139.

To put the significance of these facts in context, here is a chronology of the facts of the transaction by which GFT Investment purchased the leasehold known as Flat 2701, Dollar Bay Point, in London (the "Dollar Bay Property")[1]:

- On February 19, 2018, Michael Gastauer informed Grant Saw Solicitors LLP ("Grant Saw"), who assisted him with the transaction, that the buyer of the Dollar Bay Property would be GFT Investment. Reply SOF ¶132.
- On February 23, 2018 and February 27, 2018, C Capital Corp. wired a total of £1,989,270 from its account at Citibank to Grant Saw to pay for the Dollar Bay Property and related expenses. *See* Gastauer SOF ¶127; Ex. 124; Ex. 134.
- On February 27, 2018, Raimund Gastauer ceased to be the sole director of GFT Investment, and a Monaco company named GFO (MC) Investments became the sole director of GFT Investment. Ex. 110. At that time, Raimund Gastauer was the sole director of GFO (MC) Investments. Ex. 107. At that time, GFO (MC) Investments was circularly owned – 99% by GFT Investment and 1% by Raimund Gastauer. Ex. 108 at 1, 3-4 (article 6).

---

[1] As explained below, Raimund Gastauer failed to disclose some of these facts, and produce the documents showing them, when requested to do so in discovery. The first time the Commission heard about Raimund Gastauer's claim that he was not the sole director and shareholder of GFT Investment at the time of the Dollar Bay transaction, and saw any of Exhibits 104-110 and 123, was when he filed his pleadings opposing the Commission's summary judgment motion. While it would be appropriate to strike these exhibits, and to consider Raimund Gastauer's conduct in springing them on the Commission only when it served his purposes and prevented the Commission from taking further discovery on them, the Commission presently has no grounds to dispute their authenticity and therefore includes them in this chronology, but reserves the right to challenge them in the future should this litigation continue.

- On February 27, 2018, Raimund Gastauer transferred all of the shares of GFT Investment to GF Trust.  Ex. 105.  He has not disclosed who owns or controls GF Trust so the Court lacks information about who really owns GFT Investment.
- On March 2, 2018, Raimund Gastauer appointed Michael Gastauer as sole director of GFO (MC) Investments, resigned as the director of GFO (MC) Investments and transferred his share of that company to Michael Gastauer.  Exs. 104, 107, 108, 109.
- The leasehold for the Dollar Bay Property came into being on March 5, 2018.  Gastauer SOF ¶119; Ex. 111.
- On March 5, in response to Grant Saw's request, Michael Gastauer sent Grant Saw the register of directors and register of shareholders for GFT Investment.  Reply SOF ¶133; Ex. 127.  Grant Saw had informed him that these documents were necessary and important for the transaction.  Reply SOF ¶¶132, 134, 135.  Rather than tell Grant Saw about the transactions that happened on February 27, the documents Michael Gastauer sent disclosed Raimund Gastauer as the sole shareholder and sole director of GFT Investment.  Reply SOF ¶133; Ex. 127.  Grant Saw asked specific questions about Raimund Gastauer and his role.  Reply SOF ¶¶134-135; Ex. 128, 129.
- On March 14, 2018, Michael Gastauer assured Grant Saw that Raimund Gastauer was the sole shareholder of GFT Investment.  Reply SOF ¶135; Ex. 129.
- On March 22, 2018, Grant Saw assured the Dollar Bay sellers that the sale contract "is to be signed by the director Raimund Albrecht Erwin Gastauer in the presence of a witness."  Reply SOF ¶136; Ex. 130 at 6
- On March 23, 2018, in connection with the closing of the Dollar Bay Property transaction, Grant Saw confirmed to the Dollar Bay sellers that they "met with Michael and Raimund Gastauer yesterday and Raimund has signed a complete copy of the lease, plans and contract."  Reply SOF ¶137; Ex. 131 at 2.
- On March 23, 2018, GFT Investment and Raimund Gastauer used £1,800,000 that originated with C Capital Corp. to purchase the Dollar Bay Property.  Gastauer SOF ¶127.
- On April 9, 2018, Grant Saw informed Michael Gastauer that Raimund Gastauer would need to sign a new version of the Dollar Bay Property lease and sent him the lease prepared for Raimund Gastauer's signature as the director of the Lessee, GFT Investment.  Reply SOF ¶138; Ex. 132 at 1, 51.
- On April 24, 2018, Michael Gastauer inquired whether Grant Saw had received the agreement (which Grant Saw required to be signed by Raimund Gastauer) so that the property could be registered.  Reply SOF ¶139; Ex. 133 at 1.

1. **Raimund Gastauer's Discovery Violations Should Preclude the Court from Considering His Newly-Raised Defense.**

Raimund Gastauer's new theory of his defense, and documents to support that theory, were first presented in his opposition to the Commission's summary judgment motion made more than 17 months after the close of discovery in this case.  *See* Dkt. No. 182 (order setting fact discovery deadline of Sept. 30, 2020).  Raimund Gastauer did not disclose this theory in his

4

Answer to the Amended Complaint (*see* Dkt. No. 161 at p. 26-27); he did not disclose this theory or the documents supporting it in his Initial Disclosures under Fed. R. Civ. P. 26(a)(1) (*see* Ex. 135); he did not produce the documents supporting this theory in response to the Commission's document requests under Fed. R. Civ. P. 34 that specifically sought such documents (*see* Ex. 136);[2] and he did not disclose this theory in response to the Commission's interrogatories under Fed. R. Civ. P. 33 that specifically requested such information (*see* Ex. 137).[3] Raimund Gastauer's refusal to reveal this theory is particularly obstructive, given that his counsel was made expressly aware of that the Commission premised his liability on his role as the sole director and owner of GFT Investment before he signed his interrogatory responses. *See* Ex. 138.

Under Fed. R. Civ. P. 37(c)(1), if a party fails to provide information as required by Rule 26(a) (relating to initial disclosures) or 26(e) (relating to need to supplement document and interrogatory responses), "the party is not allowed to use that information [] to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "This sanction is 'self-executing' and 'automatic' so that parties are strongly motivated to comply with the rules." *SEC v. Hemp, Inc.*, No. 16-cv-1413, 2020 WL 9160824, *1 (D. Nev. Mar. 31, 2020) (affirming magistrate judge decision to exclude late-produced loan documents). Raimund Gastauer's late production of these documents is neither substantially justified nor harmless. These documents form half of his brand-new defense to the

---

[2] Three of the Commission's document requests specifically sought the documents Raimund Gastauer produced now: No. 8 ("All documents relating to any corporate entity, trust, partnership, or limited liability company in which Raimund Gastauer has held an ownership interest, has served as an officer or director, or has been a beneficial owner, during the Relevant Period."); No. 11 ("All documents that Relief Defendant contends support any defense he intends to present at any stage of the proceedings in this case."); and No. 13 ("All Documents Relief Defendant seeks to introduce into evidence at trial or at any stage of the proceedings in this case."). Ex. 136.
[3] The Commission asked Raimund Gastauer to identify details about monetary transfers he received from any of the Entity Defendant, Michael Gastauer, or certain other Relief Defendants during the Relevant Period (No. 1) and any value he provided in exchange for those transfers (No. 3). Ex. 137.

Commission's claim against him, which he hid from the Commission during the discovery period. He has effectively precluded the Commission from taking any discovery at all on this late-asserted defense, on the authenticity of the documents or on the circumstances surrounding the corporate transactions that he claims get him off the hook. Not only did these documents come as a complete surprise to the Commission, which had explained its claims in detail to Raimund Gastauer's counsel over two years ago, they cause significant prejudice to the Commission given that discovery has been closed for over 17 months, and it will be unable to get discovery about these transactions from Michael Gastauer, who Raimund Gastauer asserts is the owner of the Dollar Bay Property and who Raimund Gastauer knows has defaulted in this case. *See Mekonnen v. OTG Mgm't, LLC*, 394 F. Supp. 3d 134, 144-45 (D. Mass. 2019) (striking late produced summary judgment exhibits); *Miceli v. JetBlue Airways Corp.*, No. 16-cv-12032-RGS, 2018 WL 1524539, at *4 n.4 (D. Mass. Mar. 28, 2018) (striking statements in party's affidavit), *aff'd*, 914 F.3d 73 (1st Cir. 2019). This entire sequence of events appears designed to point the finger at someone from whom the Commission cannot obtain discovery. Seeking to use these new records now as both a sword and a shield results in significant prejudice to the Commission

> **2. Even if the Court Considers Raimund Gastauer's New Defense, He Demonstrated Control Over GFT Investment by Consummating the Dollar Bay Transaction on its Behalf.**

Raimund Gastauer's new defense, that he had no legal authority to control GFT Investment after "February 27, 2018" is both inaccurate and does not create a genuine dispute of material fact that precludes summary judgment. Ex. 106, ¶6. First, even Raimund Gastauer's own documents show that the earliest he could be considered to have ceased his legal authority over GFT Investment was March 2, 2018, the date when he relinquished control and ownership

6

of GFO (MC) Investments, the company that became the sole director of GFT Investment. *See* Exs. 104, 107-109. Raimund Gastauer thus legally controlled GFT Investment at the time Grant Saw received money on its behalf to purchase the Dollar Bay Property. Exs. 81, 124.

Further, even though he may not have had the legal right to act on behalf of GFT Investment after March 2, 2018, he did so anyway. By traveling to London to participate in the closing for the Dollar Bay Property, signing all of the transactional documents while purporting to be the sole director of GFT Investment, and even later, signing a newer version of the lease that was required by the seller and was necessary to register the property, Raimund Gastauer exercised control over GFT Investments and the purchase of the Dollar Bay Property. *See* Reply SOF ¶¶137-139. His signatures on those documents were necessary to close the transaction and to permit Grant Saw to release the £1,800,000 that originated with C Capital Corp. to purchase the Dollar Bay Property. Raimund Gastauer's own actions compel the conclusion that he is a proper relief defendant, and should be liable for the funds he controlled and used to purchase the Dollar Bay Property.

**B.   The Funds that Flowed To Raimund Gastauer Were the Proceeds of the Knox Defendants' Fraud.**

It is not disputed, from a pure tracing analysis, that the funds that C Capital Corp. sent to Grant Saw to purchase the London apartment were proceeds of Knox's fraud. *See* Exs. 81, 124; Gastauer SOF ¶¶79, 82, 83 (disputing these paragraphs solely based on the netting argument addressed below). It is similarly undisputed, from a tracing analysis, that the $500,000 that WB21 US Inc. sent to Raimund Gastauer's personal bank account was proceeds of Knox's fraud. *See* Ex. 80 at 1-2 (identifying Raimund Gastauer's personal account at VR-Bank Mittlefranken West EG as the recipient of a $500,000 wire from WB21 US Inc.); Dkt. No. 235 at Ex. 80

7

(identifying Citibank as source of Ex. 80); Gastauer SOF ¶¶36 (disputing assertion based solely on the netting argument addressed below).

Raimund Gastauer's second argument claims, however, that C Capital Corp. and WB21 US Inc. – from whom he received payments – were entitled to use funds originating from Knox's fraudulent trading because they are part of a network of companies called the WB21 Group that hypothetically could have paid out an equivalent amount of funds to Knox from some other WB21 Group company and were thus entitled to use Knox's funds for their own benefit. *See* Opposition Br. at 2-7; Gastauer SOF at ¶¶4, 36. While this hypothesis has the veneer of an argument worth exploring, it is not supported by any actual evidence.

Much of Raimund Gastauer's opposition is spent analogizing the WB21 Group to PayPal and explaining banking concepts like "netting" of transfers between different depositors' accounts. *See* Opposition Br. at 3-5; Gastauer SOF at ¶36. Even if the Commission accepts as true the premise that the WB21 Group generically functioned like PayPal for purposes of resolving this summary judgment motion, and that the WB21 Group in theory could net some customers' transactions against others, it does not mean that the funds directly at issue here belonged to the WB21 Group rather than Knox and his clients.

Raimund Gastauer has not produced a single piece of evidence to show that funds in the C Capital or WB21 US Inc. accounts that were paid to him directly or to purchase the London apartment had actually been offset by funds paid to Knox or his clients from some other account in another jurisdiction. His precise language is instructive; he claims that:

> **If** Wintercap SA added $100,000 of illegal trading proceeds to its WB21 account and directed WB21 to transfer an equivalent amount of euros to a control person in Europe, WB21 Pte. **might** deposit the $100,000 into a Wintercap SA Inc. bank account and **then withdraw the euros from a different WB21-owned bank account in Europe in order to complete the transfer**. At that point, the $100,000 in the Wintercap SA Inc. bank account no longer belonged to Wintercap

8

> SA, and it no longer represented illegal trading proceeds; the $100,000 dollars were now a WB21 Pte. asset that could be used to complete transfers on behalf of other WB21 users, and the illegal trading proceeds (now in the form of euros) were in the hands of the control person.

Gastauer SOF ¶36 at p. 24 (emphasis added). While Raimund Gastauer supposes that this kind of transaction **might** have happened, there is no evidence that it actually did when applied to the accounts at issue here.

All of the actual evidence suggests that such "netting" transactions did not occur. In reality, when WB21 Group entities made payments to Knox or his clients in currencies other than U.S. Dollars, they most often did so from the Entity Defendants' United States bank accounts (or accounts that had been funded from those accounts). *See* Reply SOF, ¶141. For example, Citibank, which held the C Capital accounts that were used to make the payments for the Dollar Bay Property, paid those funds from a U.S. Dollar-denominated bank account in British pounds. *See* Exs. 81, 124, 134. This was a common occurrence in the Citibank account. Wire detail records produced by Citibank show that Citibank accounts in the names of Entity Defendants WB21 US Inc., C Capital Corp. and B2 Cap Inc. made the following payments by sending wires denominated in foreign currency out of U.S. Dollar-denominated bank accounts:

| Wires Sent from Entity Defendants' Citibank Accounts from 5/4/2016 to 3/30/2018 | | | |
|---|---|---|---|
| **Foreign Currency** | **Number of Wires Sent** | **US Dollar Equivalent Total** | **From Accounts Held By:** |
| AUD - Australian Dollars | 2 | $8,386.67 | WB21 US Inc. |
| CAD - Canadian Dollars | 119 | $10,157,253.82 | WB21 US Inc., C Capital Corp., B2 Cap Inc. |
| CHF - Swiss Francs | 12 | $1,145,343.84 | WB21 US Inc., C Capital Corp. |
| EUR – Euros | 54 | $3,933,342.88 | WB21 US Inc., C Capital Corp., B2 Cap Inc. |
| GBP – British Pounds | 23 | $3,612,328.24 | WB21 US Inc., C Capital Corp., B2 Cap Inc. |
| HKD – Hong Kong Dollars | 2 | $10,241.90 | WB21 US Inc., C Capital Corp. |

| | | | |
|---|---|---|---|
| JPY – Japanese Yen | 8 | $416,832.85 | WB21 US Inc. |
| SGD – Singapore Dollars | 3 | $127,962.86 | WB21 US Inc., B2 Cap Inc. |
| Totals: | 223 | $19,415,429.56 | |

Reply SOF, ¶142. Moreover, when the Commission analyzed the payments made on to or for the benefit of Knox and his clients, it did not observe payments being made out of accounts into which Knox's trading proceeds were not deposited directly or indirectly. *See id.*, ¶¶4-7. That is, there is no evidentiary support for Raimund Gastauer's supposition that payments requested by Knox and his clients were made out of some unknown other WB21 account such that Raimund Gastauer could then assert an entitlement to the dollars in the Entity Defendants' bank accounts as "replacements" for some unidentified funds WB21 sent from other accounts. There is also no support for Raimund Gastauer's argument that WB21 Group entities were forced to rely on foreign accounts to be able to transact for Knox and his clients in foreign currencies. Summary judgment is the "put up or shut up moment in litigation." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013). Raimund Gastauer has not "put up" evidence to support his claim that the funds he received from the C Capital Corp. and WB21 US Inc. accounts were not proceeds of fraud.

The closest Raimund Gastauer comes to supporting his hypothetical netting argument with evidence is proffering an affidavit from legal counsel for the WB21 Group entities who makes the hearsay assertion that another WB21 Group employee did an analysis that is not attached. *See* Gastauer SOF, ¶36 (citing Ex. 118, Declaration of WB21 Legal Counsel). Even if the Court were to credit that hearsay analysis (which it should not on summary judgment),[4] it

---

[4] The Commission objects to this affidavit pursuant to Fed. R. Civ. Proc. 56(c)(2) because the affidavit is clearly grounded in hearsay and, therefore, inadmissible. In essence, the affidavit contains statements about what one person (the affiant) believes other people said or did, without any foundation to support that the affiant is actually competent to testify—that is, as a percipient witness who is basing testimony on his own observations or actions—

does not contradict the evidence proffered by the Commission. *See* Ex. 118, ¶¶5-6. All the scantily-described analysis says is that outgoing transfers from Entity Defendant Wintercap SA Inc. accounts included over $10 million in Canadian dollar transactions and several million in Euro transactions. *See id.* (failing to specify which specific accounts were analyzed so it is impossible to rebut in detail). As demonstrated above, the fact that the Entity Defendants' United States banks allowed them to send outgoing payments in currencies other than United States dollars rebuts, rather than supports, Raimund Gastauer's argument that the dollars in those U.S. accounts became the property of the WB21 Group by some hypothetical netting process.

In sum, Raimund Gastauer raises a hypothetical possibility that is disproved by the available evidence. There is no evidence in the record to demonstrate that WB21 Group accounts other than those to which Knox's illegal trading proceeds were transferred were ever used to make payments at the request of Knox and his clients. He thus has failed to create a genuine issue of material fact that prevents summary judgment in the Commission's favor. His arguments are no more than the "conclusory allegations, improbable inferences and unsupported speculation" that do not defeat summary judgment. *Johnson v. Johnson,* 23 F.4th 136, 141 (1st Cir. 2022) (citations omitted); *see also Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (to avoid summary judgment, nonmovant must produce "sufficiently probative" evidence and "[a]n inquiring court is not obligated either 'to draw unreasonable inferences or credit bald assertions [or] empty conclusions'").

---

about the matters set forth therein. Instead, the affidavit is based on what one person said to another. That is classic hearsay. As Fed. R. Evid. 801 makes clear, out of court statements offered for the truth of the matters asserted therein are inadmissible. Therefore, it should not be considered here. *See* Fed. R. Civ. Proc. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and who that the affiant or declarant is competent to testify on the matters stated").

11

Next, Raimund Gastauer asks the Court to make an illogical leap from the facts. The parties agree that WB21 Pte. has records showing that it still owes $11,264,415 to Knox and Wintercap, as the result of the WB21 entities refusing to turn those funds over to Knox and Wintercap in the summer of 2018. *See* Opposition Br. at 7; Gastauer SOF at ¶¶109-111. Raimund Gastauer, however, asks the court to draw the unwarranted inference that Michael Gastauer and he did not divert money from Knox and his clients for their own purposes – to buy an apartment in London and to give Raimund $500,000 - when the evidence clearly shows that they did, simply because those transfers are not recorded in the WB21 Pte. account ledgers for Knox and his clients. *See* Opposition Br. at 7-8. Of course the transfers are not recorded in the statements. Michael Gastauer would not advertise to Knox and his clients that he was misappropriating their funds. Instead, Michael Gastauer did precisely that – as the wires to Raimund Gastauer and to buy the London apartment show – and then refused to pay any of what he owed Knox and Wintercap in 2018, claiming that WB21 suddenly began to have concerns about the legality of some of the transactions that it was processing for Knox and Wintercap (after having no such qualms for over two years). *See* Exs. 82-85, 119, 120.

Raimund Gastauer's contention elevates argument over evidence. He has produced not a scintilla of evidence demonstrating that WB21 Pte. has Knox and Wintercap's money in accounts in its name. He has not detailed where that money is, in what bank it is held, or provided any documentation showing it has not been spent. Instead, Raimund Gastauer claims that the WB21 Pte. account statements that record amounts OWED, do far more than that and show money POSSESSED. Countless cases of securities fraud turn on precisely this distinction and account statements prepared by custodians of assets do not necessarily reflect the presence of those assets. *See, e.g., SEC v. Fife*, 311 F.3d 1, 6 (1st Cir. 2002) (upholding grant of preliminary

injunction where defendants misappropriated investor funds and provided forged account statements to investors); *SEC v. Constantin*, 939 F. Supp. 2d 288, 307–08 (S.D.N.Y. 2013) (granting summary judgment for Commission where defendants misappropriated client funds and prepared false account statements to conceal their theft).

There is no justification for the Court to make this leap when the uncontroverted evidence shows that funds originating from Knox's fraud were used to purchase an apartment and were sent to Raimund Gastauer's personal bank account. Such arguments by Raimund Gastauer, without supporting evidence, do not create a material dispute of fact that precludes summary judgment. Gastauer's assertions, without any evidence to back them up, are "without probative force" and should not forestall summary judgment. *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 397-98 (1st Cir. 2012) (rejecting plaintiff's supposition that something on the floor must have caused him to fall as "woven entirely out of gossamer strands of speculation and surmise" and "drawn from an empty record"). Instead, Gastauer was obligated – but failed – to produce "definite, competent evidence" of a "sufficiently probative" nature that if credited, could support a factfinder's resolution in his favor. *Murray v. Kindred Nursing Centers West LLC*, 789 F.3d 20, 25 (1st Cir. 2015). "The mere existence of a scintilla of evidence" to support Gastauer's position does not avoid summary judgment. *Id.*

**C.     Raimund Gastauer Is A Proper Relief Defendant and the Court Should Enter Summary Judgment Against Him.**

Raimund Gastauer concedes that a proper relief defendant is someone who possessed or controlled the distribution of illegally obtained funds and has no rightful claim to those funds. *See* Opposition Br. at 9. His sole arguments for why he does not qualify as a proper relief defendant, however, are limited to 1) his contention that he "does not have, and has never had, custody, possession or control of the Dollar Point Bay Property or the money used to buy it" and

13

2) his claim, disposed of above, that the money transferred to purchase the property was no longer the proceeds of fraud simply because it was not accounted for as such in the ledgers of WB21 Pte. *See id.* at 9-10. As to his first contention, he absolutely controlled the purchase of the Dollar Bay Property and the money used to buy it when he acted as the director of GFT Investment (regardless of his legal right to do so) to sign the transactional documents and use and dissipate the money that had been sent to Grant Saw to complete the purchase. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) (relief defendant is "liable for the funds he or she dissipated as well as the funds he or she retained"). As to his second contention, the evidence, when stripped of his unsupported hypotheses and unwarranted inferences, demonstrates that he received the proceeds of the Knox Defendants' fraud, both in the form of money used to purchase the London apartment and a transfer to his personal bank account. *See* Exs. 80, 81, 124; Commission's Rule 56.1 Statement of Facts, Dkt. No. 232 ("SEC SOF"), ¶¶28, 36, 38-40, 79, 82-83. Raimund Gastauer has made no assertion that he provided value in exchange for these payments. *See* SEC SOF ¶108; *see generally* Opposition Br.

Claims against relief defendants sound in equity. *See SEC v. China Energy Savings Tech. Inc.*, 636 F. Supp. 2d 199, 204 (E.D.N.Y. 2009) (granting summary judgment against relief defendants that functioned as nominees). Finding Raimund Gastauer liable as a relief defendant is equitable. He facilitated the purchase and use of proceeds of fraud to buy the Dollar Bay Property even if lacked the contemporaneous legal authority to do so, and misrepresented his role to the counsel and seller in that transaction. In that way, he essentially acted as Michael Gastauer's nominee. Raimund Gastauer also received another $500,000 into his personal account that was proceeds of fraud. It is equitable for him to be found responsible for helping Michael Gastauer dissipate the assets that were proceeds of the Knox Defendants fraud and

should be available to compensate harmed investors. The Court should find Raimund Gastauer liable as a matter of law for the $3,315,305 he improperly received and used.

## Conclusion

For the reasons set forth above and in the Commission's opening brief and supporting materials, the Commission respectfully requests that the Court grant it summary judgment against defendants WB21 US Inc., Silverton SA Inc., WB21 NA Inc., C Capital Corp., Wintercap SA Inc., and B2 Cap Inc., and relief defendants Raimund Gastauer, B21 Ltd. and WB21 DMCC, and enter judgments against them in the forms submitted by the Commission.

Respectfully submitted,

April 15, 2022                              SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/ Kathleen Shields
Kathleen Shields
Eric Forni
Nita Klunder
33 Arch Street, 24th Floor
Boston, MA 02110
Telephone: (617) 573-8904 (Shields direct);
(617) 573-8822 (Klunder direct)
Fax: (617) 573-4590
Email: shieldska@sec.gov; Klunderni@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2022, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

/s/ Kathleen Shields
Kathleen Shields